## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| Oscar Sanchez, Marcus White, Tesmond McDonald, Marcelo Perez, Roger Morrison, Keith Baker, Paul Wright, Terry McNickels, and Jose Munoz; *on their own and on behalf of a class of similarly situated persons*; | Civil Action No. 3:20-cv-00832-E-BH <br><br> **Memorandum in Support of Motion for Class Certification** |
| *Petitioners/Plaintiffs*, <br><br> v. <br><br> DALLAS COUNTY SHERIFF MARIAN BROWN, *in her official capacity*; DALLAS COUNTY, TEXAS; <br><br> *Respondents/Defendants* | |

## <u>MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>

Plaintiffs Oscar Sanchez, Marcus White, Tesmond McDonald, Marcelo Perez, Roger Morrison, Keith Baker, Paul Wright, Terry McNickels, and Jose Munoz hereby move this Court to certify this case as a class cation under Federal Rules of Civil Procedure 23(a) and 23(b)(2).

## I.     INTRODUCTION

This case is about Defendants' failure to act to protect the lives of people detained in the Dallas County Jail from novel coronavirus and its resulting disease, COVID-19. Defendants have failed to respond to the urgent threat posed to people confined in the jail by this growing pandemic, making it impossible for these individuals to observe the precautionary steps necessary to keep themselves safe, such as social distancing, increased personal hygiene, sanitizing one's environment, access to testing, and wearing protective clothing. Defendants' disregard of the known risks of illness and death exposes jail detainees to a highly fatal, infectious disease in violation of their rights under the Eighth and Fourteenth Amendments. Named Plaintiffs challenge

these unconstitutional conditions and now move for class certification under Federal Rules of Civil Procedure 23(a) and 23(b)(2). Named Plaintiffs also move for appointment of the undersigned as class counsel under Rule 23(g).

## II.     CLASS DEFINITION

Plaintiffs propose the following classes and sub-classes:

1. "Pre-Adjudication Class": All current and future detainees in pretrial custody at the Dallas County Jail, including alleged violations of probation or parole, at the Jail;

    a. "Medically-Vulnerable Pre-Adjudication Subclass": All persons who are in pretrial custody at the Dallas County Jail, including alleged violations of probation or parole, and who, by reason of age or medical condition, meet the CDC criteria for being as particularly vulnerable to injury or death if they were to contract COVID-19. A person shall be deemed "Medically-Vulnerable" if the person is over the age of 50, and/or has or experiences (a) lung disease, including asthma, chronic obstructive pulmonary disease (e.g. bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure and coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders (including sickle cell disease); (i) inherited metabolic disorders; (j) history of stroke; (k) a developmental disability; and/or (l) a current or recent (within the last two weeks) pregnancy;

2. "Post-Adjudication Class": All current and future detainees in post-adjudication custody at the Dallas County Jail, including those serving a term of incarceration pursuant to an adjudicated violation of probation or parole;

    a. "Medically-Vulnerable Post-Adjudication Subclass": All current and future detainees in post-adjudication custody at the Dallas County Jail, including those serving a term of incarceration pursuant to an adjudicated violation of probation or parole. A person shall be deemed "Medically-Vulnerable" if the person is over the age of 50, and/or has or experiences (a) lung disease, including asthma, chronic obstructive pulmonary disease (e.g. bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure and coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders (including sickle cell disease); (i) inherited metabolic disorders; (j) history of stroke; (k) a developmental disability; and/or (l) a current or recent (within the last two weeks) pregnancy.

## III.   STATEMENT OF FACTS

### A. Plaintiffs'/Petitioners Challenge Defendants' Inadequate Policies and Practices to Combat the COVID-19 Virus which Places all Putative Class Members at Serious Risk in Violation of the Constitution.

Texas and the nation are in the midst of the most significant global pandemic in generations.[1] COVID-19 is a highly contagious and deadly respiratory disease caused by a novel

---

[1] John M. Barry, *The Single Most Important Lesson from the 1918 Influenza*, New York Times (March 17, 2020), https://cutt.ly/PtQ5uAZ (Opinion piece by author of "The Great Influenza: The

coronavirus (SARS-CoV-2). No one is safe. The lethality rate of COVID-19 is estimated to be between one and six percent: several times more than the common flu that kills thousands a year.[2] All age groups including some children have contracted the disease,[3] and the World Health Organization estimates that one in five people who contract the disease require hospitalization.[4]

On March 13, 2020, the President declared a national state of emergency.[5] As of April 7, 2020, confirmed cases of COVID-19 in the United States were more than double the number in any other country.[6] On the same day, Illinois, Louisiana, New Jersey, New York reported their highest daily death tolls from COVID-19.[7] As of April 7, 2020, the Texas Health and Human Services reported 8,262 COVID-19 cases and 154 deaths from the disease state-wide,[8] and Dallas

Story of the Deadliest Pandemic in History," noting comparison between current COVID-19 outbreak and the 1918 influenza outbreak widely considered one of the worst pandemics in history).

[2] As of April 7, 2020, there were 1,428,428 confirmed cases globally, with 82,020 deaths and 300,198 recoveries. Johns Hopkins University of Medicine, *Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering at Johns Hopkins University*, https://cutt.ly/StEyn2U; *see also* "Coronavirus disease 2019 (COVID-19)", UpToDate, https://cutt.ly/GtJYSkj (as of April 4, 2020, estimated overall fatality rate of 2.3 percent globally).

[3] Robert Verity, PhD., et al., *Estimates of the Severity of Coronavirus Disease 2019: A Model-Based Analysis*, Lancet Infec Dis (March 30, 2020), 6.

[4] World Health Organization, *Q&A on Coronaviruses (COVID-19)*, *"Should I Worry About COVID-19?*," https://cutt.ly/YtEyrxl.

[5] Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, (March 13, 2020), https://cutt.ly/EtJLZQZ.

