**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| OSCAR SANCHEZ, MARCUS WHITE, TESMOND MCDONALD, MARCELO PEREZ, ROGER MORRISON, KEITH BAKER, PAUL WRIGHT, TERRY MCNICKELS, JOSE MUNOZ, KIARA YARBOROUGH, OLIVIA WASHINGTON, AND IDEARE BAILEY*; on their own and on behalf of a class of similarly situated persons,* | Civil Action No. 20-cv-832 <br><br> **First Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Injunctive and Declaratory Relief** <br><br><br> **IMMEDIATE RELIEF SOUGHT** |
| *Petitioners/Plaintiffs*, <br><br> v. <br><br> DALLAS COUNTY SHERIFF MARIAN BROWN, *in her official capacity*, and DALLAS COUNTY, TEXAS, <br><br> *Respondents/Defendants.* | |

## INTRODUCTION

1.     You are likely reading this Petition for Writ of Habeas Corpus and Class Action Complaint for Injunctive and Declaratory Relief (Complaint) from self-isolation in your home. Now imagine if someone sick with COVID-19 came into that home and sealed the doors and windows behind them. That is what Dallas County has just done to more than 5,000 human beings currently detained in the North, South, and West Towers of the Lew Sterrett Justice Center, where more than two dozen COVID-19 cases have been confirmed by Dallas County and where social/physical distancing for all but a small fraction of detainees is impossible. After Oscar Sanchez requested a test for the disease which he could not obtain in the Dallas County Jail, a staff member acknowledged the predicament, saying to Mr. Sanchez: "I don't know what these people want you to do. Die first?" Sanchez Dec. ¶ 17. Tesmond McDonald, who has COVID-19, recently had such dangerously-low oxygen levels that "he thought he was going to die," and faces the

prospect of going into critical condition without immediate transport to a hospital. McDonald Dec. ¶¶4–6.

2.      No one detained can protect themselves by leaving. Further, employees and contractors who work in the Dallas County Jail are themselves at risk of contracting COVID-19 and spreading it to loved ones and the larger community outside. And the health care system in Dallas County will be taxed beyond capacity by an outbreak originating in the Dallas County Jail unless immediate steps are taken to get it under control.

3.      We are in the midst of the most significant global pandemic in generations.[1] COVID-19 is a highly contagious and deadly respiratory disease caused by a novel coronavirus (SARS-CoV-2). No one is safe. The lethality rate of COVID-19 is estimated to be between one and six percent: several times more than the common flu that kills thousands a year.[2] All age groups including some children have contracted the disease,[3] and the World Health Organization estimates that one in five people who contract the disease require hospitalization.[4] On March 13, 2020, the President declared a national state of emergency.[5] As of April 7, 2020, confirmed cases of COVID-19 in the United States were more than double the number in any other country.[6] On

---

[1] John M. Barry, *The Single Most Important Lesson from the 1918 Influenza*, New York Times (March 17, 2020), https://cutt.ly/PtQ5uAZ (Opinion piece by author of "The Great Influenza: The Story of the Deadliest Pandemic in History," noting comparison between current COVID-19 outbreak and the 1918 influenza outbreak widely considered one of the worst pandemics in history).

[2] As of April 7, 2020, there were 1,428,428 confirmed cases globally, with 82,020 deaths and 300,198 recoveries. Johns Hopkins University of Medicine, *Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering at Johns Hopkins University*, https://cutt.ly/StEyn2U; *see also* "Coronavirus disease 2019 (COVID-19)", UpToDate, https://cutt.ly/GtJYSkj (as of April 4, 2020, estimated overall fatality rate of 2.3 percent globally).

[3] Robert Verity, PhD., et al., *Estimates of the Severity of Coronavirus Disease 2019: A Model-Based Analysis*, Lancet Infec Dis (March 30, 2020), 6.

[4] World Health Organization, *Q&A on Coronaviruses (COVID-19)*, "*Should I Worry About COVID-19?*," https://cutt.ly/YtEyrxl.

[5] Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, (March 13, 2020), https://cutt.ly/EtJLZQZ.

[6] Jennifer Calfas, Chong Koh Ping, and Drew Hinshaw, *Global Coronavirus Death Toll Passes 81,000 as Some Lockdowns Tighten*, The Wall Street Journal (Apr. 7, 2020), https://cutt.ly/ztJLM0q.

the same day, Illinois, Louisiana, New Jersey, New York reported their highest daily death tolls from COVID-19.[7] As of April 7, 2020, the Texas Health and Human Services reported 8,262 COVID-19 cases and 154 deaths from the disease state-wide,[8] and Dallas County Health and Human Services reported 1,261 COVID-19 cases with 19 deaths.[9] The Dallas County Jail accounted for 23—almost two percent—of the COVID-19 cases in Dallas County.[10] On April 5, 2020, approximately 25 percent of all new confirmed COVID-19 cases in Dallas County were in the Dallas County Jail.[11]

4.      There is no vaccine or cure for COVID-19. The best course according to public health experts is to slow and prevent transmission, primarily through a practice known as "social distancing."[12] Social distancing requires everyone to stay at least six feet away from all other people to control the spread of the virus. This measure is particularly important because the virus spreads aggressively, and people can infect others even if they do not feel sick or exhibit any symptoms.[13] The only effective way to curb the pandemic is through dramatically reducing contact

---

[7] Johns Hopkins University, Coronavirus Resource Center, *available at* https://coronavirus.jhu.edu/map.html; *see also* Brittany Shammas, et al., *Trump says Quarantine for New York Area "Will not be Necessary;" U.S. Coronavirus-related Deaths Double in Two Days*, Wash. Post (March 28, 2020, 11:27 p.m.), https://cutt.ly/ktRo8u0.

[8] Texas Health and Human Services, Texas Case Counts COVID-19, (Apr. 7, 2020), https://cutt.ly/rtJL7NJ.

[9] Dallas County Health and Human Services, 2019 Novel Coronavirus (COVID-19) Summary at 1, (Apr. 7, 2020), https://cutt.ly/ztJZwXa.

[10] *Id.* Table 4.

[11] *COVID-19 Live Updates*, KERA News (quoting Director of Dallas County Health and Human Services on April 5, 2020 as saying "the jail has 24 cases, which includes 22 inmates and two detention officers," presenting approximately 25% of all new cases in Dallas County that day), https://cutt.ly/itJSsiy.

[12] World Health Organization, *Coronavirus*, https://cutt.ly/ztWyf7e ("At this time, there are no specific vaccines or treatments for COVID-19.")."); *Dawson v. Asher*, 20-cv-409 (W.D. Wash.) at Doc. No. 4, Declaration of Dr. Robert B. Greifinger, MD, ¶ 8 ("Social distancing and hand hygiene are the only known ways to prevent the rapid spread of COVID-19.").

[13] Center for Disease Control, *How Coronavirus Spreads*, https://cutt.ly/CtYRkkC.

for all.[14] Consequently, every American institution—from schools[15] to places of worship,[16] from businesses[17] to legislatures[18]—has been exhorted to reduce the number of people in close quarters, if not empty entirely. They have also been told to undertake aggressive sanitation measures, such as cleaning and disinfecting all surfaces for exacting periods of time with products with particular alcohol contents, and closing off any areas used by a sick person.[19] These imperatives apply with special force to jails, where the government controls almost entirely a person's ability to avoid others and to maintain adequate sanitation. Indeed, the Centers for Disease Control have issued detailed directives to jails and carceral facilities.[20]

5.      Yet jails have proven incapable of implementing many of these recommendations, and incarcerated people are exposed to this highly contagious and deadly virus as a result. For example, at the peak of the outbreak in Wuhan, China—the province where COVID-19 originated—over half of all reported COVID-19 cases were incarcerated people. On Rikers Island, the rate of infection among incarcerated people is over seven times the rate of infection in New York City generally, and 25 times higher than the rate in Wuhan, China.[21]

---

[14] Harry Stevens, *Why Outbreaks Like Coronavirus Spread Exponentially, and how to "Flatten the Curve,"* Wash. Post. (March 14, 2020), https://cutt.ly/etYRnkz.

[15] Centers for Disease Control, *Interim Guidance for Administrators of US K-12 Schools and Child Care Programs*, https://cutt.ly/ItRPq5n.

[16] Centers for Disease Control, *Interim Guidance for Administrators and Leaders of Community-and Faith-Based Organizations to Plan, Prepare, and Respond to Coronavirus Disease 2019 (COVID-19)*, https://cutt.ly/KtRPk1k.

[17] Centers for Disease Control, *Interim Guidance for Businesses and Employers to Plan and Respond to Coronavirus Disease 2019 (COVID-19)*, https://cutt.ly/stRPvg4.

[18] Nat'l Conf. of State Legislatures, *Coronavirus and State Legislatures in the News*, https://cutt.ly/4tRPQne.a

[19] Centers for Disease Control, *Cleaning and Disinfecting Your Facility*, https://cutt.ly/atYE7F9.

[20] Centers for Disease Control, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (March 23, 2020), https://cutt.ly/atJPt5B.

[21] These numbers likely underestimate the infection rate on Rikers Island, as they do not include the number of people contracted COVID-19 on Rikers Island but who have already been released. The rates of infection rely on publicly released data collected by the Legal Aid Society. *See* LEGAL AID SOCIETY, *Analysis of COVID-19 Infection Rate in NYC Jails* (last visited March 30, 2020, 11:00 AM), https://cutt.ly/RtYTbWd.

6.      Despite the ubiquity of this guidance, the Texas Governor's order requiring people to "minimize in-person contact with people who are not in the same household",[22] the stay at home order issued by the County Judge of Dallas County,[23] and City of Dallas regulations implementing the Texas and Dallas County orders,[24] the Dallas County Jail has failed to provide these critical safeguards. Known conditions in the Dallas County Jail include:

- a jump in a week's time from five reported COVID-19 infections of detainees and Jail employees to almost 30 as of April 7, 2020,[25]

- a lack of COVID-19 testing for detainees at intake, during detention, or upon release,

- failure to begin "checking the temperatures of employees assigned to the jail" or asking detainees during the intake process "a set of preliminary questions recommended by Dallas County's healthcare partners" until March 27, 2020,[26]

- a shortage of Jail employees to report for work;

- routine use by Jail employees of single-use disposable surgical masks for a week or more;

- failure to educate detainees about the virus and prevention methods;

- failure to institute appropriate social distancing practices, including in dorm bunk arrangements, waiting lines, staff gatherings, and meals;

---

[22] Office of the Tex. Gov., Press Release: *Governor Abbott Issues Executive Order Implementing Essential Services and Activities Protocols* (March 31, 2020), https://cutt.ly/stJUKfc.

[23] *See* Amended "Safer at Home" Order, (Apr. 6, 2020), https://cutt.ly/otJIl2m.

[24] *See* Shelter in Place: Stay Home Stay Safe, City of Dallas, https://cutt.ly/TtJIvcg.

[25] Dallas County Health and Human Services, 2019 Novel Coronavirus (COVID-19) Table 4, (Apr. 7, 2020), https://cutt.ly/QtJZbmS; Editorial, *COVID-19 spreads with close contact, so what do we do about those in jail?*, The Dallas Morning News (Apr. 5, 2020), https://cutt.ly/8tJOi67 ("At the time of this writing, 20 inmates had tested positive for the virus, along with six detention officers and one deputy."); Ashley Paredez, *Confirmed COVID-19 cases at Dallas County Jail now up to 28*, Fox 4 (April 4, 2020), https://cutt.ly/0tJSenr ("The number of coronavirus cases at the Dallas County jail has increased from five cases last week, to now a total of 28," and "six [of those testing positive] are detention officers and two are clerks"); COVID-19 Live Updates, KERA News, *supra* note 11 (quoting Director of Dallas County Health and Human Services on April 5, 2020 as saying "the jail has 24 cases, which includes 22 inmates and two detention officers").

[26] Dallas County Sheriff's Office, "COVID-19 Initiatives," (March 27, 2020), https://cutt.ly/NtJO7zY.