[6] Jennifer Calfas, Chong Koh Ping, and Drew Hinshaw, *Global Coronavirus Death Toll Passes 81,000 as Some Lockdowns Tighten*, The Wall Street Journal (Apr. 7, 2020), https://cutt.ly/ztJLM0q.

[7] Johns Hopkins University, Coronavirus Resource Center, *available at* https://coronavirus.jhu.edu/map.html; *see also* Brittany Shammas, et al., *Trump says Quarantine for New York Area "Will not be Necessary;" U.S. Coronavirus-related Deaths Double in Two Days*, Wash. Post (March 28, 2020, 11:27 p.m.), https://cutt.ly/ktRo8u0.

[8] Texas Health and Human Services, Texas Case Counts COVID-19, (Apr. 7, 2020), https://cutt.ly/rtJL7NJ.

4

County Health and Human Services reported 1,261 COVID-19 cases with 19 deaths.[9] The Dallas County Jail accounted for 23—almost two percent—of the COVID-19 cases in Dallas County.[10] On April 5, 2020, approximately 25 percent of all new confirmed COVID-19 cases in Dallas County were in the Dallas County Jail.[11]

There is no vaccine or cure for COVID-19. The best course according to public health experts is to slow and prevent transmission, primarily through a practice known as "social distancing."[12] Social distancing requires everyone to stay at least six feet away from all other people to control the spread of the virus. This measure is particularly important because the virus spreads aggressively, and people can infect others even if they do not feel sick or exhibit any symptoms.[13] The only effective way to curb the pandemic is through dramatically reducing contact for all.[14] Consequently, every American institution—from schools[15] to places of worship,[16] from

---

[9] Dallas County Health and Human Services, 2019 Novel Coronavirus (COVID-19) Summary at 1, (Apr. 7, 2020), https://cutt.ly/ztJZwXa.

[10] *Id.* Table 4.

[11] *COVID-19 Live Updates*, KERA News (quoting Director of Dallas County Health and Human Services on April 5, 2020 as saying "the jail has 24 cases, which includes 22 inmates and two detention officers," presenting approximately 25% of all new cases in Dallas County that day), https://cutt.ly/itJSsiy.

[12] World Health Organization, *Coronavirus*, https://cutt.ly/ztWyf7e ("At this time, there are no specific vaccines or treatments for COVID-19."); *Dawson v. Asher*, 20-cv-409 (W.D. Wash.) at Doc. No. 4, Declaration of Dr. Robert B. Greifinger, MD, ¶ 8 ("Social distancing and hand hygiene are the only known ways to prevent the rapid spread of COVID-19.").

[13] Center for Disease Control, *How Coronavirus Spreads*, https://cutt.ly/CtYRkkC.

[14] Harry Stevens, *Why Outbreaks Like Coronavirus Spread Exponentially, and how to "Flatten the Curve,"* Wash. Post. (March 14, 2020), https://cutt.ly/etYRnkz.

[15] Centers for Disease Control, *Interim Guidance for Administrators of US K-12 Schools and Child Care Programs*, https://cutt.ly/ItRPq5n.

[16] Centers for Disease Control, *Interim Guidance for Administrators and Leaders of Community-and Faith-Based Organizations to Plan, Prepare, and Respond to Coronavirus Disease 2019 (COVID-19)*, https://cutt.ly/KtRPk1k.

businesses[17] to legislatures[18]—has been exhorted to reduce the number of people in close quarters, if not empty entirely. They have also been told to undertake aggressive sanitation measures, such as cleaning and disinfecting all surfaces for exacting periods of time with products with particular alcohol contents, and closing off any areas used by a sick person.[19] These imperatives apply with special force to jails, where the government controls almost entirely a person's ability to avoid others and to maintain adequate sanitation.

The impact of COVID-19 on the Dallas County Jail is dire and a clear public health emergency.  In just a week's time the number of people infected by COVID-19 in the jail jumped from 5 infections of detainees and Jail employees to almost 30 as of April 7, 2020,[20] Yet the Defendants have failed to implement adequate policies and practices to combat the virus and prevent unacceptable risk of contracting the disease for the entire putative class, including medically vulnerable prisoners and detainees and the entire jail population.  Because of the Defendants' failed policies and practices no one can protect themselves adequately from the disease in the Dallas County Jail and preventable deaths will occur.  These enormous harms and

---

[17] Centers for Disease Control, *Interim Guidance for Businesses and Employers to Plan and Respond to Coronavirus Disease 2019 (COVID-19)*, https://cutt.ly/stRPvg4.

[18] Nat'l Conf. of State Legislatures, *Coronavirus and State Legislatures in the News*, https://cutt.ly/4tRPQne.a

[19] Centers for Disease Control, *Cleaning and Disinfecting Your Facility*, https://cutt.ly/atYE7F9.

[20] Dallas County Health and Human Services, 2019 Novel Coronavirus (COVID-19) Table 4, (Apr. 7, 2020),  https://cutt.ly/QtJZbmS; Editorial, *COVID-19 spreads with close contact, so what do we do about those in jail?*, The Dallas Morning News (Apr. 5, 2020), https://cutt.ly/8tJOi67 ("At the time of this writing, 20 inmates had tested positive for the virus, along with six detention officers and one deputy."); Ashley Paredez, *Confirmed COVID-19 cases at Dallas County Jail now up to 28*, Fox 4 (April 4, 2020), https://cutt.ly/0tJSenr ("The number of coronavirus cases at the Dallas County jail has increased from five cases last week, to now a total of 28," and "six [of those testing positive] are detention officers and two are clerks"); COVID-19 Live Updates, KERA News, *supra* note 11 (quoting Director of Dallas County Health and Human Services on April 5, 2020 as saying "the jail has 24 cases, which includes 22 inmates and two detention officers").

risks are a direct result of Defendants' failure to implement adequate policies and practices to address the virus through prevention and treatment -- despite the ubiquity of clear guidance on how to combat the virus, the Texas Governor's order requiring people to "minimize in-person contact with people who are not in the same household",[21] the stay at home order issued by the County Judge of Dallas County,[22] and City of Dallas regulations implementing the Texas and Dallas County orders.[23]   Through its policies and practices the Dallas County Jail has failed to provide critical safeguards to prevent the spread of COVID-19, including:

- failure to release medically vulnerable individuals despite the known lethal risks of COVID-19 for these individuals and the need to lower the jail population to allow for greater social distancing; Compl. ¶¶ 59-64; Declaration of Dr. Robert Cohen, 4/9/20 ¶¶ 30–31 (Doc. 3-2).