- failure to segregate detainees with symptoms and illness from other detainees and guards;

- failure to provide staff with adequate personal protective equipment and to require the use and regular replacement of such equipment;

- failure to provide detainees with adequate PPE;

- failure to ensure sufficient stocks of hygiene and cleaning supplies and to provide detainees with no-cost access to these supplies.

7.      Jails are not hermetically sealed. By their nature, the people who enter jails—from correctional and medical staff, to those detained prior to trial, to those serving short sentences—typically come out in very short order. The failure of Dallas County Jail to prevent and mitigate the spread of COVID-19 endangers not only those within the institution, but the entire community. Hence, swift release of the most vulnerable to the disease and implementation of public health and education protocols in the jail, are is the only mitigation efforts that the Dallas County Jail can undertake to comport with public health guidance and to prevent a catastrophic outbreak at the facility.

8.      Absent intervention from this Court to align the operation of the Dallas County Jail with public health principles—first and foremost, the release of as many incarcerated persons as possible, but also improved sanitation, testing, and treatment protocols for all others—devastating, and in many cases deadly, irreparable harm will befall incarcerated persons, jail staff, and the community.[27] The outbreaks in detention facilities around the country, many with more resources, space, and sophisticated health delivery systems than the Dallas County Jail,[28] prove the need for

---

[27] Noam N. Levey, Jenny Jarvie, *Coronavirus Will Hit Health System Hard and Not All States are Prepared*, L.A. Times (March 12, 2020 4:00 a.m.), https://cutt.ly/mtYTI3U; Joanne Kenen, *Local Officials Alarmed by Dearth of Ventilators, Hospital Beds*, (March 14, 2020 7:00 a.m.), https://cutt.ly/stYTDDk.

[28] Sam Kelly, *134 inmates at Cook County Jail confirmed positive for COVID-19*, Chicago Sun-Times (Mar. 30, 2020). https://cutt.ly/6tYTqi5.

immediate and significant reductions in population. Case-by-case review is no match for exponential spread of the disease. Courts and executive branch officials elsewhere in the country have accepted this reality and begun broad-based, categorical releases from jails and prisons.[29]

9.      Accordingly, Petitioners/Plaintiffs (hereinafter "Plaintiffs")—classes of persons incarcerated at the Dallas County Jail—bring this action and request immediate release of all Plaintiffs and Class Members, coupled with appropriate support and conditions upon release, as informed by public health expertise. If this Court does not grant immediate release on the basis of this Petition, Plaintiffs request a hearing as soon as possible. Given the exponential spread of COVID-19, there is no time to spare.

## I.      JURISDICTION AND VENUE

10.     Plaintiffs bring this putative class action pursuant to 28 U.S.C. § 2241 and 42 U.S.C. § 1983 for relief from detention that violate their Eighth and Fourteenth Amendment rights under the U.S. Constitution.

11.     This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1651 (All Writs Act), and Article I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause) / 28 U.S.C. § 1331 (federal question jurisdiction).

12.     Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 2241(d) because the Plaintiffs and all other class members are in custody in this judicial district and venue. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

---

[29] *See, e.g.*, Memorandum and Order, *Thakker v. Doll*, No. 20-CV-0480 (M.D. Pa. Mar. 31, 2020) (categorically releasing petitioners who "suffer[] from chronic medical conditions and face[] an imminent risk of death or serious injury if exposed to COVID-19); Emmanuel Felton, *A Judge Ordered The Release Of Low-Level Prisoners Because Of The Coronavirus. People Were Absolutely Furious.*, Buzzfeed News (Mar. 27, 2020), https://cutt.ly/mtYTyxd.

## II.        PARTIES

13.     Plaintiff Oscar Sanchez is detained in the Dallas County Lew Sterrett Jail West Tower. He is a 28-year-old man. He has a history of severe chronic asthma, and has begun to show symptoms that are consistent with COVID-19, and therefore **may require immediate medical attention**. He has been incarcerated since March 10, 2020 and is being held pretrial on multiple charges, some of which are indicted, some of which are not. His cases are not currently set for trial. His next court date is April 28, 2020 for an announcement setting. He is presumptively innocent of all charges.

14.     Plaintiff Marcus White is a 37-year-old man who booked into the Dallas County Jail on November 27, 2019 and is held on $111,000 bond for multiple charges, mostly drug-related. He suffers from hypertension, for which he takes medication in the jail, as well as a serious seizure disorder for which he has not received his medication in the jail. Mr. White contracted and tested positive for COVID-19 in the jail and is being held on the 9th floor of the Dallas County Lew Sterrett West Tower Jail. He is presumptively innocent of all charges.

15.     Plaintiff Tesmond McDonald is a 32-year-old man with asthma and high blood pressure who is being held (since September 27, 2019) in the Dallas County Jail, currently in the Lew Sterrett West Tower Jail 9th floor. He is being held pretrial for three Dallas County charges of aggravated robbery, possession with intent to deliver drugs, and evading arrest. Mr. McDonald contracted COVID-19 inside the jail, and learned on April 3 that he tested positive for the virus. **His condition is very serious and he may require immediate medical attention.** He is presumptively innocent of all charges.

16.     Plaintiff Marcelo Perez is a 43-year-old man who has been held in the Dallas County Jail since January 7, 2020 on an allegation that he violated probation by committing a new drug offense. Mr. Perez is medically vulnerable in that he has hypertension and diabetes. He has

been denied the ability to maintain social distancing, proper hygiene, and he is exposed continuously to people who show symptoms consistent with COVID-19.

17.     Plaintiff Roger Morrison is a 49-year-old man, medically vulnerable to COVID-19 because of his pre-existing conditions of high blood pressure, hepatitis C, and cirrhosis of the liver among other issues. He was booked in on March 9, 2020 and is being held on drug possession and evading arrest charges in the Dallas County Jail South (Kays) Tower C3 medical pod. He has been unable to protect himself within the jail from exposure to other inmates and guards who have potentially been exposed to COVID-19. He has begun to exhibit flu-like symptoms.

18.     Plaintiff Keith Baker is a 25-year-old man. He booked in on March 7, 2020 on an unindicted allegation of aggravated assault, as well as some misdemeanor offenses. He is currently detained in the Dallas County Lew Sterrett Jail West Tower, 9th floor. He has severe asthma and is being held adjacent to three people who have tested positive for COVID-19. Mr. Baker has developed symptoms consistent with COVID-19, but has not been tested for the virus. He is presumptively innocent of all charges.

19.     Plaintiff Paul Wright is a 48-year old man who is being held in the Dallas County Jail South (Kays) Tower 3rd floor. He booked in on February 21,2020 and is being held awaiting transport to the Texas Department of Criminal Justice to serve the remainder of a two-year sentence for felony assault, a sentence for which he has backtime credit for 14 months. He has hepatitis C and has been unable to protect himself within the jail from exposure to other inmates and guards who have potentially been exposed to COVID-19.

20.     Plaintiff Terry McNickles is a 58-year-old man being held in the Dallas County Jail South (Kays) Tower on a parole violation. He was booked into the jail on March 16, 2020. He was taken to a parole hearing, but the hearing was cancelled because of the pandemic, and he was not

told when he might have a chance to have a new hearing date. Mr. McNickles is medically vulnerable because he had a kidney removed last year due to cancer. He has been unable to protect himself within the jail from exposure to other inmates and guards who have potentially been exposed to COVID-19.

21.     Plaintiff Jose Munoz is a 37-year-old man, detained in the Dallas County Jail South (Suzanne Kays) Tower 3rd floor. He has been held since October 4, 2019. He is currently on probation for drug possession but is awaiting transportation to a drug treatment facility in Wilmer, Texas which was ordered as a condition of his probation. Because of the COVID-19 pandemic, however, the facility is not taking new patients, so his wait in jail is indefinite. He has been unable to protect himself from exposure to the COVID-19 virus through social distancing or protective measures of any kind.

22.     Plaintiff Kiara Yarborough is a 25-year-old woman, detained in the Dallas County Jail South (Suzanne Kays) Tower 4th floor. She has been held since December 19, 2019 and is currently being held awaiting transportation to a special treatment program, the Intermediate Sanction Facility. Because of the COVID-19 pandemic, however, the facility is not taking new patients, so her wait in jail is indefinite. Ms. Yarborough is susceptible to kidney infections known as pyelonephritis and requires medication for high blood pressure.

23.     Olivia Washington is a 26-year-old woman, detained in the Dallas County Jail South (Suzanne Kays) Tower 4th floor. She has been held since February 6, 2020. Ms. Washington is currently being held awaiting transport to the Substance Use Felony Punishment Facility. Because of the COVID-19 pandemic, however, the facility is not taking new patients, so her wait in jail is indefinite. People in Ms. Washington's pod where she is housed have been coughing and getting sick.

24.     Plaintiff Ideare Bailey is a 35-year-old man detained in the Dallas County Jail. He has been held since April 6, 2020 on an accusation of property theft. Despite being granted a bond reduction and ordered released on electronic monitoring, Mr. Bailey has not been released. Mr. Bailey has Type 2 Diabetes. When he was booked into the Dallas County Jail, Mr. Bailey was healthy. He was placed in South Tower pod 2C with about sixty other people, and the man next to him was coughing. Mr. Bailey has since tested positive for COVID-19. Mr. Bailey has been refused an appointment to receive an electronic monitor, despite his wife having paid his bond, because he has tested positive for COVID-19.

25.     The Dallas County Sheriff, Marian Brown ("Sheriff Brown"), is a Dallas County official, the head of the Dallas County Sheriff's Department, and the administrator of the Dallas County Jail. Sheriff Brown is the final policymaker for running and administering the jail in Dallas County. Sheriff Brown is sued in her official capacity.

26.     Dallas County, Texas ("Dallas County") is a municipal corporation organized under the laws of the State of Texas. Dallas County controls and operates the Jail, through Sheriff Brown. Dallas County currently has immediate custody over Plaintiffs Sanchez, White, McDonald, Perez, Morrison, Baker, Wright, McNickles, Munoz, Yarborough, Washington, and Bailey and all other putative class members. Among others, Sheriff Brown is a final policymaker for Dallas County.

### III.     NOTICE OF RELATED CASE

27.     Per Rule 3.3(b)(iii) of the Local Civil Rules of the U.S. District Court for the Northern District of Texas, Plaintiff provide notice that this case arguably arises from a common nucleus of operative fact with, and therefore may be a "related case" to, *Daves v. Dallas County*, No. 3:18-cv-00154-N, pending before U.S. District Judge David Godbey.

### IV.     FACTUAL ALLEGATIONS

A.    **COVID-19 Poses a Significant Risk of Illness, Injury, or Death.**

28.    The novel coronavirus that causes COVID-19, has led to a global pandemic.[30] As of April 8, 2020, there were more than 1.45 million reported COVID-19 cases throughout the world and more than 12,900 deaths in the United States.[31] Projections indicate that as many as 240,000 people in the U.S. will die from COVID-19, accounting for existing interventions.[32]

29.    COVID-19 is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.[33] There is no vaccine against COVID-19, and there is no known medication to prevent or treat infection.[34] Social distancing—deliberately keeping at least six feet of space between persons to avoid spreading illness[35]—and a vigilant hygiene regimen, including washing hands frequently and thoroughly with soap and water, are the only known effective measures for protecting against transmission of COVID-19.[36] Because the coronavirus spreads among people who do not show symptoms, maintaining a six foot distance from others is the best way to prevent contraction. In other words, *everyone* including officials at the Dallas County Jail has to act as is if *everyone* has the disease.

---

[30] Betsy McKay et al., *Coronavirus Declared Pandemic by World Health Organization*, WALL ST. J. (Mar. 11, 2020, 11:59 PM), https://cutt.ly/UtEuSLC.

[31] Johns Hopkins University COVID-19 Data Center, (Apr. 8, 2020), https://coronavirus.jhu.edu/.

[32] Rick Noack, et al., *White House Task Force Projects 100,000 to 240,000 Deaths in U.S., Even With Mitigation Efforts*, Wash. Post. (April 1, 2020, 12:02 a.m.), https://cutt.ly/5tYT7uo.