- a lack of COVID-19 testing for detainees at intake, during detention, or upon release, Compl. ¶51; Cohen Dec. ¶¶ 33, 35.

- failure to begin "checking the temperatures of employees assigned to the jail" or asking detainees during the intake process "a set of preliminary questions recommended by Dallas County's healthcare partners" until March 27, 2020.[24]

- a shortage of Jail employees to report for work; Compl. ¶ 62; Cohen Dec. ¶ 23.

- routine use by Jail employees of single-use disposable surgical masks for a week or more; Compl. ¶¶ 6, 54; Cohen Dec. ¶ 38.

- failure to educate detainees about the virus and prevention methods; Compl. ¶ 53; Cohen Dec. ¶¶ 40–41.

---

[21]  Office of the Tex. Gov., Press Release: *Governor Abbott Issues Executive Order Implementing Essential Services and Activities Protocols* (March 31, 2020), https://cutt.ly/stJUKfc.

[22]  *See* Amended "Safer at Home" Order, (Apr. 6, 2020), https://cutt.ly/otJIl2m.

[23]  *See* Shelter in Place: Stay Home Stay Safe, City of Dallas, https://cutt.ly/TtJIvcg.

[24]  Dallas County Sheriff's Office, "COVID-19 Initiatives," (March 27, 2020), https://cutt.ly/NtJO7zY; *see also* Cohen Dec. at ¶¶ 12, 15, 29.

- failure to institute appropriate social distancing practices, including in dorm bunk arrangements, waiting lines, staff gatherings, and meals; Compl. ¶¶ 49-50; Cohen Dec. ¶ 45.

- failure to segregate detainees with symptoms and illness from other detainees and guards; Compl. ¶ 52; Cohen Dec. ¶¶ 20–21, 24.

- failure to provide staff with adequate personal protective equipment and to require the use and regular replacement of such equipment; Compl. ¶ 54; Cohen Dec. ¶¶ 27, 38.

- failure to provide detainees with adequate PPE; Compl. ¶ 55; Cohen Dec. ¶¶ 27, 38.

- failure to ensure sufficient stocks of hygiene and cleaning supplies and to provide detainees with no-cost access to these supplies. Compl. ¶¶ 56-57; Cohen Dec. ¶¶ 27, 39–40.

These unified policies and practices apply to all members of the putative class and sub-classes and put all of them at risk of serious harm and even death.

The failure of Dallas County Jail to prevent and mitigate the spread of COVID-19 endangers not only all those within the institution, but the entire community. *See* Declaration of Dr. Eric Lofgren, Ph.D., 4/9/20 ¶¶ 22–28 (Doc. 3-1) (discussing increased infections, hospitalizations, and deaths among incarcerated persons, jail staff, and broader community if sufficient measures not taken at the jail). Hence, swift release of the most vulnerable to the disease and implementation of public health and education protocols in the jail, are the only mitigation efforts that the Dallas County Jail can undertake to comport with public health guidance and to prevent a catastrophic outbreak at the facility that will also endanger the community at large. Lofgren Dec. ¶¶ 29–31; Cohen Dec. ¶¶ 30–32.

## B. The Petitioner/Plaintiffs

The Petitioners/Plaintiffs are:

8

Petitioner Oscar Sanchez is detained in the Dallas County Lew Sterrett Jail West Tower. He is a 28-year-old man. He has a history of severe chronic asthma and has begun to show symptoms that are consistent with COVID-19. He has been incarcerated since March 10, 2020 and is being held pretrial on multiple charges, some of which are indicted, some of which are not. His cases are not currently set for trial. His next court date is April 28, 2020 for an announcement setting. He is presumptively innocent of all charges.  Compl. ¶ 13.

Petitioner Marcus White is a 37-year-old man who booked into the Dallas County Jail on November 27, 2019 and is held on $111,000 bond for multiple charges, mostly drug-related. He suffers from hypertension, for which he takes medication in the jail, as well as a serious seizure disorder for which he has not received his medication in the jail. Mr. White contracted and tested positive for COVID-19 in the jail and is being held on the 9th floor of the Dallas County Lew Sterrett West Tower Jail. He is presumptively innocent of all charges. Compl. ¶ 14.

Petitioner Tesmond McDonald is a 32-year-old man with asthma and high blood pressure who is being held (since September 27, 2019) in the Dallas County Jail, currently in the Lew Sterrett West Tower Jail 9th floor. He is being held pretrial for three Dallas County charges of aggravated robbery, possession with intent to deliver drugs, and evading arrest. Mr. McDonald contracted COVID-19 inside the jail and learned on April 3 that he tested positive for the virus. **His condition is very serious and he may require immediate medical attention.** He is presumptively innocent of all charges. Compl. ¶ 15.

Petitioner Marcelo Perez is a 43-year-old man who has been held in the Dallas County Jail since January 7, 2020 on an allegation that he violated probation by committing a new drug offense. Mr. Perez is medically vulnerable in that he has hypertension and diabetes. He has been

denied the ability to maintain social distancing, proper hygiene, and he is exposed continuously to people who show symptoms consistent with COVID-19.  Compl. ¶ 16

Petitioner Roger Morrison is a 49-year-old man, medically vulnerable to COVID-19 because of his pre-existing conditions of high blood pressure, hepatitis C, and cirrhosis of the liver among other issues. He was booked in on March 9, 2020 and is being held on drug possession and evading arrest charges in the Dallas County Jail South (Kays) Tower C3 medical pod. He has been unable to protect himself within the jail from exposure to other inmates and guards who have potentially been exposed to COVID-19. He has begun to exhibit flu-like symptoms.  Compl. ¶ 17.