[33] Centers for Disease Control and Prevention, *Interim Infection Prevention and Control Recommendations for Patience with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings*, https://cutt.ly/ztRAo0X.

[34] *Supra* note 12.

[35] Johns Hopkins University, *Coronavirus, Social Distancing and Self-Quarantine*, https://cutt.ly/VtYYiDG.

[36] Declaration of Dr. Robert L. Cohen, MD, In Support of Petitioners' Motion for a Temporary Restraining Order and Preliminary Injunction, ¶ 9.

30.     Once contracted, COVID-19 can cause severe damage to lung tissue, including a permanent loss of respiratory capacity, and it can damage tissues in other vital organs, such as the heart and liver.[37]

31.     People over the age of 50 face a greater risk of serious illness or death from COVID-19.[38] In a February 29, 2020 preliminary report, individuals age 50-59 had an overall mortality rate of 1.3 percent; 60-69-year-olds had an overall 3.6 percent mortality rate, and those 70-79 years old had an 8 percent mortality rate.[39]

32.     People of any age who suffer from certain underlying medical conditions, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, and asthma, also have an elevated risk.[40] Early reports estimate that the mortality rate for those with cardiovascular disease was 13.2 percent, 9.2 percent for diabetes, 8.4 percent for hypertension, 8.0 percent for chronic respiratory disease, and 7.6 percent for cancer.[41]

---

[37] Centers for Disease Control, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://cutt.ly/etRPVRl

[38] Xianxian Zhao, et al., Incidence, clinical characteristics and prognostic factor of patients with COVID-19: a systematic review and meta-analysis (March 20, 2020), https://cutt.ly/etRAkmt.

[39] *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths* Chart, https://cutt.ly/ytEimUQ (data analysis based on WHOChina Joint Mission Report).

[40] *Coronavirus disease (COVID-19) advice for the public: Myth buster*s, World Health Organization, https://cutt.ly/dtEiCyc ("Older people, and people with pre-existing medical conditions (such as asthma, diabetes, heart disease) appear to be more vulnerable to becoming severely ill with the virus.").

[41] *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization

(Feb. 28, 2020), at 12, https://cutt.ly/xtEokCt (finding fatality rates for patients with COVID-19 and co-morbid conditions to be: "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer").

33.     In many people, COVID-19 causes fever, cough, and shortness of breath. However, for people over the age of fifty or with medical conditions that increase the risk of serious COVID-19 infection, shortness of breath can be severe.[42] Most people in higher risk categories who develop serious illness will need advanced support. This requires highly specialized equipment like ventilators that are in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians.[43]  This level of care is not available in the Dallas County Jail.

34.     In serious cases, COVID-19 causes acute respiratory disease syndrome (ARDS), which is life-threatening: those who receive ideal medical care with ARDS have a 30 percent mortality rate.[44] Even in non-ARDS cases, COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, cause permanent loss of breathing capacity.[45] COVID-19 may also target the heart, causing a medical condition called myocarditis, or inflammation of the heart muscle. Myocarditis can reduce the heart's ability to pump.[46] This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and the ability to work.

35.     COVID-19 can also trigger an over-response of the immune system and result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury.[47]

---

[42] Zhao, *supra* note 36.

[43] *Dawson*, 20-cv-409 (W.D. Wash.) at Doc. No. 5, Declaration of Dr. Jonathan Louis Golob ¶ 6.

[44] Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Maryland, March 25, 2020, https://cutt.ly/stERiXk.

[45] Golob Dec., *supra* note 4336 at ¶ 7.

[46] *Id.*

[47] *Id.*

36.     These complications can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.[48]

37.     Even some younger and healthier people who contract COVID-19 may require supportive care, which includes supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.[49]

38.     The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 infection than from influenza.[50] According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.[51] For people in the highest risk populations, the fatality rate of COVID-19 infection is about 15 percent.[52]

39.     Patients who do not die from serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from neurologic damage, loss of digits, and loss of respiratory capacity.[53]

**B.      Persons Incarcerated in the Dallas County Jail Face Grave and Immediate Danger Due to COVID-19.**

40.     Beyond the general public health presented by the COVID-19 pandemic, persons incarcerated at the Dallas County Jail face a particularly acute threat of illness, permanent injury, and death.

---

[48] CDC, *Interim Clinical Guidance*, *supra* note 37.
[49] Golob Dec., *supra* note 43 at ¶ 5.
[50] *Id.* at ¶ 4.
[51] Betsy McKay, *Coronavirus vs. Flu Which Virus is Deadlier*, WALL ST. J. (Mar. 10, 2020, 12:49 PM), https://cutt.ly/itEmi8j.
[52] Golob Dec., *supra* note 43 at ¶ 4.
[53] *Id.*

41.     As of April 7, 2020, there are 8,262 confirmed COVID-19 cases in Texas,[54] with 1,261 of them in Dallas County.[55] To date, there have been 154 confirmed deaths from COVID-19 in Texas,[56] with 19 in Dallas County.[57] While there are more than 20 documented COVID-19 detainee cases and six detention officers from the Dallas County Jail, the true number is much likely higher given the limited and inadequate testing at the facility.  *See supra* fn 25 (describing known reports of confirmed cases); White Dec. ¶ 2 (Plaintiff White describing how he was denied testing until more than 10 days after his presentation of symptoms, despite his close proximity to other detainees).

42.     State and local officials have recognized the emergency situation posed by COVID-19 in Texas and Dallas County. On March 31, 2020, Texas Governor Greg Abbott issued an order requiring people to "minimize in-person contact with people who are not in the same household".[58] Nine days earlier, County Judge Clay Jenkins ordered people in Dallas County to stay at home.[59] The City of Dallas has promulgated regulations implementing the Texas and Dallas County orders.[60]

43.     People in congregate environments, which are places where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19, as already evidenced by

---

[54] Texas Case Counts COVID-19, *supra* note 8.
[55] Dallas County Health and Human Services, 2019 Novel Coronavirus (COVID-19) Summary at 1, (Apr. 7, 2020), https://cutt.ly/xtJXUH8.
[56] Texas Case Counts COVID-19, *supra* note 8.
[57] Dallas County Health and Human Services, 2019 Novel Coronavirus (COVID-19) Summary, *supra* note 55 at 1.
[58] Tex. Gov. Abbott Executive Order Announcement, *supra* note 22.
[59] "Safer at Home" Order, *supra* note 23.
[60] *See* City of Dallas, Shelter in Place, *supra* note 24.

the rapid spread of the virus in cruise ships[61] and nursing homes.[62] It is virtually impossible for people who are confined in prisons, jails, and detention centers to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission. This is demonstrated by dramatic outbreaks in the Cook County Jail[63] in Chicago and Rikers Island in New York City, where the transmission rate for COVID-19 is estimated to be the highest in the world.[64] The CDC also warns of "community spread" where the virus spreads easily and sustainably within a community where the source of the infection is unknown.[65]

44.     Epidemiologists[66] caution that the spread of COVID-19 in a jail setting will be more rapid and more catastrophic than in the general population, and further, will contribute to worse outcomes for the broader population, as illustrated in the following graphs:

---

[61] The CDC is currently recommending that travelers defer cruise ship travel worldwide. "Cruise ship passengers are at increased risk of person-to-person spread of infectious diseases, including COVID-19." *COVID-19 and Cruise Ship Travel*, Centers for Disease Control and Prevention, https://cutt.ly/7tEEQvT.

[62] The CDC notes that long-term care facilities and nursing homes pose a particular risk because of "their congregate nature" and the residents served. *Preparing for COVID-19: Long-term Care Facilities, Nursing Homes*, Centers for Disease Control and Prevention, https://cutt.ly/7tEEITH.

[63] *See supra* note 28.

[64] *Supra* note 21

[65] *How Coronavirus Spreads*, Centers for Disease Control and Prevention, https://cutt.ly/jtEE9vG.

[66] *See* Declaration of Eric Lofgren in Support of Petitioners' Motion for a Temporary Restraining Order and Preliminary Injunction.



45.     Correctional settings further increase the risk of contracting COVID-19 due to the high numbers of people with chronic, often untreated, illnesses housed in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, presence of many high-contact surfaces, and no possibility of staying at a distance from others.[67]

46.     As the below chart illustrates, health conditions that make COVID-19 particularly dangerous are more prevalent in the incarcerated population than in the general public.[68]

---

[67] Letter from Johns Hopkins Faculty, *supra* note 44; *Velesaca v. Decker*, 20-cv-1803 (S.D.N.Y.) at Doc. No. 42 (March 16, 2020) (Declaration of Dr. Jaimie Meyer) (noting, *inter alia*, that jails environments have reduced prevention opportunities, increased susceptibility, and are often poorly equipped to diagnose and manage outbreaks of infection disease).

[68] Peter Wagner & Emily Widra, *No need to wait for pandemics: The public health case for criminal justice reform*, Prison Policy Initiative (Mar. 6, 2020), https://cutt.ly/7tJXmlC.

| Health condition | Jails | Prevalence of health condition by population | | United States |
| --- | --- | --- | --- | --- |
| | | State prisons | Federal prisons | |
| Ever tested positive for Tuberculosis | 2.5% | 6.0% | | 0.5% |
| Asthma | 20.1% | 14.9% | | 10.2% |
| Cigarette smoking | n/a | 64.7% | 45.2% | 21.2% |
| HIV positive | 1.3% | 1.3% | | 0.4% |
| High blood pressure/hypertension | 30.2% | 26.3% | | 18.1% |
| Diabetes/high blood sugar | 7.2% | 9.0% | | 6.5% |
| Heart-related problems | 10.4% | 9.8% | | 2.9% |
| Pregnancy | 5.0% | 4.0% | 3.0% | 3.9% |

*Health conditions that make respiratory diseases like COVID-19 more dangerous are far more common in the incarcerated population than in the general U.S. population. Pregnancy data come from our report, Prisons neglect pregnant women in their healthcare policies, the CDC's 2010 Pregnancy Rates Among U.S. Women, and data from the 2010 Census. Cigarette smoking data are from a 2016 study, Cigarette smoking among inmates by race/ethnicity, and all other data are from the 2015 BJS report, Medical problems of state and federal prisoners and jail inmates, 2011-12, which does not offer separate data for the federal and state prison populations. Cigarette smoking may be part of the explanation of the higher fatality rate in China among men, who are far more likely to smoke than women.*

47.   Correctional facilities house large groups of people together, and move people in groups to eat, recreate, and go to court.[69] They frequently have insufficient medical care for the population even outside times of crisis.[70] Hot water, soap, and paper towels are often in limited supply. Incarcerated people, rather than professional cleaners, are responsible for cleaning the facilities[71] and often are not given appropriate supplies.

48.   Outbreaks of tuberculosis and the flu regularly occur in jails, including during the H1N1 epidemic in 2009 in which jails and prisons dealt with a disproportionately high number of cases.[72]

---

[69] *See, e.g,* Nathalie Baptiste, *Correctional Facilities are the Perfect Incubators for the Coronavirus*, (March 6, 2020), https://cutt.ly/GtRSi3e.

[70] *See, e.g.*, Steve Coll, *the Jail Health-Care Crisis*, The New Yorker (Feb. 25, 2019), https://cutt.ly/ftERHNg.

[71] *See, e.g.,* Wendy Sawyer, *How much do incarcerated people earn in each state?*, Prison Policy Initiative, (April 10, 2017); https://cutt.ly/qtER2bh (noting that "custodial, maintenance, laundry" and "grounds keeping" are among the most common jobs for incarcerated people); North Carolina Dept. of Corrections, *North Carolina Prison Inmates at Work*, https://cutt.ly/jtERCbb (noting that cleaning the grounds and facilities is one of the jobs of incarcerated persons in North Carolina).

[72] Declaration of Robert L. Cohen, M.D. (Cohen Dec.) ¶¶ 4–5.  The H1N1 "swine flu" pandemic outbreak spread dramatically in jails and prisons in 2010, but that strain of virus had a low fatality rate because of the characteristics of the virus—COVID-19's fatality rate is far higher. David M. Reutter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few* (Feb. 15, 2010), https://cutt.ly/ytRSkuX.