Petitioner Keith Baker is a 25-year-old man. He booked in on March 7, 2020 on an unindicted allegation of aggravated assault, as well as some misdemeanor offenses. He is currently detained in the Dallas County Lew Sterrett Jail West Tower, 9th floor. He has severe asthma and is being held adjacent to three people who have tested positive for COVID-19. Mr. Baker has developed symptoms consistent with COVID-19 but has not been tested for the virus. He is presumptively innocent of all charges. Compl. ¶ 18.

Petitioner Paul Wright is a 48-year old man who is being held in the Dallas County Jail South (Kays) Tower 3rd floor. He booked in on February 21,2020 and is being held awaiting transport to the Texas Department of Criminal Justice to serve the remainder of a two-year sentence for felony assault, a sentence for which he has backtime credit for 14 months. He has hepatitis C and has been unable to protect himself within the jail from exposure to other inmates and guards who have potentially been exposed to COVID-19. Compl. ¶ 19.

Petitioner Terry McNickles is a 58-year-old man being held in the Dallas County Jail South (Kays) Tower on a parole violation. He was booked into the jail on March 16, 2020. He was taken to a parole hearing, but the hearing was cancelled because of the pandemic, and he was not told

when he might have a chance to have a new hearing date. Mr. McNickles is medically vulnerable because he had a kidney removed last year due to cancer. He has been unable to protect himself within the jail from exposure to other inmates and guards who have potentially been exposed to COVID-19. Compl. ¶ 20.

Petitioner Jose Munoz is a 37-year-old man, detained in the Dallas County Jail South (Suzanne Kays) Tower 3rd floor. He has been held since October 4, 2019. He is currently on probation for drug possession but is awaiting transportation to a drug treatment facility in Wilmer, Texas which was ordered as a condition of his probation. Because of the COVID-19 pandemic, however, the facility is not taking new patients, so his wait in jail is indefinite. He has been unable to protect himself from exposure to the COVID-19 virus through social distancing or protective measures of any kind. Compl. ¶ 21.

### C.  The Defendants

The Defendants in this action, sued in their official capacities, are the Dallas County Sheriff, Marian Brown and Dallas County, Texas ("Dallas County") is a municipal corporation organized under the laws of the State of Texas.  Compl. ¶¶ 22-23

## IV.    LEGAL ARGUMENT

Plaintiffs' suit for injunctive relief under the Fourteenth Amendment, and the Medically Vulnerable Subclasses' petition for habeas corpus, arise from Defendants' failure to protect them from the severe risk of death or serious physical harm. Those risks affect each Class and Subclass member identically. This Court should, therefore, certify the Classes and the Medically-Vulnerable Subclasses.

The claims of the Classes and Subclasses are ideally suited to proceed as a class action under Federal Rule of Civil Procedure 23(b)(2) and as an analogous class habeas proceeding. *See,*

*e.g. Ibrahim v. Acosta*, 326 F.R.D. 696, 699 (S.D. Fla. 2018) (certifying class of plaintiffs seeking habeas relief). Rule 23(c)(5) further allows for a class to be divided into subclasses, where the subclasses are treated as a class under Rule 23. Defendants are subjecting Named Plaintiffs and putative Class and Subclass members to the same injury: confinement in conditions that they know present a high risk of infection of a deadly disease in violation of Class members' rights under the Eighth and Fourteenth Amendments. The Named Plaintiffs and the proposed Class and Subclass meet Rule 23(a)'s prerequisites for class certification: joinder of all proposed class members in this numerous and transient class is impracticable; the questions of law and fact necessary for resolution of this claim are common to all members of the proposed classes; the Named Plaintiffs' claims are typical of the classes; and the Named Plaintiffs and their counsel are dedicated to vindicating the constitutional rights of the proposed classes. Additionally, as Rule 23(b)(2) requires, Defendants' unconstitutional acts apply to every member of the Class and Subclass, such that the requested final declaratory and injunctive relief is appropriate for the class as a whole.

### D.  The Requirements of Rule 23(a) Are Satisfied

Plaintiffs seeking class certification must meet four factors under Rule 23(a):

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These class action prerequisites, known respectively as numerosity, commonality, typicality, and adequacy, are each met in this case.

### 1.  Numerosity

Plaintiffs' proposed Classes are sufficiently numerous to make joinder impracticable. Fed. R. Civ. P. 23(a)(1). There is no fixed number of class or subclass members required for a finding of numerosity. Instead, the key question is "whether joinder of all members is practicable in view

of the numerosity of the class and all other relevant factors." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981). These other relevant factors include "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *Id.*; William B. Rubenstein, Newberg on Class Actions § 3:12 (5th ed.). Courts also consider "judicial economy arising from the avoidance of a multiplicity of actions." *Id.* Finally, "the fact that the class includes unknown, unnamed future members also weighs in favor of certification." *Pederson v. La. State Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000). The Fifth Circuit has held that "[t]he general rule encouraging liberal construction of civil rights class actions applies with equal force to the numerosity requirement of Rule 23(a)(1)." *Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975), *abrogated by Gardner v. Westinhouse Broad Co.*, 437 U.S. 478 (1978). Joinder is presumptively impracticable when a class consists of forty members or more. *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (citing Newberg on Class Actions § 3.05 (3d ed.)

Joinder of the proposed members of each Class is impracticable. The Dallas County Jail's Daily Jail Population Statistics show that on April 2, 2020, 5309 people were detained in the jail, all of whom are members of a proposed Class. This number will likely increase as additional people are arrested in the future and detained in the jail. Because the proposed Classes contain well over forty members, they satisfy the numerosity requirement. *See* Ex. 1, *Dallas County Criminal Justice Management Committee Information Statistics, Detention Early Warning Report, 4/2/20*.