49.     Numerous public health experts, including Dr. Gregg Gonsalves,[73] Ross MacDonald,[74] Dr. Marc Stern,[75] Dr. Oluwadamilola T. Oladeru and Adam Beckman,[76] Dr. Anne Spaulding,[77] Homer Venters,[78] Jaimie Meyer,[79] the faculty at Johns Hopkins schools of nursing, medicine, and public health,[80] and Josiah Rich[81] have all strongly cautioned that people booked into and held in jails are likely to face serious, even grave, harm due to the outbreak of COVID-19.

50.     Because of the extraordinary danger that COVID-19 will spread in jails and prisons, the Centers for Disease Control and Prevention ("CDC") have issued specific guidance for dealing with correctional and detention facilities, including local jails.[82] The guidance was published on March 23, 2020. It acknowledges that incarcerated people are forced to exist "within congregate environments" that "heighten[] the potential for COVID-19 to spread once introduced," especially given that "[t]here are many opportunities for COVID-19 to be introduced into a correctional or detention facility," including "daily staff ingress and egress" as well as "high turnover" of "admit[ted] new entrants."  In light of these concerns, the guidance recommends that detention

---

[73] Kelan Lyons, *Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak,* Connecticut Mirror (March 11, 2020), https://cutt.ly/BtRSxCF.

[74] Craig McCarthy and Natalie Musumeci, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* New York Post (March 19, 2020), https://cutt.ly/ptRSnVo.

[75] Marc F. Stern, MD, MPH, *Washington State Jails Coronavirus Management Suggestions in 3 "Buckets,"* Washington Assoc. of Sheriffs & Police Chiefs (March 5, 2020), https://cutt.ly/EtRSm4R.

[76] Oluwadamilola T. Oladeru, et al., *What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind,* (March 10, 2020), https://cutt.ly/QtRSYNA.

[77] Anne C. Spaulding, MD MPDH, *Coronavirus COVID-19 and the Correctional Jail,* Emory Center for the Health of Incarcerated Persons (March 9, 2020).

[78] Madison Pauly, *To Arrest the Spread of Coronavirus, Arrest Fewer People*, Mother Jones (March 12, 2020), https://cutt.ly/jtRSPnk.

[79] Meyer Dec., *supra* note 67.

[80] *See,* supra note 44.

[81] Amanda Holpuch, *Calls Mount to Free Low-risk US Inmates to Curb Coronavirus Impact on Prisons*, The Guardian (March 13, 2020 3:00 p.m.), https://cutt.ly/itRSDNH.

[82] Centers for Disease Control, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (March 23, 2020), https://cutt.ly/atJPt5B.

facilities "explore strategies to prevent over-crowding of correctional and detention facilities during a community outbreak." The guidance further recommends that the correctional facilities:

a.  Post signage throughout the facility communicating COVID-19 symptoms and hand hygiene instructions, ensure such signage is understandable for non-English speaking people as well as those with low literacy, and provide clear information about the presence of COVID-19 cases within a facility and the need to increase social distancing and maintain hygiene precautions;

b.  Ensure sufficient stocks of hygiene and cleaning supplies, including tissues; liquid soap where possible; hand drying supplies; alcohol-based hand sanitizer; cleaning supplies effective against the coronavirus; and recommended personal protective equipment like face masks, disposable medical gloves, and N95 respirators;

c.  Provide incarcerated people no-cost access to soap (providing liquid soap where possible), running water, hand drying machines or disposable paper towels for hand washing, and tissues (providing no-touch trash receptacles for disposal);

d.  Consider relaxing restrictions on allowing alcohol-based hand sanitizer where security concerns allow;

e.  Provide a no-cost supply of soap sufficient to allow frequent hand washing, providing liquid soap where possible;

f.  Suspend co-pays for incarcerated people seeking medical evaluation for respiratory symptoms;

g.  Even if COVID-19 cases have not been identified locally or inside, implement "intensified cleaning and disinfecting procedures" that clean and disinfect high-touch surfaces and objects "[s]everal times per day," and ensure adequate supplies to support intensified cleaning and disinfection practices";

h.  Perform pre-intake screening and temperature checks for all new entrants;

i.  Adopt social distancing strategies to increase space between individuals, including rearranging bunking to ensure that beds are at a minimum six feet apart in all directions, increasing space in lines and waiting areas, staggering meals and rearranging seating during meals so that detainees are sitting on only one side of the table and are separated with adequate space;

j.  Medically isolate confirmed and suspected cases and quarantine of contacts.

51.     Despite the fact that the CDC Guidelines have been available for weeks, the Dallas County Jail has not complied with the majority of these guidelines.

52.     The Dallas County Jail has wholly failed to implement protective social distancing policies among detainees or staff.  Many of the detainees sleep in shared bunk dorm "pods" with up to 64 beds.  Sanchez Dec. ¶ 2 (all pods in the South Tower have 64 beds in a common room); Perez Dec. ¶ 3; McNickles Dec. ¶ 1. Even though the bunks are only between 1 and 4 feet apart, far closer than the recommended six or more feet, the shared bunk rooms have been almost full to capacity with between 48 and 60 men at any given time in the last few weeks in a single common dorm.  Wright Dec. ¶ 6;  Morrison Dec., ¶ 4, Munoz Dec., ¶ 8; Perez Dec. ¶ 3; Sanchez Dec. ¶. 2; McKnickles Dec. ¶¶ 1. 5.  Neither the detainees nor the staff practice social distancing.  Sanchez Dec. ¶ 7; McKnickles Dec. ¶ 4. Social distancing is not observed or encouraged by jail staff. Incarcerated persons are frequently held in situations in which they are within less than a six-foot distance from one another, such as in the booking room, holding cells, lunch lines, and in bunk-bed sleeping arrangements. Prisoners continue to share items and food.

53.     Social distancing is not possible during sleep, meals, or during distribution of medications under the current conditions. During meals the tables are crowded and the detainees sit so close that they are touching the persons seated next to them.  Dec. Sanchez ¶ 9.  The men line up for meals, commissary, clothing, and medication in close proximity, no more than one foot apart.   Sanchez Dec. ¶ 10. The detention officers are also not practicing social distancing. McKnickles Dec. ¶ 4.  They gather in groups, and on at least one occasion, a group of guards ate from a common bag of chips. Perez Dec.¶ 7.  Educational materials on social distancing are offered inconsistently and do not reach all persons in the Dallas County Jail.

22

54.     The Dallas County Jail has neither implemented adequate testing nor adopted adequate procedures to isolate confirmed and suspected cases.  Testing has been delayed or denied, even to detainees with symptoms.  *See* White Dec. ¶ 2 (despite presenting with symptoms including coughing, congestion and body aches on March 21st, Plaintiff White was not moved from a group dorm until four days later, and COVID-19 testing was not offered until more than 10 days later, on April 2); Perez Dec. ¶ 3 (he has not been tested despite developing cough, and reporting other men in his pod who were coughing for weeks to the nurse, but no evaluation offered to them); Wright Dec. ¶ 4 (no one in his dorm has been tested for the virus).  Men with symptoms are frequently denied medical treatment.  *Id.*; McDonald Dec. ¶ 3 (jail staff denied Plaintiff McDonald's request for evaluation and treatment when he experienced breathing problems even though he has severe asthma); Baker Dec. ¶ 2 (medical attention withheld for five hours to Plaintiff Baker during a severe asthma attack).  Named plaintiff McDonald, who has tested positive for COVID-19 and has significant underlying medical conditions, has been denied basic hydration. McDonald Dec. at ¶ 7.  Incarcerated persons and staff who have been exposed to persons who test positive for COVID-19, or who are presumed positive for COVID-19, continue to interact in close quarters with other incarcerated persons and staff and share common spaces including in dorms.

55.     Detainees who tested positive remained in group dorms next to detainees who did not have symptoms and who had not been tested.  *Se*e Baker Dec. ¶ 4 (describing Plaintiff Baker's repeated requests to be moved when held next to individuals with confirmed cases of the virus). Even when the Dallas County Jail officials determined that positive cases required movement of exposed detainees, they transferred the individuals who had been exposed in closed proximity with persons with confirmed cases to different dorms without any testing.  *See* Sanchez Dec. ¶ 3 (describing his transfer to from the dorm with a number of confirmed cases to a new dorm without

23

testing); Baker Dec. ¶¶ 4-5 (describing being transferred to a new cell, connected to two other cells, after being in proximity with the confirmed cases and not receiving testing despite the fact that he had a sore throat and cough).

56.      The Dallas County Jail has further failed to provide basic information about virus prevention recommended by the CDC to all detainees. Some of the plaintiffs have been left to try to discover how to protect themselves from intermittently available news coverage. *See* White Dec. ¶ 4 ("The jail staff never told Mr. White about how to avoid spreading the virus…he learned on the news that the virus is airborne and can stay on surfaces for several days. Mr. White no longer has access to the news); Morrison Dec. ¶ 3 ("The staff have not told [him] about COVID-19. He knows he is high risk, but does not know how to prevent himself from getting the virus."); Wright Dec. ¶ 9 (reporting that the jail staff have not provided information about the virus or how to prevent its spread).

57.      Contrary to the CDC's guidelines, the Dallas County Jail has failed to provide staff with adequate PPE and to require the use and regular replacement of such equipment.  Most guards do not wear masks *See* Perez ¶7 ("Mr. Perez has seen only one out of every six guards wearing masks."). Some guards even enter pods holding people known to have tested positive for COVID-19 without any PPE. Wright ¶ 3. When guards do use PPE, they often do not follow the proper public health guidance required for the mask to be effective. *See* Baker ¶ 9 ("The staff in the West Tower wear masks, but they do not change them out between interactions with detainees who have the virus and those who don't have the virus."); Sanchez ¶ 5 ("The guards that wear facemasks do not change their masks when they go from dorm to dorm.").  Many jail staff do not consistently or properly wear masks, for example reusing masks designed for single use, or nurses failing to change masks and other personal protective equipment between medical visits.

24

58.     Detainees are generally denied access to any PPE, even upon request. *See* Perez ¶6

("When Mr. Perez asked for a mask, he was told that the jail staff have to buy their own masks, so

they would not give him one."); Sanchez ¶ 5 ("When Mr. Sanchez asked guards for a facemask,

he was told the only people that need masks are the guards."); McKnickles ¶ 7 ("He also asked for

face masks. The jail staff haven't. . . given him any personal protective gear."). *See also*, Morrison

¶5; Munoz ¶ 3; White ¶ 3. Those that are denied staff masks are also prevented from creating their

own from materials they have access it in their cells. Perez ¶ 6 ("Some detainees tried wrapping

bath towels around their heads to cover their faces, but the jail staff told them they were not allowed

to do that."). When detainees are given masks, which is inconsistent, they are expected to wear the

same mask for the remaining period of their detention, regardless of how long. Baker ¶9 (""Mr.

Baker was provided with a mask only after he asked for one. He has had to use the same one

repeatedly because he was not given replacements."). Jail staff does not give consistent instructions

about when and how incarcerated persons should wear masks, for example only instructing

incarcerated persons to put masks on upon a visit from an attorney or other person. Most

egregiously, when a detainee is removed from a pod because he is sick, the guards require his

cellmates to collect the sick man's belongings and clean his bunk without first providing them with

any personal protective gear. Sanchez Dec. ¶ 3; Perez Dec. ¶ 9.