Moreover, because the proposed Classes include future members, traditional joinder is not practicable. Future Class Members will suffer the same injury absent injunctive relief from Defendants' deliberate indifference to the unsafe conditions in the jail. Class relief targeting these unconstitutional conditions is therefore appropriate because, regardless of the size of the Class,

13

traditional joinder is not practicable. *See Phillips v. Joint Legislative Comm. on Performance & Expenditure Review of State of Miss.*, 637 F.2d 1014, 1022 (5th Cir. 1981) ([T]he alleged class includes future and deterred applicants, necessarily unidentifiable. In such a case the requirement of Rule 23(a)(1) is clearly met, for 'joinder of unknown individuals is certainly impracticable.'" (citation omitted); Moore's Federal Practice—Civil § 23.22(f) ("Class-action plaintiffs seeking injunctive or declaratory relief frequently seek to define a class to include people who might be injured in the future. Courts in these cases often find that joinder of separate suits would be impracticable because those who have not yet been injured, or who do not know that they have been injured, are unlikely to join a lawsuit."); Newberg on Class Actions § 25:4 (4th ed.) ("Even a small class of fewer than 10 actual members may be upheld if an indeterminate number of individuals are likely to become class members in the future or if the identity or location of many class members is unknown for good cause."); *see also Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859,  878 (11th Cir. 1986) (finding impracticability of non-class joinder for a class including future members, who necessarily could not yet be identified). In such cases, the numerosity requirement is satisfied because the putative class seeks declaratory and injunctive relief against an ongoing policy, a resolution will affect numerous people in the future, and the composition of the class is fluid and unknown. *Jones*, 519 F.2d at 1100 (granting liberal construction of numerosity prong in a case seeking injunctive relief on behalf of future class members because "[t]he general rule encouraging liberal construction of civil rights class actions applies with equal force to the numerosity requirement of Rule 23(a)(1)."); *see also, e.g.*, *Walker v. City of Calhoun, Georgia*, No. 4:15-cv-170-HLM, 2016 WL 361580, at *6 (N.D. Ga. Jan. 28, 2016) ("[T]here is a future stream of class members who would suffer the same injury absent injunctive relief. Under those circumstances, the Court agrees with Plaintiff that joinder is impracticable.").

14

The proposed Subclasses also easily meet the numerosity threshold. The Medically-Vulnerable Subclasses are comprised of people who are medically vulnerable to COVID-19 because of underlying medical conditions—a person shall be deemed "Medically-Vulnerable" if the person is over the age of 50, and/or has or experiences (a) lung disease, including asthma, chronic obstructive pulmonary disease (e.g. bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure and coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders (including sickle cell disease); (i) inherited metabolic disorders; (j) history of stroke; (k) a developmental disability; and/or (l) a current or recent (within the last two weeks) pregnancy. The WHO-China Joint Mission Report indicates that the mortality rate from COVID-19 for those with cardiovascular disease was 13.2%, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[25]

According to one study, "asthma prevalence is 30%–60% higher among individuals with a history of incarceration as compared with the general population."[26] One study estimates that up to 15% of people who are in custody have asthma, 10% of people in custody live with a heart condition that requires medical care, 10% live with diabetes, and 30% have hypertension.[27] Based

---

[25] Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization (Feb. 28, 2020), at 12, https://cutt.ly/atBJsEW; Cohen Dec. ¶26.
[26] Elizabth M. Vigilanto et al., *Mass Incarceration and Pulmonary Health: Guidance for Clinicians*, 15 Ann. Am. Thoracic Soc. 409, 409 (2019).
[27] Laura M. Marushack et al., *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12*, U.S. Dept. of Justice (2014).

15

on these estimates and assuming some overlap in these diagnoses, a fair estimate of the number of people who live with one or more of these medical vulnerabilities exceeds one thousand.

A class action does not present any insurmountable difficulties in management—the Classes and Subclasses are easily ascertainable from records in the Defendants' possession *and* are limited in geographic scope, as opposed to a nationwide, multi-district class of millions. Requiring separate individual lawsuits against Defendants would likely result in far greater manageability problems, such as duplicative discovery (including numerous depositions of the same County officials and repetitive production of documents), repeated adjudication of similar controversies in this Court (with the resultant risk of inconsistent judgments), and excessive costs for all involved.

In sum, the number of potential and future Class and Subclass members, the difficulty in immediately identifying these potential Class and Subclass members, and the addition of future, unknown Class and Subclass members make joinder impracticable. Additionally, judicial economy will be significantly better served by resolving the central factual and legal issues concerning the unconstitutional conditions of confinement, as opposed to requiring multiple proceedings as Defendants continue to detain individuals in unsafe conditions. Rule 23(a)(1) is thus satisfied.

### 2.  Commonality

The claims asserted on behalf of the proposed Classes and Subclasses include "questions of law or fact common to the class" that satisfy Rule 23(a)(2). Commonality requires that the class members' claims "depend on a common contention" such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The threshold for satisfying the commonality

16

prerequisite is "not demanding." *Mullen*, 186 F.3d at 625; *Lightbourn v. Cty. of El Paso, Tex.*, 118 F.3d 421, 426 (5th Cir. 1997). "To satisfy the commonality requirement under Rule 23(a)(2), class members must raise at least one contention that is central to the validity of each class member's claims." *In re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014). Courts generally "find[] common questions of law to be at a high level of generality . . . and questions of fact similarly broad . . . ." Newberg on Class Actions § 3:19 (5th ed.) (citations omitted). Commonality also requires these common questions "to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (emphasis in original) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009) ). These "common answers" may be answers about the "defendant's injurious conduct." *Deepwater Horizon*, 739 F.3d at 811. Traditionally, the Rule asks whether the disputed questions are capable of class-wide proof or resolution, and claims need not be identical to satisfy this requirement. *Simms v. Jones*, 296 F.R.D. 485, 497 (N.D. Tex. 2013) ("Even a single common question of law or fact can suffice.") (citing *Dukes*, 564 U.S. at 359); *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994); *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 n.14 (11th Cir. 2000).