59.     The Dallas County Jail has also fallen far short of ensuring sufficient stocks of

hygiene and cleaning supplies or providing detainees with no-cost access to these supplies. Wright

Dec. ¶8. ("Sometimes the guards just don't have the soap and other cleaning agents.")  Some

detainees are given 3-4 single use bars of soap once a week that don't last one day. McDonald ¶

11. Others are not given any soap at all. White ¶ 6. The only way to obtain additional soap is to

purchase it through commissary, which is either irregularly available or shut down completely,

depending on the Tower. McDonald ¶ 11; Baker ¶ 6; Sanchez 11. *See* Munoz ¶ 6, "Mr. Munoz requested soap today and was told that the detainees were using excessive soap. He did not want to argue with the guards, so he did not receive any soap." As a result, detainees and the cells in which they are forced to live are anything but clean. *See* Morrison ¶ 6 ("The pod is filthy"); McDonald ¶ 10 ("The walls in his cell are so dirty that he is afraid to touch them."). While some pods have access to shower daily, detainees in pods holding people who have either tested positive for COVID-19 or are suspected of exposure to COVID-19 have been denied showers for up to ten days in a row. Baker par 8. White ¶ 8. Sick detainees are therefore forced to either "take a bird bath in the sink" or forego bathing altogether. When they are finally allowed to take a shower, the water is cold. Baker ¶ 8. Some detainees are forced to use the available soap to launder their clothing because sufficient clean laundry is not available, and are then left without enough soap to bathe or wash their hands. Incarcerated persons consistently report insufficient access to soap and cleaning supplies.

60.     The Dallas County Jail has failed to enforce adequate policies for disinfecting surfaces to prevent the spread of the virus. First, large numbers of detainees share a small number of phones, yet the phones are not regularly cleaned. Sanchez p7 ("All 60 men in both A and E pods share 8 phones, none of which are disinfected between use.") Additionally, detainees themselves are responsible for cleaning the pods, including the toilets and showers. Volunteers are rewarded with larger portions of food regardless of the quality of their work. Because the jail has not adequately informed detainees about the virus and how to prevent its spread, cleaning volunteering often do an insufficient job which goes unchecked. Sanchez par 8. ("Mr. Sanchez started volunteering because his bunk is 3 feet from the toilets and the other volunteers usually do not

clean properly."). Beds and cells are not cleaned and disinfected even after a person infected or presumptively infected with COVID-19 are moved from one space to another.

61.    The Dallas County Jail has denied detainees with adequate nutrition during the pandemic.  Detainees on the 9th floor of West Tower, which holds both people who have been tested positive for COVID-19 and people who have not been tested, endure especially cruel conditions. Guard distribute meals to people on the 9th floor by "smashing the food and shoving it in the crack between the door and the ground." Baker ¶7. Much of the food becomes inedible. As a result, some detainees have lost a significant amount of weight in a short period of time. Baker ¶7.

62.    The Dallas County Jail does not reliably facilitate legal calls or visits for detainees via video or telephone call. Detainees seeking the assistance of counsel in their criminal case, or wishing to raise issues with respect to their constitutional rights as detainees in the Dallas County Jail, thus experience difficulties and delays.

### C.    Existing Procedures and Protocols Will Not Be Sufficient to Ensure the Safety of Class Members or the General Public.

63.    Because of the severity of the threat posed by COVID-19, and its potential to rapidly spread throughout a correctional setting, public health experts recommend the rapid release from custody of people most vulnerable to COVID-19.[83] Release protects the people with the

---

[83] *See* Cohen Dec. at ¶¶ 30 – 31 ("Considerable downsizing is needed—less urgent action will not be sufficient."; Meyer Dec., *supra* note 67 at ¶¶ 37–38 (noting that population reduction in jails will be "crucially important to reducing the level of risk both for those within [jail] facilities and for the community at large," and that stemming the flow of intakes is a part of the necessary intervention); Greifinger Dec., *supra* note 12 at ¶ 13 ("In my opinion, the public health recommendation is to release high-risk people from detention, given the heightened risks to their health and safety, especially given the lack of a viable vaccine for prevention or effective treatment at this stage."); *Dawson*, 20-cv-409 (W.D. Wash.) at Doc. No. 6, Declaration of Marc Stern at ¶¶ 9–10 (noting that release is "a critically important way to meaningfully mitigate" the risks of harm to persons who are at high risk of serious illness or death, as well as to support the broader community health infrastructure).

greatest vulnerability to COVID-19 from transmission of the virus, and it also allows for greater risk mitigation for people held or working in a jail and the broader community.[84] Release of the most vulnerable people from custody also reduces the burden on the region's health care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time.

64.     Jail administrators in Cuyahoga County, Ohio[85]; Los Angeles, California[86]; San Francisco, California[87]; Jefferson County, Colorado[88]; Montgomery, Alabama[89]; and the State of New Jersey,[90] among others, have concluded that widespread jail release is a necessary and appropriate public health intervention. New bookings into jails also must be reduced, as recognized by statewide action in California directing judges to set bail at $0 in a wide range of cases.[91]

65.     Notwithstanding efforts by the Dallas Sheriff's Office to detect obvious symptoms of COVID-19 infection and release some detainees, immediate release of medically vulnerable Plaintiffs remains a necessary public health intervention.[92] Release of the Medically-Vulnerable

---

[84] *Id.*

[85] Scott Noll, *Cuyahoga County Jail Releases Hundreds of Low-Level Offenders to Prepare for Coronavirus Pandemic,* (March 20 2020 6:04 p.m.), https://cutt.ly/CtRSHkZ.

[86] Alene Tchekmedyian, *More L.A. County Jail Inmates Released Over Fears of Coronavirus Outbreak,* L.A. Times, (March 19, 2020 6:55 p.m.), https://cutt.ly/ltRSCs6.

[87] Megan Cassidy, *Alameda County Releases 250 Jail Inmates Amid Coronavirus Concerns, SF to Release 26,* San Francisco Chronicle (March 20, 2020), https://cutt.ly/0tRSVmG.

[88] Jenna Carroll, *Inmates Being Released Early From JeffCo Detention Facility Amid Coronavirus Concerns,* KDVR Colorado (March 19, 2020 2:29 pm.), https://cutt.ly/UtRS8LE.

[89] *See In Re: Covid-19 Pandemic Emergency Response,* Administrative Order No. 4, Montgomery County Circuit Court (March 17, 2020).

[90] Erin Vogt, *Here's NJ's Plan for Releasing Up to 1,000 Inmates as COVID-19 Spreads* (March 23, 2020), https://cutt.ly/QtRS53w.

[91] Maura Dolan, *In Uncharted Territory, California Court Leaders OK Urgent New Rules for Coronavirus*, Los Angeles Times (April 6, 2020, 6:50 p.m.), https://cutt.ly/atJVHcI.

[92] *See* Public Health Expert Declarations, *supra* note 83.

Subclass Members is necessary both to prevent significant harm, but also to facilitate the social distancing needed to reduce transmission for all proposed Class Members and the wider public.[93]

66.     The Dallas County Jail cannot handle the rapidly growing COVID-19 outbreak there, and thus the relief Plaintiffs seek is necessary to forestall the exponential spread of COVID-19 from the Jail to the community at large. With more than 5,000 detainees in the North, South, and West Towers of the Lew Sterrett Justice Center, dozens of employees failing to report for work, the delay in starting to screen employees and detainees for COVID-19 until March 27, 2020, the general unavailability of COVID-19 test kits for detainees and employees, the shortage of N95 masks and other personal protective equipment (PPE) even for employees much less for detainees, the routine mingling of large groups of detainees (50 or more) within dozens of pods, and the impossibility of implementing social/physical distancing for detainees and employees, the Dallas County Jail has failed to protect the present population of detainees, employees, and the larger community against the racing spread of COVID-19.

67.     Nor are the medical resources in Dallas County remotely adequate to deal with the looming repercussions of the outbreak in the Dallas County Jail. On April 5, 2020, the City of Dallas disclosed that 19 hospitals reported 772 intensive care unit (ICU) beds with 462 occupied and 865 ventilators with 302 in use.[94] Between March 10, 2020 and April 6, 2020, 383 Dallas patients with COVID-19 have been hospitalized (30 percent of all COVID-19 cases), with 119 in ICUs and 72 on ventilators (19 percent of all COVID-19 cases).[95] If the number of serious COVID-

---

[93] *Id.* Further, in the prison context, the ABA urges that "Governmental authorities in all branches in a jurisdiction should take necessary steps to avoid crowding that… adversely affects the … protection of prisoners from harm, including the spread of disease." ABA Standard on Treatment of Prisoners 23-3.1(b).

[94] Fox 4, *Dallas Hospitals Report having more than 2,000 beds, 563 ventilators available* (Apr. 5, 2020) https://cutt.ly/ztJVCs1.

[95] Dallas County Health and Human Services 2019 Novel Coronavirus (COVID-19) Summary, *supra* note 55 at Table 5.

19 cases in Dallas County grows at a rate similar to the rate of increase since March 10, the number of ICU beds and ventilators available in the community will be grossly inadequate, and there will be no time to adjust to the emergency.[96] The outbreak in the Dallas County Jail could easily overwhelm the scarce supply of ICU beds and ventilators for the entire Dallas community.

68.     Further, the Dallas County Jail must respond to and manage the continued risk of harm posed by the COVID-19 outbreak by following CDC[97] and other public health guidelines. This requires: (a) providing all incarcerated persons a six-foot radius (113 ft$^2$) or more of distance between any other persons, as well as during meals, transportation, court sessions, recreation, counts, and all other activities; (b) instituting a safety plan to prevent a further COVID-19 outbreak in the Dallas County Jail in accordance with CDC guidelines; (c) making readily available access to sanitation solutions, without charge, for the purposes of cleaning cell, dormitory, laundry, and eating areas, including sufficient soap, and lifting any ban on alcohol-based hygiene supplies (e.g. hand sanitizer, cleaning wipes); (d) providing COVID-19 testing for all class members, jail staff, and visitors; (e) providing those incarcerated with personal protective equipment, including face masks; (f) providing persons incarcerated with updated information about COVID-19 and daily population statistics with respect to the jail itself; (g) ensuring sufficient access to quarantine and medical isolation space, while still providing adequate hygiene and basic necessities; (h) waiving all medical co-pays for those experiencing COVID-19 like symptoms; and (i) waiving all charges for medical grievances during the COVID-19 outbreak. Cohen Dec. ¶¶ 30–46.

---

[96] This has occurred in other places with widespread outbreaks already. New York State is currently depending on 1,100 ventilators donated from Oregon State and China. Colin Dwyer, "*This is a Big Deal: New York Hails Ventilator Deliveries from China and Oregon*, N.Y. Times, (April 4, 2020), https://cutt.ly/jtJTmT4. New York City is asking veterinarians to donate ventilators. Miranda Bryant, *New York Veterinarians Give Ventilators to 'War Efforts' Against Coronavirus*, The Guardian, (Apr. 2, 2020), https://cutt.ly/utJTTQG.

[97] Centers for Disease Control, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (March 23, 2020), https://cutt.ly/atJPt5B.

## V.      CLASS ACTION ALLEGATIONS

69.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil
Procedures on behalf of themselves and a class of similarly situated individuals.

70.     Plaintiffs Oscar Sanchez, Marcus White, Keith Baker, Tesmond McDonald, and
Ideare Bailey seek to represent a class of all current and future detainees in pretrial custody,
including alleged violations of probation or parole, at the Jail ("Pre-Adjudication Class"),
including a subclass of all persons who, by reason of age or medical condition, the CDC has
identified as particularly vulnerable to injury or death if they were to contract COVID-19
("Medically-Vulnerable Pre-Adjudication Subclass"). Plaintiffs Sanchez, Baker, McDonald, and
Bailey are also representatives and members of this Medically-Vulnerable Pre-Adjudication
Subclass.

71.     Plaintiffs Marcelo Perez, Paul Wright, Jose Munoz, Roger Morrison, Terry
McNickles, Kiara Yarborough, and Olivia Washington seek to represent a class of all current and
future detainees in post-adjudication custody, including those serving a term of incarceration
pursuant to an adjudicated violation of probation or parole, at the Jail ("Post-Adjudication Class"),
including a subclass of persons who, by reason of age or medical condition, are particularly
vulnerable to injury or death if they were to contract COVID-19 ("Medically-Vulnerable Post-
Adjudication Subclass"). Plaintiffs Perez, Wright, Morrison, McNickles, and Yarborough are also
representatives and members of this Medically-Vulnerable Post-Adjudication Subclass.