Although there need only be common issues of law *or* fact under Rule 23(a), this case presents numerous issues of both law and fact that are common to the Classes and Subclasses. Among the most important common questions of fact are:

- what measures Defendants implemented in the Dallas County Jail in response to the COVID-19 crisis;
- whether the conditions in the Dallas County Jail comply with the Centers for Disease Control and Prevention's guidelines for preventing the spread of COVID-19;
- whether Defendants' practices during the COVID-19 pandemic exposed people jailed at the Dallas County Jail to a substantial risk of serious harm;
- whether Defendants knew of and disregarded a substantial risk of serious harm to the safety and health of the class; and

- whether COVID-19 presents a risk of harm so severe to some people that the only constitutionally permissible way to protect them is to release them from custody immediately.

Among the most important common questions of law are:

- whether Defendants are liable under the Eighth and Fourteenth Amendments for their deliberate indifference to conditions of confinement that create a risk of serious illness, needless suffering, and death.

This case exemplifies the Supreme Court's explanation of commonality in *Wal-Mart Stores, Inc. v. Dukes*. The Court clarified that it is not just the existence of hypothetical common questions that justify class treatment. *Id*. at 349–50. Rather, there must be common answers that resolve the factual or legal claims presented by the plaintiffs. *Id*. at 350. In this case, the answers to the fundamental common questions of fact and law listed above are dispositive in determining Defendants' liability to all Class and Subclass members. If the conditions in the Dallas County Jail expose people jailed therein to a substantial risk of serious harm, then this litigation turns on whether Defendants knew of and disregarded such a risk.

Although there may be factual variations in some details of Classes and Subclass Members' cases, such as whether they are pretrial or sentenced, these differences are immaterial to the merits and "will not defeat the commonality requirement, so long as a single aspect or feature of the claim is common to all proposed class members." *Bynum v. District of Columbia*, 214 F.R.D. 27, 33 (D.D.C. 2003); *see also Dukes*, 564 U.S. at 350 (commonality satisfied if one can resolve an issue central to Plaintiffs' claims "in one stroke."). The claims raised by the Class and Subclass Members are independent of issues like specific arrest charges; instead, the claims are based solely on the conditions to which each and every person detained in the jail are subjected.

### 3.  Typicality

The named Plaintiffs in this case have claims typical of people who are subject to Defendants' post-arrest policies and practices. "[T]he test for typicality is not demanding." *Mullen*, 186 F.3d at 625. To meet the typicality requirement, the named plaintiffs' claims must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3) . "Typicality does not require a complete identity of claims." *James v. Dallas, Tex.*, 254 F.3d 551, 571 (5th Cir. 2001), *abrogated on other grounds in In re Rodriguez*, 695 F.3d 360 (5th Cir. 2012). In analyzing typicality, "the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *Id.* (citing Moore's Federal Practice § 23.24[4] (3d ed. 2000)).

Here, the Named Plaintiffs' legal claims are the same as the legal claims of the other members of the proposed Classes and Subclasses they represent. The Named Plaintiffs and Class and Subclass Members they represent are all injured in the same way: Defendants are keeping them in conditions of confinement that put them at substantial risk of serious harm. For the Subclasses, each person claims that she must be released because her health is at imminent and immediate risk from the same virus and same policy failures as each other person in the Subclasses. Thus, the ongoing and future injury of the Classes and the Classes' representatives arise from the same policy and practice. *See* Newberg on Class Actions § 23:4 (4th ed.) ("[T]he typicality requirement is generally satisfied when the representative plaintiff is subject to the same statute, regulation, or policy as class members."). The claims of the Named Plaintiffs also rely on the same legal theories as the claims of all other Class and Subclass members concerning whether Defendants' deliberate indifference to the risk of serious harm is unconstitutional. *See Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001) ("The typicality requirement may be satisfied

despite substantial factual differences . . . when there is a 'strong similarity of legal theories.'" (citation omitted). The proof concerning whether Defendants have acted with deliberate indifference in the face of the COVID-19 pandemic and the legal argument about whether this inaction is unlawful are critical for each Class and Subclass member in this case to establish the liability of Defendants.

Thus, if the Named Plaintiffs succeed in proving that Defendants' deliberate indifference to the risk of severe harm as alleged in the Complaint is unlawful, then that ruling will necessarily benefit every other member of the Class and Subclass. That is the essence of Rule 23(a)'s typicality requirement.

### 4. Adequacy

It is clear that the class representatives will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy analysis encompasses two separate inquiries: (1) whether the named Plaintiffs have common interests with the other class members, and (2) whether the representatives will adequately prosecute the action through qualified counsel. *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005); *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 562–63 (8th Cir. 1982). "Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." *Mullen*, 186 F.3d at 625–26. The Fifth Circuit has specified that, while courts should consider class representatives' "willingness and ability . . . to take an active role in and control the litigation," the representatives "need not be legal scholars and are entitled to rely on [class] counsel." *Feder*, 429 F.3d at 130-132 n.4. "The representative class members are entitled to work with, and rely upon, their counsel in pursuing their claims and navigating the complicated legal and factual issues associated with"

complex litigation. *Stoffels v. SBC Commc'ns, Inc.*, 238 F.R.D. 446, 455 (W.D. Tex. 2006). An example of an adequate class representative is one with "commendable familiarity with the complaint and with the concept of a class action." *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir. 1982).