72.     The "Medically-Vulnerable" subclasses are defined as all current and future
persons held at the Dallas County Jail over the age of 50, as well as all current and future persons
held at the Dallas County Jail of any age who experience (a) lung disease, including asthma,
chronic obstructive pulmonary disease (e.g. bronchitis or emphysema), or other chronic conditions
associated with impaired lung function; (b) heart disease, such as congenital heart disease,

31

congestive heart failure and coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders (including sickle cell disease); (i) inherited metabolic disorders; (j) history of stroke; (k) a developmental disability; and/or (l) a current or recent (within the last two weeks) pregnancy.

73.     This action has been brought and may properly be maintained as a class action under Federal law. It satisfies the numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

74.     Joinder is impracticable because (1) the classes and subclasses are numerous; (2) the classes and subclasses include future members, and (3) the classes and subclass members are incarcerated, rendering their ability to institute individual lawsuits limited.

75.     Based on available information, there are at least 40 people in the proposed Pre-Adjudication Class, the proposed Post-Adjudication Class, and each proposed subclass. Everyone in the Dallas County Jail is a proposed class members. The April 6, 2020 daily population report for the Dallas County Jail listed 5,180 total persons, of which nearly 200 people were in custody for pending misdemeanor charges, over 1,000 for pending felony charges, 255 people for parole violation holds, and over 500 serving various sentences.[98]

76.     Common questions of law and fact exist as to all members of the proposed classes: all are at unreasonable risk of serious harm from contracting COVID-19 due to the conditions in the Dallas County Jail and Defendants' failure to take reasonable measures to assure their safety

---

[98] Dallas County Criminal Justice Management Committee Information Statistics (April 6, 2020). The "serving various sentences" figure is based on an approximation including the categories with a Texas Dep't of Corrections designation, "sentenced SJF," "serving in county jail," and/or "serving county fines and fees."

from the disease, and all have a right to receive adequate COVID-19 prevention, testing, and treatment. Questions of fact common to all proposed class members include whether the conditions in the Dallas County Jail expose them to heightened risk of contracting COVID-19, and questions common to all members of the subclass include whether the conditions in the Dallas County Jail expose them to heightened risk of serious illness, injury, or death. Questions of law common to all proposed class and subclass members include what relief is necessary to mitigate the risks posed by their confinement in the Dallas County Jail.

77.     Plaintiffs' claims are typical of the class and the subclass members' claims. Defendants have placed them at significant risk of harm by failing to take appropriate steps to address the risk of contracting, and being rendered seriously ill or injured by, COVID-19 in the Dallas County Jail. Plaintiffs, like every person in the Jail, face heightened risk of contracting COVID-19 if they are not adequately protected by Defendants.

78.     Named Plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class. Plaintiffs have no interests adverse to the interests of the proposed class. Plaintiffs retained *pro bono* counsel with experience and success in the prosecution of civil rights litigation. Counsel for Plaintiffs know of no conflicts among proposed class members or between counsel and proposed class members.

79.     Defendants have acted on grounds generally applicable to all proposed class members, and this action seeks declaratory and injunctive relief. Plaintiffs therefore seek class certification under Rule 23(b)(2).

80.     In the alternative, the requirements of Rule 23(b)(1) are satisfied, because prosecuting separate actions would create a risk of inconsistent or varying adjudications with

respect to individual class members that would establish incompatible standards of contact for the party opposing the proposed classes.

## VI.  ARGUMENT

### A.  Plaintiffs' Incarceration Amidst the Current COVID-19 Outbreak in the Dallas County Jail Violates their Right to Constitutional Conditions of Confinement.

81.     Corrections officials have a constitutional obligation to provide for detainees' reasonable safety and to address their serious medical needs. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Indeed, under the Eighth Amendment, prison officials "must provide humane conditions of confinement; . . . must ensure that inmates received adequate food, clothing, shelter, and medical care, and must take reasonable reassures to guarantee the safety of the inmates[.]" *Id.* at 832 (internal quotation marks omitted).[99] This obligation also requires corrections officials to address prisoners' serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Brown v. Plata*, 563 U.S. 493, 531-32 (2011); *Hinojosa v. Livingston*, 807 F.3d 657, 666 (5th Cir. 2015) (plaintiff stated an Eighth Amendment claim when Defendants subjected him to conditions "posing a substantial risk of serious harm" to his health).

82.     This obligation requires corrections officials to protect detainees from infectious diseases like COVID-19; officials may not wait until someone tests positive for the virus, and an outbreak begins. *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993) ("That the Eighth Amendment protects against future harm to inmates is not a novel proposition. . . . It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on

---

[99] Plaintiffs and Class Members are both pretrial and post-conviction detainees. The Fourteenth Amendment's Due Process Clause governs conditions-of-confinement claims like these for pretrial detainees, while the Eighth Amendment governs post-conviction detainees. While it is clear that pretrial detainees are presumed innocent and therefore merit greater protection, *see Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979), the distinction is irrelevant here: the harms of actual and potential COVID-19 contraction alleged herein clearly satisfy the Eighth Amendment's more restrictive standard.

the ground that nothing yet had happened to them"); *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) ("It is also important to note that [an] inmate need not show that death or serious illness has [already] occurred."); *see also Farmer*, 511 U.S. at 833 ("[H]aving stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course.").

83.     Jail officials violate this affirmative obligation by showing "deliberate indifference" to the substantial risk of serious harm. *Farmer*, 511 U.S. at 828. With respect to an impending infectious disease like COVID-19, deliberate indifference is satisfied when corrections officials "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. at 33 (holding that a prisoner "*states a cause of action . . .* by alleging that [corrections officials] have, with deliberate indifference, exposed him to conditions that pose an unreasonable risk of serious damage to future health") (emphasis added); *see also Ball v. LeBlanc*, 792 F.3d 584, 594 (5th Cir. 2015) (court "may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious") (citing *Farmer*, 511 U.S. at 842); *Hinojosa*, 807 F.3d at 667 ("open and obvious nature" of dangerous prison conditions supported an inference of deliberate indifference"); *Johnson v. Epps*, 499 F. App'x 583, 589-92 (5th Cir. 2012) (allegations that prisoner was exposed to "serious, communicable diseases" and that prison officials were aware of the risk and did nothing to prevent it were sufficient to state a claim for violation of Eighth Amendment rights); *Gates v. Collier*, 501 F.2d 1291, 1300-03 (5th Cir. 1974) (affirming district court's holding that allowing "[s]ome inmates with serious contagious diseases . . . to mingle with the general prison population," alongside maintaining a

host of other unsanitary and inhumane conditions, "constitute[d] cruel and unusual punishment") (cited with approval in *Rhodes v. Chapman*, 452 U.S. 337, 352 n. 17 (1981)).

84.     Here, COVID-19 is "sure or very likely to cause serious illness," and even waiting until "next week" to attempt mitigation efforts within the jail will be too long. *See supra* Part IV. The harmful "condition of confinement" is confinement itself. Moreover, jail officials have been on notice of the substantial threat that COVID-19 poses to detainees—including the putative class members—for weeks.

85.     As outlined in the Declaration of Robert L. Cohen, M.D., Regarding the Spread of COVID-19 in and from the Dallas County Jail (Cohen Dec.) in support of Plaintiffs' Motion for a Temporary Restraining Order, Preliminary Injunction, and Writ of Habeas Corpus, there are no mitigation efforts that the Dallas County Jail could undertake that would better prevent the risk of contraction—and possible later spread to the non-jail community—than immediate release of the Medically-Vulnerable Subclass and others as needed. Cohen Dec. at ¶ 30–46.

86.     In addition to the immediate release of all Medically-Vulnerable Class Members, the Dallas County Jail must implement the additional measures outlined by Dr. Cohen (e.g., physical distancing, testing, quarantine, hygiene, medical care, personal protective equipment, public health information, etc.) and other public health/CDC guidance. Efforts to date—starting to check the temperature of employees and relying on regular staff to evaluate existing detainees and ask COVID-19 screening questions to new detainees as of March 27, 2020, continuing only routine sanitation protocols, wearing surgical masks for up to a week rather than changing them daily, and assigning potentially infected detainees to "designated" cells within the Dallas County Jail itself[100]—are plainly deficient. Defendants' failure to release particularly vulnerable people and

---

[100] COVID-19 Initiatives, Dallas County Sheriff's Office, *supra* note 26.

sufficiently adopt protocols to protect those who remain incarcerated constitutes deliberate indifference. *See, e.g.*, *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644 (5th Cir. 1996) ("even where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices."). As Dr. Cohen notes, the conditions in the Dallas County Jail "create a high risk of contributing to an outbreak of COVID-19," as the jail is not operationalizing public health guidance and is not equipped to slow transmission of the disease. Cohen Dec. at ¶¶ 4, 13–22.

87.     A related but distinct right of pretrial detainees—who are presumed innocent and therefore entitled to greater protection from unconstitutional conditions of confinement—is that their pretrial confinement cannot amount to punishment. *Bell*, 441 U.S. at 535 ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."); *id.* at n.16 (pretrial detainees retain greater protections than convicted counterparts); *Parker v. Carpenter*, 978 F.2d 190, 193 (5th Cir. 1992) (ordering evidentiary hearing on whether transfer to more violent wing was punitive). Punishment—and therefore deliberate indifference—is established if the jailer's conduct is either not rationally related to a legitimate, nonpunitive government purpose or excessive in relation to that purpose. *Bell*, 441 U.S. at 561; *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473–74 (2015); *see also Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415 (5th Cir. 2017).  Both elements are satisfied here. Even if the Dallas County Jail's current spacing of detainees and provision of healthcare would serve the legitimate purpose of jail health and safety in normal times, those procedures, together with recent modifications, are now endangering health and safety in the wake of COVID-19 by keeping people in the jail. Hence, continuing to detain Plaintiffs and putative class members is not rationally

related to the goal of health and safety (both the jail's and the public's) and is indeed excessive in relation to the course of conduct that would in fact achieve that goal: release with the support protections outlined herein. *See Plata*, 563 U.S. 493 (ordering release of inmates to correct overcrowding that violated Eighth Amendment); Memorandum and Order. Other courts to evaluate this question in light of the present COVID-19 pandemic have determined that the Eighth and Fourteenth Amendments require release of vulnerable persons. *Thakker*, No. 20-CV-0480 (M.D. Pa. Mar. 31, 2020) (categorically releasing petitioners who "suffer[] from chronic medical conditions and face[] an imminent risk of death or serious injury if exposed to COVID-19"); *Fraihat v. Wolf*, 20-cv-590 (TJH), (C.D. Cal. Mar. 30, 2020) ("This is an unprecedented time in our nation's history, filled with uncertainty, fear, and anxiety. But in the time of a crisis, our response to those at particularly high risk must be with compassion and not apathy. The Government cannot act with a callous disregard for the safety of our fellow human beings."); *Castillo v. Barr*, 20-cv-605 (TJH) (AFM), Dkt. No. 32 (C.D. Cal. Mar. 27, 2020); *Coronel*, 2020 WL 1487274; *Basank v. Decker*, 20-cv-2518 (AT), Dkt. No. 11 (S.D.N.Y. Mar. 26, 2020) ("The risk that Petitioners will face a severe, and quite possibly fatal, infection if they remain in immigration detention constitutes irreparable harm warranting a TRO."); *Jovel v. Decker*, 12-cv-308 (GBD), Dkt. No. 27 (S.D.N.Y. Mar. 26, 2020); *Malam v. Adducci*, No. 20-cv-10829 (E.D. Mich.) at Doc. No. 23 (granting similar motion for a temporary restraining order).