Regarding the first inquiry, the Named Plaintiffs are adequate representatives of the Classes they represent because their interests in the vindication of the legal claims that they raise are completely aligned with, and are not antagonistic to, the interests of the other Class Members. The Named Plaintiffs, like other Class Members, have a strong interest in no longer being detained in unsafe conditions. The Named Plaintiffs who represent the Medically-Vulnerable Subclass share the Subclass's interest in release because of the particular danger that the virus presents for them. There are no known conflicts of interest among Members of the proposed Class and Subclass, all of whom have a similar interest in vindicating their constitutional rights in the face of their unlawful treatment by Defendants. Moreover, the declaratory and injunctive relief sought by Named Plaintiffs will benefit the entire class equally.

Regarding the second inquiry, the Named Plaintiffs also meet the requirement that they will adequately prosecute the action. They are represented in this case by highly qualified and experienced civil rights attorneys who are able and willing to conduct this litigation on behalf of the class. Plaintiffs' counsel from Susman Godfrey L.L.P., the ACLU, the ACLU of Texas Foundation, Civil Rights Corp, and Next Generation Action Network collectively have extensive experience litigating complex class action cases and civil rights cases. As discussed in greater detail below, *infra* Part III, Plaintiffs' counsel are qualified and experienced counsel with a history of zealous advocacy on behalf of their clients, and Rule 23(a)(4)'s adequacy requirement is thus met.

### E.  The Requirements of Rule 23(b)(2) Are Met[28]

In addition to satisfying the requirements of Rule 23(a), the proposed Classes and Subclasses satisfies Rule 23(b)(2). A putative class action must meet the requirements of either Rule 23(b)(1), Rule 23(b)(2), or Rule 23(b)(3). *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Rule 23(b)(2) provides for class certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). . "This is a simple inquiry in most cases." Newberg on Class Actions § 4:28 (5th ed.) . The requirement of a generally applicable set of actions "ensures that the class's interests are related in a manner that makes aggregate litigation appropriate . . . and therefore efficient." *Id.* Thus, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Dukes*, 564 U.S. at 360.

As the Supreme Court has recognized, "[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of cases in which class certification is proper under Rule 23(b)(2). *Amchem*, 521 U.S. at 614; *see also Holmes v. Cont'l Can Co.*, 706

---

[28] At least with respect to a Damages Class under Rule 23(b)(3) (Plaintiffs do not seek to certify a Damages class because they have not brought a damages claim), courts have held that "ascertainability" is, in essence, a fifth Rule 23 prerequisite. A class must be "adequately defined and clearly ascertainable." *De Bremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970). "In other words, the class must meet a minimum standard of definiteness which will allow the trial court to determine membership in the proposed class[,]" although "'it is not necessary that the members of the class be so clearly identified that any member can be presently ascertained.'" *Earnest v. GMC*, 923 F. Supp. 1469, 1473 & n.4 (N.D. Ala. 1996) (quoting *Carpenter v. Davis*, 424 F.2d 257, 260 (5th Cir. 1970)). Although it is doubtful that such a requirement should exist with respect to a purely injunctive class under Rule 23(b)(2), *see, e.g.*, *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592–93 (3d Cir. 2012) (noting that the rule has been applied to Rule 23(b)(3) damages classes), that requirement is easily met here. The Defendants already have in their possession the identity of each and every person in the class. Also, by necessity, the Defendants will come to know the identity of each future person detained in the jail.

F.2d 1144, 1152 (11th Cir. 1983) ("Civil rights class actions . . . are generally treated under subsection (b)(2) of Rule 23."); Newberg on Class Actions, *supra*, § 1:3 ("Rule 23(b)(2) . . . . is typically employed in civil rights cases and other actions not primarily seeking money damages. The (b)(2) class action is often referred to as a 'civil rights' or 'injunctive' class suit."). This is because "[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Dukes,* 564 U.S. at 360 (citation omitted). Thus, "Rule 23(b)(2) has been liberally applied in the area of civil rights, including suits challenging conditions and practices at various detention facilities." *Braggs v. Dunn*, 317 F.R.D. 634, 667 (M.D. Ala. 2016) (citation omitted).

This case is exactly the kind of class action that Rule 23(b)(2) is meant to capture. *Id.*; *see also* Newberg on Class Actions § 4:40 (5th ed.) ("While civil rights cases are often maintained against public and private defendants under civil rights *statutes*, many (b)(2) class actions challenge government actions on *constitutional* grounds as well.") (emphasis in original). The Classes' interests are sufficiently related to warrant aggregate litigation, as are the interests of the members of the Subclasses. The Defendants have acted on grounds that apply generally to the Classes and Subclasses. Injunctive and declaratory relief are appropriate to the Classes and Subclasses precisely because the only adequate relief is enjoining Defendants' unconstitutional policies.

Furthermore, it is far more efficient for this court to grant injunctive and declaratory relief protecting all of the class members than to extend that relief piecemeal through individual suits. Because the putative Classes and Subclasses challenge the Defendants' scheme as unconstitutional through declaratory and injunctive relief that would apply the same relief to every member of the

class, Rule 23(b)(2) is appropriate and necessary. *In re Veneman*, 309 F.3d 789, 792 (D.C. Cir. 2002) (" Rule 23(b)(2) certification is appropriate where plaintiffs seek declaratory or injunctive relief for class-wide injury)."[29] As the Supreme Court explained recently:

> When a class seeks an indivisible injunction benefiting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute. Predominance and superiority are self-evident.

*Dukes*, 564 U.S. at 362-363. In *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998), the Fifth Circuit stated that the underlying premise of a Rule 23(b)(2) class action is that class "members suffer from a common injury which is properly addressed by class-wide relief." *Id.* at 413. "Thus, if the plaintiffs [seek] only injunctive and declaratory relief, [the] case [can] readily be certified as a class action under Rule 23(b)(2)." *Id.* at 411. As the Fifth Circuit recognized, "[s]uch relief may often be awarded without requiring a specific or time-consuming inquiry into the varying circumstances and merits of each class member's individual case." *Id.* at 414.