**B.      28 U.S.C. § 2241 is an Appropriate Vehicle to Remedy these Violations.**

88.      Section 2241(c)(3) allows this court to order the release of inmates like Plaintiffs who are held "in violation of the Constitution." 28 U.S.C. 2241(c)(3);*Boumediene v. Bush*, 533 U.S. 723 (2008) (The federal constitution requires that the habeas privilege be available in the absence of suspension);  *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("It is clear, not only from the language of 2241(c)(3) and 2254(a), but also from the common-law history of the writ, that the

essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody."); *Peyton v. Rowe*, 391 U.S. 54, 67 (1968) (Section 2241(c)(3) can afford immediate release for claims other than those challenging the sentence itself).[101]

89.     While the Fifth Circuit has indicated that "conditions of confinement" claims may not sound in Section 2241, habeas remains the proper remedy under these circumstances. *See Pierre v. United States*, 525 F.2d 933, 935–36 (5th Cir. 1976) (rejecting habeas petitioners' request for an injunction pertaining to immigration work authorizations under § 2241, "habeas is not available to review questions unrelated to the cause of detention. Its sole function *is to grant relief from unlawful imprisonment or custody* and it cannot be used properly for any other purpose."). However, the Fifth Circuit has not addressed how Section 2241 would apply in the current context, where the "condition" is a lightning-fast pandemic that has *already infected at least 28 inmates and guards at the Dallas County Jail.* Because immediate release is the only medically and legally sound remedy, rather than mere mitigation and/or further proceedings, traditional arguments against § 2241 as the proper vehicle are distinguishable.[104] *Cf. Skinner v. Switzer*, 562 U.S. 521, 534 (2011) (preferring Section 1983 to Section 2241 where outcome of challenge is not inevitable) (citing *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)); *see also Jones v. Cunningham*, 371 U.S.

---

[101] Section 2241, rather than § 2254, is the appropriate vehicle for state prisoners seeking COVID-based discharge. Section 2254 is a set of rules about how convicted state prisoners challenge the lawfulness of the proceedings producing their convictions and sentences. A state prisoner does not litigate under § 2254 simply because that prisoner denominates a filing as a habeas challenge; the litigation falls under § 2241 if it contains challenges to ongoing custody having nothing to do with whether the original conviction and sentence were lawfully imposed. As the Tenth Circuit has noted, a "challenge to the validity of [petitioner's] conviction and sentence" should "properly be brought under § 2254" but "an attack on the execution of his sentence" should be "pursuant to § 2241." *Montez v. McKinna*, 208 F.3d 862, 865 (10th Cir. 2000) (holding that a state prisoner's challenge to his interstate prison transfers was properly considered under § 2241). The instant petition is an attack on the *execution* of the petitioners' sentences. It is a challenge to continued custody that is independent of the underlying conviction and sentence, which makes § 2241 the appropriate vehicle.

236, 243 (1963) (habeas "is not now and never has been a static, narrow, formalistic remedy");

Eve Brensike Primus, *A Structural Vision of Habeas Corpus*, 98 CAL. L. REV. 1, 12-14 (an original

purpose of habeas was to rectify systemic violations by state actors). Addressing the Sixth Circuit's

prohibition against § 2241 challenges to "conditions," one district court determined that challenges

to confinement itself in light of the COVID-19 pandemic are properly brought in § 2241 petitions:

> Petitioner does not take issue with the steps taken at the [detention facility] to mitigate the risk of detainees contracting COVID-19. Rather, she says that no matter what steps are taken, due to her serious health conditions, there is no communal holding facility where she could be incarcerated during the COVID-19 pandemic that would be constitutional. Petitioner's claim must therefore be considered as a challenge to the continued validity of confinement itself. Accordingly, Petitioner's claim is properly brought under 28 U.S.C. § 2241, and the Court has jurisdiction.

*Malam*, No. 20-cv-10829 (E.D. Mich.) at Doc. No. 23 (Order granting motion for a temporary

restraining order).

90.     Plaintiffs have availed themselves of any possible state court avenues to pursue the

relief they seek from this Court.

91.     Oscar Sanchez is pretrial custody without an expected court date in his criminal

proceeding until April 28, 2020. Mr. Sanchez has been denied the ability to reliably hold legal

visits with counsel, and as of the filing of this amended petition, counsel cannot confirm whether

Mr. Sanchez sought a motion for reduced bond in an effort to realize his release from the Dallas

County Jail. Even if he has not filed a motion for a bond reduction in his criminal case, Mr. Sanchez

should be deemed to have exhausted state law remedies for the purposes of his § 2241 petition.

Because of the nature of Mr. Sanchez's arrest, he is unlikely to be released on an affordable pretrial

bond particularly in light of reduced court hours and staff. Further, Mr. Sanchez went to great

efforts to seek redress through the Dallas County Jail's grievance procedures, including by filing

a grievance and two appeals.

92.     Marcus White is in custody on a parole hold. Detainees subject to a parole hold are not eligible for release on bond reduction. Mr. White cannot request an expedited hearing with respect to his parole, and doing so would not provide him an opportunity to challenge the conditions of his detention. Therefore, Mr. White has no adequate or available state remedy to exhaust. For this reason, Mr. White should be deemed to have exhausted state law remedies for the purposes of his petition to this Court under § 2241.

93.     Tesmond McDonald is a post-adjudication detainee, and no longer has a right to a criminal defense attorney. On March 18, 2020, Mr. McDonald sought release from the Dallas County Jail on reduced bond. As a result, bond was set by the district judge. Mr. McDonald's efforts to seek out an adequate state remedy for his release, without the right to an attorney, demonstrates that he should be deemed to have exhausted the available state law remedies.

94.     Marcelo Perez is being held in the Dallas County Jail on an allegation that he violated probation by committing a new drug offense. He is currently on hold for a transfer to the drug treatment facility in Wilmer, Texas. Because of the COVID-19 pandemic, however, the facility is not taking new patients, thus his wait in jail is indefinite. As a post-adjudicated detainee, Mr. Perez no longer has a right to an attorney. Were Mr. Perez to seek a state court remedy via a Writ of Habeas Corpus in Texas - which would progress slowly through the court system - without a lawyer, he could expect to face considerable delays and wait months for adjudication. Grinter Dec. ¶ 7. Because of the extraordinary circumstances preventing Mr. Perez from seeking state relief, he should be deemed to have exhausted state law remedies.

95.     Roger Morrison is being held in the Dallas County Jail on a parole hold. Detainees who are on a parole hole are not eligible for release on bond reduction. Mr. Morrison cannot request an expedited hearing with respect to his parole, and doing so would not provide him an

opportunity to challenge the conditions of his detention Therefore, Mr. Morrison has no adequate or available state remedy to exhaust. For this reason alone, Mr. Morrison should be deemed to have exhausted state law remedies.

96.     Keith Baker is in pretrial custody in the Dallas County Jail. As of the time of filing this amended petiton/complaint, counsel for Mr. Baker cannot confirm whether he has moved for a reduced bond in state court. However, even if he has not filed a motion for a bond reduction in his criminal case, Mr. Baker should be deemed to have exhausted state law remedies for the purposes of his § 2241 petition. Mr. Baker went to great efforts to seek redress through the Dallas County Jail's grievance procedures, including by filing a grievance and two appeals. Mr. Baker's willingness to pursue adequate state remedies by seeking his release through filing a grievance and two appeals, demonstrates a considerable effort to exhaust all available state procedures for release. Because there is no alternative, sufficiently swift, remedy that could be pursued in the state courts, Mr. Baker should be deemed to have exhausted the available state law remedies.

97.     Paul Wright is being held in the Dallas County Jail while awaiting transport to the Texas Department of Criminal Justice. As a post-adjudicated detainee, Mr. Wright no longer has a right to an attorney. On March 4, 2020, Mr. Wright sought release on reduced bond. As a result, bond was set by the district judge. Thereafter, Mr. Wright entered into a plea on March 17, 2020. Neither avenue afforded Mr. Wright the opportunity to seek his release pursuant to the COVID-19 outbreak, nor did they result in such relief. Mr. Wright's efforts to seek out an adequate state remedy, without the right to an attorney, thoroughly demonstrates that he should be deemed to have exhausted the available state law remedies.

98.     Terry McNickels is being held in the Dallas County Jail pursuant to an alleged parole violation. His scheduled parole hearing was cancelled because of the pandemic. Making

matters worse for Mr. McNickels, as of approximately March 2020, all parole hearings in Dallas County were indefinitely suspended. Accordingly, the Dallas County parole board has not released any information outlining a potential time frame for when detainees will have an opportunity to reschedule cancelled parole hearings. Moreover, bond reduction hearings are not available for parole detainees. Mr. McNickels is thus precluded – through no fault of his own – from receiving an opportunity in state court to demonstrate that he should be released from jail. Therefore, he should be deemed to have exhausted the available state law remedies.

99.     Jose Munoz is being held pursuant to a probation order from a drug possession charge. Mr. Munoz is awaiting transportation to a drug treatment facility in Wilmer, Texas. Because of the COVID-19 pandemic, however, the facility is not taking new patients, and so his wait in jail is indefinite. As a post-adjudication detainee, Mr. Munoz no longer has right to an attorney. Mr. Munoz entered into a plea on January 27, 2020, pursuant to which he expected to receive treatment in Wilmer, Texas. Were Mr. Munoz to seek a state court remedy via a Writ of Habeas Corpus in Texas - which would progress slowly through the court system - without a lawyer, he could expect to face considerable delays and wait months for adjudication. Grinter Dec. ¶ 7. Mr. Munoz should be deemed to have exhausted the available state law remedies.

100.     Kiara Yarborough is being held in the Dallas County Jail pursuant to a probation order and is awaiting transport to the Intermediate Sanctions Facility (ISF) as a condition of her probation. TDCJ has announced that they will for the indefinite future not be transporting anyone to prisons or treatment facilities. Because she does not have a pending criminal case, she does not have the right to appointed counsel. Were Ms. Yarborough to seek a state court remedy via a Writ of Habeas Corpus in Texas - which would progress slowly through the court system - without a

lawyer, she could expect to face considerable delays and wait months for adjudication. Grinter Dec. ¶ 7. Ms. Yarborough should be deemed to have exhausted the available state law remedies.

101.    Olivia Washington being pursuant to a probation order and is awaiting transport to the Substance Abuse Felony Punishment facility (SAFP), as a condition of her probation. Because of the COVID-19 pandemic, however, the facility is not taking new patients, thus her wait in jail is indefinite. Because she does not have a pending criminal case, she does not have the right to appointed counsel. Were Ms. Washington to seek a state court remedy via a Writ of Habeas Corpus in Texas - which would progress slowly through the court system - without a lawyer, she could expect to face considerable delays and wait months for adjudication. Grinter Dec. ¶ 7. Because there is no alternative remedy that could be pursued in the state courts, Ms. Washington should be deemed to have exhausted the available state law remedies.

102.    Ideare Bailey is a pretrial detainee. He has filed a writ requesting pretrial release, and the district judge set a bond, which he posted. His bond has a condition that he be supervised with an electronic leg monitor, but the pretrial services division refuses to provide him one because he tested positive for COVID-19. Mr. Bailey has exhausted the available remedies in state court but remains incarcerated. Because there is no additional, alternative remedy that could be pursued in the courts of the State of Texas, Mr. Bailey should be deemed to have exhausted the available state law remedies.

103.    Further, section 2241 contains no exhaustion requirement conceivably applicable to prisoners seeking COVID-based discharge.[102] Plaintiffs are all therefore excused from 28

---

[102] Section 2241 does have provisions that impose some exhaustion-like constraints on litigation by military prisoners challenging their combatant status determinations. Those provisions are not relevant here.

U.S.C. § 2241's prudential exhaustion requirement.[103] It is well settled that "exhaustion is not required when the state procedures do not afford swift vindication." *Galtieri v. Wainwright*, 582 F.2d 348, 354 n. 12 (5th Cir.1978). Plaintiffs will not receive a sufficiently swift resolution of their constitutional claims if forced to exhaust all available remedies via state writs of habeas. Such remedies would take months under normal circumstances, and certainly will now take longer in light of substantial court closures across the state in response to the COVID-19 emergency.[104] *See* Amended Declaration of Alison Grinter (highlighting the extent, and unpredictability, of local state court closures and noting that all local courts in Dallas "have slowed or suspended functions").[105]

104.     Given the severity and spread of COVID-19, hours matter; Plaintiffs' case is one of the rare circumstances in which "it is proper for federal courts to treat claims technically unexhausted." *Galtieri*, 582 F.2d at 354.