This case falls squarely within this requirement of the appropriateness of declaratory or injunctive relief to the class as a whole, because Defendants have acted with deliberate indifference to the health and safety of all members of the Classes by failing to take the necessary action to avoid an outbreak of COVID-19 in the jail. The only way to remedy the injury to the Classes is to enjoin Defendants' conduct as to all of the class members.

---

[29] Rule 23(b)(2) arose out of experience "in the civil rights field," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997) (citation omitted), in which the government typically treats a whole class in an unconstitutional manner based on law or government policy. "Rule 23(b)(2) was promulgated in 1966 essentially as a tool for facilitating civil rights actions." Moore's Federal Practice § 23.43; *see also* Newberg on Class Actions § 1:3 (5th ed.) (" Rule 23(b)(2) authorizes a class action when a party has taken or refused to take action with respect to a class, and final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole. This category is typically employed in civil rights cases and other actions not primarily seeking money damages. The (b)(2) class action is often referred to as a 'civil rights' or 'injunctive' class suit.").

The Classes and Subclasses therefore seek declaratory and injunctive relief to require Defendants to take the necessary steps to prevent an outbreak of COVID-19 in the jail. The relief sought—a declaration that Defendants violate Class Members' constitutional rights by failing to adequately safeguard their health and safety in the midst of a potential outbreak of a deadly infectious disease and an injunction requiring them to release the Subclasses and take the steps necessary to prevent such an outbreak—would apply equally to the all members of the Classes and Subclasses. *See Holmes*, 706 F.2d at 1155 (Rule 23(b)(2) applies to "claims resting on the same grounds and applying more or less equally to all members of the class."). Therefore, certification under Rule 23(b)(2) is appropriate. *See Allison*, 151 F.3d at 411 (stating that the requirements of Rule 23(b)(2) are satisfied because "the predominant relief sought is injunctive or declaratory."); *Baby Neal*, 43 F.3d at 58 (noting that the requirements of Rule 23(b)(2) are "almost automatically satisfied in actions primarily seeking injunctive relief" for common legal claims.).

### F. Undersigned Counsel Should Be Appointed Class Counsel Under Rule 23(g)

Federal Rule of Civil Procedure 23(g) requires that the court appoint class counsel for any class that is certified. Fed. R. Civ. P. 23(g)(1). Class counsel must "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In determining whether this requirement is met, courts must consider: (1) "the work counsel has done in identifying or investigating potential claims in the actions;" (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;" (3) "counsel's knowledge of the applicable law;" and (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

Undersigned Counsel satisfy these four requirements. The Plaintiffs and proposed Classes are represented by attorneys who have experience litigating complex civil rights matters and class

action lawsuits in federal court and extensive knowledge of both the conditions in the jail and the relevant constitutional law. *See* Declaration of Amy Fettig, April 12, 2020 (Ex. 2). Class Counsel have conducted an extensive investigation into the conditions in Dallas County Jail and the sanitation and social distancing requirements that are necessary to prevent an outbreak of COVID-19. *See* Fettig Dec. ¶ 6.  In addition, Class counsel has sufficient financial and human resources to litigate this matter. *Id*. In sum, Plaintiffs' attorneys are experienced advocates; possess "sufficient vigor" along with sufficient resources, to adequately represent the Class and prosecute this action; and are appropriate counsel for the matter. *See Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987) (citations omitted).

## V.    CONCLUSION

For the reasons stated above, the Named Plaintiffs respectfully asks this Court to certify the Classes and Subclasses described in this Motion.

Dated: April 12, 2020                                             Respectfully submitted,

/s/ Andrea Woods_____
AMERICAN CIVIL LIBERTIES FOUNDATION
Andrea Woods
N.Y. Bar No. 5595509
Meredith Taylor Brown*
N.Y. Bar No. 5678602
Brandon Buskey
125 Broad Street, 18th Floor
New York, NY 10004
(212)549-2528
*awoods@aclu.org*

Henderson Hill
N.C. Bar No. 18563
201 W. Main St. Suite 402
Durham, NC 27701
(919)682-9563
*hhill@aclu.org*

Amy Fettig
D.C. Bar No. 484883
915 15th Street N.W.,7th Floor
Washington, D.C. 20005
(202)548-6608
*afettig@aclu.org*

ACLU FOUNDATION OF TEXAS
Brian Klosterboer
Texas. Bar No. 24107833
Adriana Piñon**
Texas Bar No. 24089768
Andre Segura
Texas Bar No. 24107112
5225 Katy Fwy., Suite 350
Houston, TX 77007
Tel: (713) 942-8146
Fax: (346) 998-1577

CIVIL RIGHTS CORPS
Katherine Hubbard*
D.C. Bar No. 1500503
Elizabeth Rossi
D.C. Bar No. 1500502
1601 Connecticut Ave NW,Suite 800
Washington, D.C. 20009
(202)894-6126
*katherine@civilrightscorps.org*
*elizabeth@civilrightscorps.org*

SUSMAN GODFREY L.L.P.
Barry Barnett
Texas Bar No. 01778700
8115 Preston Road, Suite 575
Dallas, TX 75225
(866)754-1900
*bbarnett@susmangodfrey.com*

Michael Gervais*
N.Y. Bar No. 5122890
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
(310)789-3100
*mgervais@susmangodfrey.com*

NEXT GENERATION ACTION
NETWORK LEGAL ADVOCACY FUND
Alison Grinter-Allen
Texas Bar 24043476

Kim T. Cole
Texas Bar No. 24071024
1808 South Good Latimer Expressway
Dallas, TX 75226
(214)704-6400
*agrinter@thengan.com*
*kcole@thengan.com*

ATTORNEYS FOR PETITIONERS/PLAINTIFFS
*\*pro hac vice application forthcoming*
*\*\*N.D. Texas admission application forthcoming*


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served

via the Court's CM/ECF system on all counsel registered with that system, and via email, on

April 12, 2020.

/s/Andrea Wood_____
Andrea Woods