## VII.     CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Unconstitutional Conditions of Confinement in Violation of the Fourteenth Amendment to the U.S. Constitution
42 U.S.C. § 1983 / 28 U.S.C. § 2241
*Pre-Adjudication Class versus All Defendants*

105.     Plaintiffs incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

---

[103] To the extent that courts have imposed prudential exhaustion rules on § 2241 petitioners, those petitioners have been seeking modifications to confinement conditions rather than discharge. The concerns that animate such prudential restrictions—the existence of parallel statutes with exhaustion requirements—do not apply to those seeking discharge

[104] Texas Courts, *Current and Upcoming Closures*, https://cutt.ly/VtJBR8w (listing dozens of state court closures due to the pandemic).

[105] *See also* Supreme Court of Texas, Court of Criminal Appeals of Texas, *First Emergency Order Regarding the COVID-19 State of Disaster*, (March 13, 2020), https://cutt.ly/1tL4MOc (authorizing all courts in Texas to, *inter* alia, "Modify and suspend any and all deadlines and procedures" until 30 days after the Governor's state of disaster related to COVID-19 is lifted); Jolie McCullough, *Coronavirus Pauses Many Texas Court Proceedings. For Some, that Means More Time in Jail*, Texas Tribune (March 19, 2020, 11:00 a.m.), https://cutt.ly/StL4HEE.

106.     Under the Fourteenth Amendment, corrections officials are required to provide for the reasonable health and safety of persons in pretrial custody. *Youngberg v. Romeo*, 457 U.S. 307, 315–16, 324 (1982) (the state has an "unquestioned duty to provide adequate . . . medical care" for detained persons).

107.     As part of the right, the government must provide incarcerated persons with reasonable safety and address serious medical needs that arise in jail to at least the same degree of persons in custody subsequent to a conviction. Deliberate indifference to the serious risk COVID-19 poses to members of the Pre-Adjudication Class, and particularly members of the Medically-Vulnerable Pre-Adjudication Subclass, violates this right.

108.     The Dallas County Jail has refused to comply with public health guidelines to manage an outbreak of COVID-19 and has not provided for the safety of the Pre-Adjudication Class. Defendants' actions and inactions result in the confinement of members of the Pre-Adjudication Class in a jail where they do not test for, treat, or prevent COVID-19 outbreaks, which violates Plaintiffs' rights to treatment and adequate medical care.

109.     Accordingly, Defendants, as supervisors, direct participants, and policy makers for Dallas County and the Dallas County Jail have violated the rights of the Pre-Adjudication Plaintiff Class under the Fourteenth Amendment.

## SECOND CLAIM FOR RELIEF

**Unconstitutional Punishment in Violation of the Fourteenth Amendment to the U.S. Constitution**
42 U.S.C. § 1983 / 28 U.S.C. § 2241
*Pre-Adjudication Class versus All Defendants*

110.     Plaintiffs incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

111.    Under the Fourteenth Amendment, persons in pretrial custody have greater due process protections than those convicted and therefore cannot be punished as part of their detention. *Bell*, 441 U.S. at 535 n.16. Punishment is established if the jailer's conduct is either not rationally related to a legitimate, nonpunitive government purpose or excessive in relation to that purpose.

112.    Even assuming that the Dallas County Jail's spacing and provision of medical services inside the facility normally serves the legitimate, nonpunitive purpose of health and safety of detained persons, the Dallas County Jail has failed to comply with public health guidelines to manage an outbreak of COVID-19. Therefore, continuing to detain Pre-Adjudication Class members without making the Dallas County Jail compliant with COVID-19-specific guidance from public health experts is not rationally related to, and excessive in relation to, that purpose.

113.    Accordingly, Defendants, as supervisors, direct participants, and policy makers for Dallas County and the Dallas County Jail have violated the rights of the Pre-Adjudication Plaintiff Class under the Fourteenth Amendment.

### THIRD CLAIM FOR RELIEF
**Unconstitutional Conditions of Confinement in Violation of the Eighth Amendment to the U.S. Constitution**
42 U.S.C. § 1983 / 28 U.S.C. § 2241
*Post-Adjudication Class versus All Defendants*

114.    Plaintiffs incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

115.    Under the Eighth Amendment, persons in carceral custody have a right to be free from cruel and unusual punishment. As part of the right, the government must provide incarcerated persons with reasonable safety and address serious medical needs that arise in jail. *See, e.g., Helling*, 509 U.S. at 33; *Estelle*, 429 U.S. at 104; *DeShaney*, 489 U.S. at 200. Deliberate indifference to the serious risk COVID-19 poses to members of the Post-Adjudication Class, and

particularly members of the Medically-Vulnerable Post-Adjudication Subclass, infringes on the protection from cruel and unusual punishment. Defendants violate this right by subjecting members of the Post-Adjudication Class to conditions of confinement that do not ensure their safety and health.

116.    The Jail has failed to comply with public health guidelines to manage an outbreak of COVID-19 and cannot provide for the safety of the Post-Adjudication Class.

117.    Defendants' actions and inactions result in the confinement of members of the Post-Adjudication Class in a jail where they do not have the capacity to test for, treat, or prevent COVID-19 outbreaks, which violates Plaintiffs' rights to treatment and adequate medical care.

118.    By operating the Jail without the capacity to test for, treat, or prevent a COVID-19 outbreak, Defendants, as supervisors, direct participants, and policy makers for Dallas County and the Dallas County Jail have violated the rights of the Post-Adjudication Plaintiff Class under the Eighth Amendment.

## VIII.        REQUEST FOR RELIEF

119.    Plaintiffs incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

120.    The outbreak of COVID-19 in the Dallas County Jail is creating a public health crisis for detainees and employees as well as the community at large. To prevent unnecessary disease, suffering, and deaths, Plaintiffs and Class Members respectfully request that the Court order the following relief:

1.    Certification of this action as a Class Action;

2.    A temporary restraining order, preliminary injunction, permanent injunction, and/or writ of habeas corpus requiring Defendants to identify all Medically-Vulnerable Subclass Members in both the Pre-Adjudication and Post-Adjudication Classes within six (6) hours of the Court's order and release—within twenty-four (24) hours of submission of the list—all such persons absent proof of judicially-

recorded findings by clear and convincing evidence that the individual poses such a serious risk of flight or danger to others that no other conditions can mitigate;

3.   A temporary restraining order, preliminary injunction, permanent injunction, and/or writ of habeas corpus requiring Defendants to provide all persons released with educational resources on COVID-19 including instructions that they should self-isolate for the CDC-recommended period of time (currently 14 days) following release;

4.   Following immediate release of all Medically-Vulnerable Subclass Members, a plan, to be submitted to the Court in three (3) days and overseen by a qualified public health expert agreed upon by the parties or ordered by the Court pursuant to Fed. R. Evid. 706, which outlines:

   a.   Specific mitigation efforts, in line with CDC guidelines, to prevent, to the degree possible, contraction of COVID-19 by all Class Members not immediately released;

   b.   A housing and/or public support plan for any released Class or Subclass Members whose testing confirms have been exposed to or infected with COVID-19 and who do not readily have a place to self-isolate for the CDC-recommended period of time (currently 14 days).

   c.   An evaluation of whether the release of the Subclass Members permits adequate social distancing and whether other categories of prisoners must be released to provide for compliance with CDC guidelines.

5.   A preliminary injunction, permanent injunction, and/or writ of habeas corpus requiring Defendants to:

   a.   Continue to release via habeas or transfers to home confinement, all current and future Medically-Vulnerable subclass members absent proof of judicially-recorded findings by clear and convincing evidence that the individual poses such a serious risk of flight or danger to others that no other conditions can mitigate;

   b.   Report weekly on the population of persons in the Dallas County Jail who are Medically-Vulnerable as defined in this action;

   c.   Follow the terms of the public health expert plan submitted pursuant to Fed. R. Evid. 706;

   d.   Release via habeas, or transfer to home confinement, additional Class Members, including those not considered "Medically-Vulnerable," as needed to ensure that all remaining persons incarcerated in the Dallas County Jail are under conditions consistent with CDC and public health

guidance to prevent the spread of COVID-19, including requiring that all persons be able to maintain six feet or more of space between them.[106]

6.    If immediate release is not granted on the basis of this Complaint alone, then expedited review of the Complaint, including oral argument, via telephonic or videoconference if necessary;

7.    A declaration that jail's policies violate the Fourteenth Amendment rights to reasonable safety and to be free from punishment prior to conviction with respect to the Pre-Adjudication Class;

8.    A declaration that Dallas County Jail's policies violate the Eighth Amendment right against cruel and unusual punishment with respect to the Post-Adjudication Class;

9.    An award of Plaintiffs' attorney fees and costs under 42 U.S.C. § 1988 and other applicable law; and

10.    Any further relief to which Plaintiffs are entitled.

---

[106] If, after granting habeas writs and/or transfer orders to home confinement as outlined above, additional release orders are required to comply with the public health expert plan submitted pursuant to Fed. R. Evid. 706, Plaintiffs would anticipate moving the Court to convene a three-judge panel pursuant to 18 U.S.C. § 326(a)(3).

Dated: April 17, 2020.

Respectfully submitted,

| | | */s/ Barry Barnett* |
|---|---|---|
| _____ | _____ | SUSMAN GODFREY L.L.P. |
| AMERICAN CIVIL | ACLU FOUNDATION OF TEXAS | Barry Barnett |
| LIBERTIES FOUNDATION | Brian Klosterboer | Texas Bar No. 01778700 |
| Andrea Woods* | Texas. Bar No. 24107833 | 8115 Preston Road, Suite 575 |
| N.Y. Bar No. 5595509 | Adriana Piñon** | Dallas, TX 75225 |
| Brandon Buskey* | Texas Bar No. 24089768 | (866) 754-1900 |
| 125 Broad Street, 18th | Andre Segura | *bbarnett@susmangodfrey.com* |
| Floor | Texas Bar No. 24107112 | |
| New York, NY 10004 | 5225 Katy Fwy., Suite 350 | |
| (212) 549-2528 | Houston, TX 77007 | Michael Gervais* |
| *awoods@aclu.org* | Tel: (713) 942-8146 | N.Y. Bar No. 5122890 |
| | Fax: (346) 998-1577 | 1900 Avenue of the Stars, |
| Henderson Hill* | | Suite 1400 |
| N.C. Bar No. 18563 | _____ | Los Angeles, CA 90067 |
| 201 W. Main St. Suite 402 | CIVIL RIGHTS CORPS | (310) 789-3100 |
| Durham, NC 27701 | Katherine Hubbard*** | *mgervais@susmangodfrey.com* |
| (919) 682-9563 | D.C. Bar No. 1500503 | |
| *hhill@aclu.org* | Elizabeth Rossi* | |
| | D.C. Bar No. 1500502 | _____ |
| Amy Fettig* | 1601 Connecticut Ave NW, | NEXT GENERATION ACTION |
| D.C. Bar No. 484883 | Suite 800 | NETWORK |
| 915 15th Street N.W., | Washington, D.C. 20009 | Alison Grinter |
| 7th Floor | (202) 894-6126 | Texas Bar 24043476 |
| Washington, D.C. 20005 | *katherine@civilrightscorps.org* | Kim T. Cole |
| (202) 548-6608 | *elizabeth@civilrightscorps.org* | Texas Bar No. 24071024 |
| *afettig@aclu.org* | | 1808 South Good Latimer |
| | | Expressway |
| | | Dallas, TX 75226 |
| | | (214) 704-6400 |
| | | *agrinter@thengan.com* |
| | | *kcole@thengan.com* |

ATTORNEYS FOR PETITIONERS/PLAINTIFFS
*admitted pro hac vice*
**N.D. Texas admission application forthcoming*
*** pro hac vice application forthcoming*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing was served via the Court's CM/ECG system on all counsel registered with that system, and via email, on April 17, 2020

*/s/ Barry Barnett*
Barry Barnett
