# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| OSCAR SANCHEZ, MARCUS WHITE, TESMOND MCDONALD, MARCELO PEREZ, ROGER MORRISON, KEITH BAKER, PAUL WRIGHT, TERRY MCNICKELS, JOSE MUNOZ, KIARA YARBOROUGH, OLIVIA WASHINGTON, AND IDEARE BAILEY; *on their own and on behalf of a class of similarly situated persons*; | Civil Action No. 20-cv-832 |
| | |
| | **Plaintiffs' Reply in Support of Their Motion for a Temporary Restraining Order and Writ of Habeas Corpus** |
| *Petitioners/Plaintiffs*, | |
| v. | |
| DALLAS COUNTY SHERIFF MARIAN BROWN, *in her official capacity*; DALLAS COUNTY, TEXAS; | |
| *Respondents/Defendants* | |

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER AND WRIT OF HABEAS CORPUS

## <u>TABLE OF CONTENTS</u>

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS .................................. 4

A.    Defendants Are Not Implementing Their Purported Policies ....................................... 6

B.    Social Distancing is Necessary, but Impossible, in the Jail ............................................ 9

C.    Subjecting Plaintiffs to Infection, Illness, and Death Constitutes Deliberate

Indifference ................................................................................................................... 14

1.    Post-Adjudication Class ................................................................................................ 16

2.    Pre-Adjudication Class ................................................................................................. 17

3.    Sheriff Brown is Deliberately Indifferent Despite the Fact that She is Required Under

State Law to Execute Judicial Orders ............................................................................ 18

II.   THE REMAINING FACTORS WEIGH HEAVILY IN FAVOR OF PLAINTIFFS'

REQUESTED RELIEF .................................................................................................. 19

III.  THE NATURE OF THE RELIEF PLAINTIFFS SEEK ............................................. 22

A.    Plaintiffs Seek a Temporary Restraining Order and Writs of Habeas Corpus ........ 22

B.    Preliminary Injunction Order .................................................................................... 23

C.    In the Alternative, the Court can Grant Relief Under § 1983 Exclusively ................ 23

D.    If the Court Denies the Medically-Vulnerable Named Plaintiffs' Requests for Habeas

Writs, They Request Release Pending Further Adjudication ................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Barrera v. Wolf*,
  No. 20-CV-1241 (KPE), Dkt. No. 41 (S.D. Tex. April 17, 2020)..........................................28

*Calley v. Callaway*,
  496 F.2d 701 (5th Cir. 1974) ...............................................................................................33

*Daskalea v. District of Columbia*,
  227 F.3d 433 (D.C. Cir. 2000).............................................................................................24

*Daves v. Dallas County*,
  Case No. 18-11368 (Jan. 23, 2019)................................................................................27, 28

*Depriest v. Walnut Grove Corr. Auth.*,
  2015 WL 3795020 (S.D. Miss., June 10, 2015), *appeal dismissed as moot sub
  nom. Depriest v. Fisher*, 669 Fed. App'x. 209 (5th Cir. 2016)...............................................32

*Duvall v. Dallas County*,
  631 F.3d 203 (5th Cir. 2011). Dkt. 34 ..................................................................................23

*Gates v. Cook*,
  376 F.3d 323 (5th Cir. 2004) ...............................................................................................13

*Helling v. McKinney*,
  509 U.S. 25 (1993)..........................................................................................................13, 24

*Hope v. Pelzer*,
  536 U.S. 730 (2002)..............................................................................................................24

*Hunt v. Dental Dep't*,
  865 F.2d 198 200 (9th Cir. 1989) .........................................................................................24

*Jackson v. Johnson*,
  475 F.3d 261 (5th Cir. 2007) ...............................................................................................32

*Lake Charles Diesel, Inc. v. Gen. Motors Corp.*,
  328 F.3d 192 (5th Cir. 2003) ..........................................................................................11, 27

*Money v. Pritzker*,
  No. 20-CV-2093, 2020 WL 1820660 (N.D. Ill. Apr. 10, 2020)............................................23

*Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*,
  834 F.2d 326 (3d Cir. 1987)..................................................................................................24

i

*Parker v. Carpenter*,
    978 F.2d 190 (5th Cir. 1992) ................................................................25

*Plata v. Brown*,
    No. C01-1351 TEH, 2013 WL 12436093 (N.D. Cal. June 24, 2013) ....................................32

*Saltz v. Tennessee Dep't of Employment Sec.*,
    976 F.2d 966 (5th Cir. 1992) ................................................................26

*Santosky v. Kramer*,
    455 U.S. 745 (1982)................................................................28

*Valentine v. Collier*,
    ECF 40, Case No. 4:20-cv-01115 (S.D.Tex. Apr. 16, 2020)................................................................32

*In re Wainwright*,
    518 F.2d 173 (5th Cir. 1975) ................................................................33

*Ware v. Jackson Cty.*,
    150 F.3d 873 (8th Cir. 1998) ................................................................24

*Woodward v. Corr. Med. Servs. of Ill., Inc.*,
    368 F.3d 917 (7th Cir. 2004) ................................................................25

*Ex Parte Young*,
    209 U.S. 123 (1908)................................................................26

**Statutes**

18 U.S.C. § 326(a)(3)................................................................33

28 U.S.C. § 2241 ................................................................*passim*

42 U.S.C. § 1983................................................................11, 31, 32, 33

Prison Litigation Reform Act, 18 U.S.C. § 3626................................................................31, 32, 33

## ARGUMENT

The need for the emergency relief has grown even more urgent since Petitioners/Plaintiffs (hereinafter "Plaintiffs) filed this lawsuit on April 9, 2020. As of April 16, 2020, 47 people detained in the Dallas County Jail had tested positive for COVID-19, and another 27 were awaiting test results. Sixteen jail staff members were positive, and another 14 were in quarantine pending test results. These numbers likely dramatically undercount the number of people infected because of how little testing has occurred, and the fact that many people with the disease have no symptoms.[1] Moreover, multiple, credible reports describe dozens of people in the jail who have COVID-like symptoms but are not being tested or quarantined, and some of whom are being denied treatment. Williams Dec. ¶19 (describing cellmate with painful sore throat too afraid to seek medical help, and then not receiving testing or treatment upon contacting the nurse); Bailey Dec. ¶¶ 2 – 10 (wife of Plaintiff Ideare Bailey describing Mr. Bailey's contraction of COVID-19 in the Dallas County Jail); Fly Dec. III.

Dr. Cohen notes in his supplemental declaration that the policies described by Dallas officials in the materials submitted to this Court fall short of essential CDC guidelines in key ways. Supp. Cohen Dec. ¶ 11. For instance, Dr. Cohen notes that the Dallas County Jail's practices around intake screening, a "key area" given the opportunity for exposure and spread, are "convoluted" and fail to provide adequate assurance that persons are screened, given personal

---

[1] For example, after a single person tested positive in a housing unit in an Arkansas prison, prison officials tested all other men living in the same housing unit and found that 43 out of 46 of them were positive. All were asymptoamic. *See* Samantha Michaels, MOTHER JONES, *Want to Know How Fast Coronavirus Can Spread in Prison? Look at Arkansas* (Apr. 13, 2020), https://www.motherjones.com/coronavirus-updates/2020/04/cummins-unit-prison-arkansas-coronavirus-spread/; *see also* Drew Karedes, BOSTON 25 NEWS, *CDC reviewing 'stunning' universal testing results from Boston homeless shelter* (Apr. 15, 2020), https://www.boston25news.com/news/cdc-reviewing-stunning-universal-testing-results-boston-homeless-shelter/Z253TFBO6RG4HCUAARBO4YWO64/?fbclid=IwAR1lmQq7GN8l46shklNNZBMJ_k3SCuixwIsaIu_eFs2cspjR4fVDTz_ZTIQ; Phil Stewart and Idrees Ali, REUTERS, *Coronavirus clue? Most cases aboard U.S. aircraft carrier are symptom-free* (Apr. 16, 2020), https://www.reuters.com/article/us-health-coronavirus-usa-military-sympt-idUSKCN21Y2GB.

1

protective equipment, and isolated. *Id.* ¶ 12. And the Dallas County Jail's use of the infirmary—where medically-vulnerable patients will be housed—as a place for intake, quarantine, and isolation is "highly problematic." *Id.* ¶ 13. As Dr. Cohen stresses, however, social distancing "is the key to stopping the spread of COVID-19," and the Dallas County Jail's stated policies to facilitate social distancing "will not mitigate the spread of the virus and cannot mitigate the spread of the virus without serious population reductions." *Id.* ¶ 27. Finally, the CDC guidelines do not cover jail downsizing orders, in part because the CDC recognizes that decisions to order individuals' release from jail are more properly vested in authorities such as this Court. *Id.* ¶ 28. But Dr. Cohen stresses that release in order to facilitate social distancing and protected the most vulnerable is crucial to protect the health and safety of persons living and working in the Dallas County Jail as well as those in the broader community. *Id.* ¶¶ 29–30.

As Dr. Lofgren indicates in his supplemental declaration, substantial numbers of incarcerated people at the Dallas County Jail will become infected, require hospitalization, and die if the jail does not further expedite release and slow intake even further in the days ahead.  Supp. Lofgren Dec. ¶¶ 9–10. Accounting for the approximately 17 percent reduction in the Dallas County Jail realized to date, and even in the unlikely event that no other persons incarcerated at the jail were infected with COVID-19 and rigorous social distancing were followed, Dr. Lofgren's epidemiological model predicts that the Dallas County Jail will see approximately 6,000 infections, 800 hospitalizations, and 250 deaths over the next six months. *Id.*

Indeed, the spread of COVID-19 in the Dallas County Jail is just days behind the outbreaks in other jails and prisons. Earlier this week, an individual detained pretrial at New York City's Rikers Island died from COVID-19 while handcuffed to a bed, which was Rikers' second in-

custody death.[2] Three persons incarcerated in the Cook County Jail have died of COVID-19,[3] as well as 18 individuals who were in federal custody.[4]

Persons incarcerated at the Dallas County Jail are in danger of suffering a similar fate. While Defendants argue that they have adequate policies in place to prevent and contain COVID-19, the evidence suggests that Defendants are not following those purported policies. More importantly, even if Defendants were consistently following each policy detailed in their response, these interventions are not enough to prevent widespread illness and death in the Dallas County Jail. Supp. Cohen Dec. ¶¶ 11–19; 25–30.

In this brief, Plaintiffs respond to Defendants' and Proposed-Intervenors' arguments on the merits of Plaintiffs' claims, Dkts. 33, 34, and address the other elements Plaintiffs must show to secure a preliminary relief, which include showing (1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) that granting the preliminary injunction will not disserve the public interest. *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 195–96 (5th Cir. 2003).

In a forthcoming omnibus brief responding to Defendants' and Proposed-Intervenors' Motions to Dismiss, Plaintiffs respond to Defendants' and proposed-Intervenors' arguments pertaining to this Court's jurisdiction to hear Plaintiffs' claims. As will be set forth in that brief, jurisdiction is properly asserted under both 28 U.S.C. § 2241 and 42 U.S.C. § 1983, because, *inter alia*, (1) Plaintiffs have adequately exhausted both the state court avenues available to them and

---

[2] Reuven Blau, THE CITY, *Second Rikers Island Inmate Dies of COVID-19 After Failed Bid to Spring Him* (Apr. 13, 2020), https://thecity.nyc/2020/04/second-rikers-inmate-dies-of-covid-after-freedom-bid-fails.html
[3] Paige Fry, CHICAGO TRIBUNE, *Third inmate with COVID-19 at Cook County jail dies* (Apr. 12, 2020), https://www.chicagotribune.com/news/breaking/ct-covid-jail-death-third-20200413-ob7u5h7ccfg4zo6fgy46p2zpqi-story.html
[4] FED. BUREAU OF PRISONS, COVID-19 CORONAVIRUS, https://www.bop.gov/coronavirus/

the grievance procedures in the Dallas County Jail, (2) any further exhaustion of state court remedies would be futile and result in irreparable harm, and (3) because the only appropriate relief for Medically-Vulnerable subclass members presented by the violation of their constitutional rights raised in this action is release, and therefore invocation of § 2241 is appropriate. The Court should therefore reach the merits of Plaintiffs' Motion for a Temporary Restraining Order and Writ of Habeas Corpus.

## I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

What is not in dispute in this litigation is the need to reduce the inmate population and take other steps recommended by the CDC to mitigate the spread of COVID-19 in the Dallas County Jail.  In that regard, in their opposition to Plaintiffs' motion for immediate relief, Defendants claim to be making every effort to do both with respect to the situation in the Dallas County Jail, Dkt. 34 at 9–14, essentially conceding that the present public health crisis requires such a response from them. The problem, however, is that Defendants' assurances that the Sheriff is taking adequate steps to mitigate the spread of COVID-19 within the jail fall short of the necessary interventions, and are inconsistent with actual practices. Dkt. 34 at 9–14. Notwithstanding the efforts detailed by Defendants—the consistency and accuracy of which Plaintiffs dispute—Plaintiffs have still demonstrated a likelihood of success on their claim that Defendants have acted with deliberate indifference towards the risk of harm to all proposed class members and/or subjected Pre-Adjudication Class Members to pretrial punishment.

As Dr. Cohen notes, the practices Defendants' describe do not meet essential public health guidance regarding COVID-19 in important ways, including around quarantining and screening at intake, cohorting in the jail (among other things, Defendants use the infirmary as a place for quarantine, thus further exposing any medically-vulnerable persons housed in the infirmary), and failure to ensure social distancing, which is key. Supp. Cohen Dec. ¶¶ 11–19; 25–30. Defendants

4

are well aware of this, and do not seem to dispute that social distancing is necessary in the facility. But, as Dr. Cohen notes, there is no evidence of any serious attempt to impose social distancing and proper quarantine measures inside Dallas County Jail. *Id.* ¶¶ 25–28.

Further, Defendants' submission regarding their policies and practices is at odds with numerous, consistent accounts that many of the procedures described are not carried out in practice: (1) testing is extremely limited; (2) education and training on symptoms and precautions are limited; (3) hand soap and other cleaning supplies are not in sufficient supply; (4) prisoners are not properly quarantined or cohorted upon exposure to COVID-19; (5) showers and clean laundry are not readily accessed; and (6) clean personal protective equipment is often unavailable.

Most importantly, even if Defendants were carrying out every single policy they describe with perfect consistency, those policies are no substitute for the social-distancing practices that medical experts agree are necessary to prevent an uncontrollable outbreak and to mitigate the unconstitutional risk of serious illness or death—and which are impossible inside the Dallas County Jail. Supp. Cohen Dec. ¶ 30; Supp. Lofgren Dec. ¶¶ 9–10.

The failure to undertake compliance with even the most basic recommended measures to mitigate the spread of COVID-19 demonstrates that Defendants are acting with deliberate indifference to the severe risk COVID-19 poses to Plaintiffs. Dkt. 3 at 27–33; *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (The risk of contracting a communicable disease can constitute such an "unsafe, life-threatening condition" that violates the Eighth Amendment); *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) ("It is also important to note that [an] inmate need not show that death or serious illness has [already] occurred.").

Plaintiffs are thus likely to succeed on the merits of their Eighth and Fourteenth Amendment claims against the Defendants.

5

### A.  Defendants Are Not Implementing Their Purported Policies

Defendants describe textbook adherence to public health guidance in the Dallas County Jail. The reality is very different from what they describe:

- **Social distancing is not, and cannot be, adequately practiced.**

People detained in the jail are routinely kept in spaces where they cannot maintain six feet of space from other people, including during the booking process, Williams Dec. ¶ 2 (describing the twelve hours spent in the booking area as so crowded "I could smell the breath of the people next to me"); while being kept in holding cells, Fly Dec. at II.1 (Stanphill Norbert detailing being held two-to-four feet apart from others in a holding cell); while standing in lines for food, Williams Dec. ¶ 20 ("We ate meals in the day room sitting side-by-side")); while using the phone, *id.*; and in the housing units where bunk beds are close to together, Wykevia Bailey Dec. ¶ 3 (Wife of Plaintiff Ideare Bailey could hear people coughing in Mr. Bailey's pod during her phone conversations with him); Fly Dec. II.7. Moreover, inmates continue to share items like books, coffee, and food. *Id.* II.4. Notwithstanding the County's claims that they have educated incarcerated persons about the importance of social distancing, the testimony of James Williams, who was recently released from the Dallas County Jail, is that detainees "were not told to keep six feet apart." Williams Dec. ¶ 20. While Defendants claim that video conferencing has been made available to facilitate social distancing efforts, Dkt. 34 at 7, video visits are not reliably accessed. *See* Dkt. 39 ¶ 62.

- **Education about the disease is inadequate and inconsistent, at best.**

Some inmates report that they have received no education about COVID-19 or social distancing, and that they have not seen any information posted in the jail. Williams Dec. ¶ 21 (only received information about COVID-19 upon discharge from the jail); Fly Dec. IV(1)-(3)

("Several detainees reported that the first time the staff told them anything about the virus was on April 9, 2020."). Others report that education is minimal, and moreover, ineffective, because jail staff provide conflicting information. For example, one nurse instructed inmates to protect themselves by using a towel over their faces when they were not being given masks. But people detained report being threatened with isolation or other punishment if they covered their faces with towels. Perez Dec. ¶ 6 ("Some detainees tried wrapping bath towels around their heads to cover their faces, but the jail staff told them they were not allowed to do that.").

- **Jail staff routinely do not wear face masks, and temperature checks are unsanitary.**

Guards routinely fail to wear masks. Fly Dec. I(1). Some guards have even told inmates that guards are not required to wear masks. *Id.* I(1)(c). Inmates have reported that even the doctors do not always wear masks during evaluations. Williams Dec. ¶ 7. One guard informed an inmate that guards only receive one mask per week. Fly Dec. I(1)(e). A nurse was observed taking off her mask during a coughing episode. Williams Dec. ¶ 21. The nurse that makes the morning rounds to check peoples' temperatures uses the same device to check the temperatures of 40 to 60 people and does not clean the device in between. Fly Dec. I(5). Some of the people who were subject to this unsanitary temperature check in the full 40- to 60-person pod tested positive for COVID-19. *Id.*

- **Detainees are not provided personal protective equipment.**

Incarcerated persons report not receiving masks, or receiving them very rarely. Fly Dec. I(2). Masks that are provided are not replaced and become dirty or break. *Id.* I(2)(b)-(c), (i). In pods of a few dozen people, most detainees interviewed estimate a small handful of persons wearing masks, for example, six in a 24-man tank, Fly Dec. I(2)(e) or five people in a 50-plus person pod. *Id.* I(2)(g). Detainees report being told to wear their masks when the sergeant or other

important visitors come through the jail. *Id.* I(2)(d),(h) (At approximately 1:30 p.m. on April 15, 2020, both Chad Schark and Marcelo Perez reported an officer announcing to their pod, "Hey, we got some visitors. Everybody, put your masks on.").

- **Cleaning supplies are not sufficiently available**

Many inmates report being confined to grotesque cells without any cleaning supplies, despite requested requests. Fly Dec. I(7)(b) (Marcus White was denied cleaning supplies for 19 days, despite being in dorm with persons who had tested positive for COVID-19); *id.* I(10) (numerous reports of insufficient cleaning supplies and dirty cells). One inmate observed his cellmate use his own washcloth, meant for showers, to clean a toilet because it was covered in stains. *Id.* I(10)(a). Williams Dec. ¶ 16 (describing being required to clean cell with bath towel; not being provided toilet paper while in quarantine). In a similar manner to instructions to wear masks, detainees report being instructed to clean up when visitors and photographers came to the jail on April 15, 2020. Fly Dec. I.(2)(h).

- **Basic sanitation practices are not observed**

Detainees report not receiving soap for days, or only after filing emergency grievances. Fly Dec. I(12). One person reported never receiving any soap at all. *Id.* I(10)(a). Soap has been out of stock in the commissary for a week at a time. *Id.* I(6)-(7). Soap is provided in such small quantities that it does not meet detainees' needs to wash their hands, wash their clothes, or shower. *Id.* I(7)(b), I(10). James Williams reports incarcerated persons making efforts to clean their cells and common areas on their own accord, with limited supplies, because of their own fears for their health. Staff neither instructed them to clean nor cleaned these spaces sufficiently. Williams Dec. ¶¶ 6, 12.

All of these reports undermine Defendants' assertions about conditions in the jail.

**B.      Social Distancing is Necessary, but Impossible, in the Jail**

Defendants' efforts to reduce the jail population are important, but utterly fail to remedy the problem, which is a lack of sufficient space within which to practice social distancing. Social distancing is the most critical strategy for protecting people from infection. Dr. Cohen explains that "because of the structure of the jail and manner in which daily activities occur in a jail, incarcerated persons intermingle, and it is not possible to limit gatherings to less than 10 individuals or engage in social distancing required by public health guidance." Dkt. 3-2 ¶ 7; *see also* Williams Dec. ¶¶ 5, 8, 20; Fly Dec. II(1) (Stanphill Norbert describing close quarters in a holding cell during transfer); (3), (5)-(7) (detailing sleeping and housing arrangements in multi-person cells or large dormitory-style pods).

Many of the units in the Dallas County Jail house people in dormitory-style pods as pictured below:[5]



---

[5] Images have been taken from the video "Behind Bars: The World's Toughest Prisons," Season 1, Episode 3: Dallas County Jail (October 3, 2016), written and directed by Florian Fiedler, distributed by Quintus Media, *available at* https://www.amazon.com/Behind-Bars-Worlds-Toughest-Prisons/dp/B0764N4J4N *and* https://www.youtube.com/watch?v=fkX2hanoYyM.



Even persons not housed in these pods are often in multiple-person cells at a close distance, as pictured below:



In short, social distancing is *impossible* in a jail that detains almost 5,000 people—even if the jail, as Defendants claim (Dkt. 34 at 6, 10–12), is "not at [] capacity," the population is 20

percent lower than it was a month ago, the Sheriff has "requested" that law enforcement agencies make fewer arrests, and book-ins have been reduced. As a result, infections will continue to increase until the incarcerated population is reduced to an extent that allows sufficient social distancing. Dkt. 3-2 ¶ 45; Supp. Cohen Dec. ¶¶ 28–30; Supp. Lofgren Dec. ¶¶ 9–10 (noting the likelihood of an epidemic in the Dallas County Jail in the coming weeks and months if release is not effectuated at roughly double the rate thus far). No other strategy is sufficient to effectively mitigate the serious risk of a widespread outbreak that is highly likely to result in severe illness and death, especially to the medically vulnerable classes. Dkt. 3-2 (Cohen Declaration) ¶ 30 ("Given the current conditions in the jail, it is my opinion that steps should immediately be taken to release any inmate who is over the age of 50 or otherwise medically vulnerable . . . to protect them from a serious risk of death. No less intrusive intervention will adequately address the public health risk posed by COVID-19 in the Dallas County Jail environment."); Supp. Cohen Dec. ¶ 30 ("From a public health perspective that focuses on the lives and well-being of those living and working in the jail, the jail populations needs to be reduced in order to remove the most vulnerable individuals from the jail who are at elevated risk of suffering severe symptoms and to allow the remaining population to implement the required social distancing in order to avoid the risks of overcrowded congregate living.").

Defendants ignore the scope of the problem and instead offer this Court a misleading chart illustrating the reduction in the jail population. Defendants' chart uses 4,800 as the minimum population on the y-axis, making the downward slope of the line graph appear more significant than it is (Dkt. 34 at 10). The same numbers are better illustrated with a chart that uses "zero" as the bottom of the y-axis:



But regardless of the visual aid, the point is that the reduction thus far in the jail population is insufficient to protect Plaintiffs and proposed Class Members. Indeed, even accounting for the reduction in population and intake that Defendants have undertaken, and even if the jail were undertaking social distancing with consistency (which other evidence suggests is impossible), without further steps taken to ensure physical distancing, persons incarcerated in the Dallas County Jail will face an anticipated 6,000 infections, 800 hospitalizations, and 250 deaths over the next six months. Supp. Lofgren Dec. ¶¶ 9–10. Releasing the most medically-vulnerable

persons and discontinuing admissions of medically-vulnerable persons, as plaintiffs request, would cut prisoner deaths by 56.1 percent. Lofgren Dec., Doc. No. 3-1 ¶ 17.





Dr. Cohen and Dr. Lofgren agree that the only strategy for avoiding a catastrophic loss of life in the Dallas County Jail, which will necessarily spill over into the broader community, is to release many more people, "starting with persons over 50 and the medically vulnerable[.]" Dkt. 3-2 (Cohen Declaration) ¶ 45; Dkt. 3-1 (Lofgren Declaration) ¶ 17 (projecting dramatic decrease in prisoner deaths if medically-vulnerable persons released from custody and no longer booked); Supp. Lofgren Dec. ¶¶ 9–10 (projecting considerable infections, hospitalizations, and death absent rapid downsizing); Supp. Cohen Dec. ¶¶ 28–30.

## C.   Subjecting Plaintiffs to Infection, Illness, and Death Constitutes Deliberate Indifference

Defendants suggest they cannot be deemed deliberately indifferent to Plaintiffs' serious medical needs in light of the efforts they have undertaken to address the COVID-19 threat in the

Dallas County Jail because "deliberate indifference" requires a "pervasive pattern of serious deficiencies." *Duvall v. Dallas County*, 631 F.3d 203, 208 (5th Cir. 2011). Dkt. 34 at 9. Yet, the medical community's consensus that nothing short of extreme social distancing will save lives establishes that even if Sheriff Brown were able to implement everything she claims to have implemented, her actions would be gravely deficient. Defendants themselves acknowledge that they have known about the threat posed by COVID-19 for over a month. Dkt. 34 at 2 (noting a Declaration of Local Disaster issued in Dallas on March 12, 2020). Today, an outbreak of the disease has already taken hold in the Dallas County Jail. The record establishes a "pervasive pattern of serious deficiencies." Because (1) Plaintiffs dispute the extent to which Defendants follow their own practices, and (2) significantly, even if Defendants followed their purported practices perfectly, the practices would not address the serious medical needs of Plaintiffs and proposed class members, Plaintiffs remain likely to succeed on the merits of their constitutional claims.[6]

---

[6] Proposed-Intervenors erroneously claim that three recent COVID-19-related prisoner cases undermine the merits of Plaintiff's action. Dkt. 33 at 21. First, Proposed-Intervenors present an example of "an action practically identical to this one" involving two class actions suits brought by individuals imprisoned in various Illinois correctional facilities during COVID-19. Dkt. 33 at 22; *see Money v. Pritzker*, No. 20-CV-2093, 2020 WL 1820660 (N.D. Ill. Apr. 10, 2020). The court denied the constitutional claims because it did not find evidence of deliberate indifference. *See id.* at *2.  Unlike *Money*, Plaintiffs' evidence clearly shows deliberate indifference.

Proposed-Intervenors also raise the decision from the Southern District of Texas in *Sacal-Micha v. Longoria*, which found that a writ of habeas corpus was not a proper vehicle for challenging an inmate's conditions of confinement due to COVID-19. No. 1:20-CV-37, 2020 WL 1815691 at *4 (S.D. Tex. Apr. 9, 2020). The inmate in *Sacal-Micha*, however, failed to allege a pervasive pattern of deficiencies or deliberate indifference, which can be distinguished from the current case. *Id.* at *4-*5.

Finally, Proposed-Intervenors cite the recent decision in *Coleman v. Newsom*, where a three-judge federal court based in California rejected claims by two classes of prisoners to order the release of a significant number of prisoners to allow for physical distancing to prevent the spread of COVID-19. No. 01-CV-01351-JST, 2020 WL 1675775 at *1 (E.D. Cal. Apr. 4, 2020). The three-judge court denied the plaintiffs' motion because the court was first convened in 2007 to consider a different issue regarding whether the release of prisoners was necessary "to remedy California's structural failure to provide constitutionally adequate medical and mental health care services to inmates." *Id.* at *1.

1.  **Post-Adjudication Class**

For the Post-Adjudication Class, subjective deliberate indifference occurs where Defendants "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering." *Helling*, 509 U.S. at 33. Defendants do not contend that they were unaware of COVID-19. Dkt. 34. Rather, they assert that they have implemented sufficient policies to mitigate the risk. *Id.* at 9–14. But even if those policies were sufficient, and medical experts agree that they are not, Plaintiffs offer extensive evidence that those policies are not being implemented, followed, or enforced. *See* Dec. of Amy Fly; Williams Dec; Bailey Dec; Dkts. 39-1–39-12; 3-4–3-9. Defendants cannot insulate themselves from liability by showing that they have policies on the books when the record overwhelmingly demonstrates that these policies exist in name only.

In deciding whether there has been deliberate indifference to an incarcerated person's serious medical needs, the Court need not defer to the judgment of prison doctors or administrators. *Hunt v. Dental Dep't*, 865 F.2d 198 200 (9th Cir. 1989). A court "may infer the existence of [deliberate indifference] from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (citing *Farmer*, 511 U.S. at 842). Where "knowledge of the need for medical care [is accompanied by the] . . . intentional refusal to provide that care," the deliberate indifference standard has been met." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) (citing *Ancata v. Prison Health Servs.*, 769 F.2d 700, 704 (11th Cir.1985)).

Unimplemented policies cannot save Defendants from liability for a deliberate indifference claim. *Daskalea v. District of Columbia*, 227 F.3d 433 (D.C. Cir. 2000) ("[A] 'paper' policy cannot insulate a municipality from liability where there is evidence, as there was here, that the municipality was deliberately indifferent to the policy's violation.") *see also Ware v. Jackson Cty.*, 150 F.3d 873, 882 (8th Cir. 1998) ("[W]ritten policies of a defendant are of no moment in the face

16

of evidence that such policies are neither followed nor enforced."). In *Daskalea*, the court found liability where evidence included "not only the continued blatant violation of the policy, but also the fact that the policy was never posted, that some guards did not recall receiving it, that inmates never received it, and that there was no evidence of the training that was supposed to accompany it." 277 F.3d at 271. That same evidence is before the Court here, and liability should likewise follow. *See also Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) ("[I]gnoring a policy is the same as having no policy in place in the first place.").

Finally, even if Defendants were following their purported policies perfectly, their failure to ensure social and physical distancing at all times—a central element to preventing transmission of COVID-19—constitutes deliberate indifference to Plaintiffs' and proposed class members' medical needs. Supp. Cohen Dec. ¶¶ 25–30.

## 2.  Pre-Adjudication Class

As Plaintiffs have briefed, protections are even greater for the Pre-Adjudication Class, which cannot be punished *at all*. *See, e.g.*, *Bell*, 441 U.S. at 535 ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."); *id.* at n.16 (pretrial detainees retain greater protections than convicted counterparts); *Parker v. Carpenter*, 978 F.2d 190, 193 (5th Cir. 1992) (ordering evidentiary hearing on whether transfer to more violent wing was punitive). Punishment—and therefore deliberate indifference—is established if the jailer's conduct is either not rationally related to a legitimate, non-punitive government purpose or excessive in relation to that purpose. *Bell*, 441 U.S. at 561; *Kingsley*, 135 S. Ct. at 2473–74; *see also Alderson*, 848 F.3d at 424. Here, where presumptively innocent Pre-Adjudication Class Members are being held in conditions that threaten their health and life,

17

typically because they do not have enough money to be released, both elements are satisfied. *See* Dkt. 3 at 30–31.

3. **Sheriff Brown is Deliberately Indifferent Despite the Fact that She is Required Under State Law to Execute Judicial Orders**

Defendants assert that, because state law requires Defendant Brown to enforce court orders, and because state law purportedly does not authorize her to "unilaterally" release people from the jail, she has not behaved unreasonably and therefore cannot be liable for a deliberate indifference claim. Dkt. 34 at 22. In other words, Defendants suggest that it cannot be objectively unreasonable to do the best that one can under the circumstances, and thus an injunction, temporary restraining order, and/or writ of habeas corpus cannot issue. Dkt. 34 at 22. Plaintiffs are not asking Defendant Brown to act unilaterally, or contrary to the law. Plaintiffs are rather asking this Court to ensure that Defendant Brown follows the law.

The law does not require the Sheriff to act maliciously or to be singularly responsible for the overcrowded jail in order to be ordered to cease confining people in unlawful and dangerous conditions. In *Brown v. Plata*, the Supreme Court confirmed that where the prison population is such that reduction is the *only* way to cure a constitutional violation, an injunction may issue even if the defendant's affirmative conduct did not cause the overcrowding. 563 U.S. 493, 521, 526–29 (2011) (noting that prisoner-release order was appropriate because adequate care was "impossible" without a reduction). If a deliberate indifferent showing were impossible to make because a local official is bound by state and local law, then *Brown*'s conclusion that non-release measures were "impossible" would have ended that case. It is a core tenant of civil rights law that plaintiffs may sue local enforcers who violate their federal constitutional rights, even if those violations occurred pursuant to state and local law. *Ex Parte Young*, 209 U.S. 123 (1908); *Saltz v. Tennessee Dep't of*

18

*Employment Sec.*, 976 F.2d 966, 968 (5th Cir. 1992) (describing the doctrine that officials may be sued in their official capacities for injunctive relief as "a fixture in federal litigation").

Defendants also argue that Plaintiffs' habeas claim to release must be denied because Plaintiffs have purportedly failed to exhaust their state remedies. That is incorrect for all the reasons explained in Plaintiffs' forthcoming response to Defendants' and Proposed-Intervenors' Motions to Dismiss. To preview, each Plaintiff has pursued remedies for release in state court, lacks access to criminal defense counsel to do so, or can establish the unavailability and/or futility of the limited options available to them. Dkt. 39 ¶¶ 91–102.

## II.     THE REMAINING FACTORS WEIGH HEAVILY IN FAVOR OF PLAINTIFFS' REQUESTED RELIEF

Having provided numerous facts showing a substantial likelihood that Plaintiffs will prevail on the merits, Plaintiffs can also clearly show the remaining elements required to ascertain a preliminary injunction, including irreparable injury, the balance of the equities, and that granting the preliminary injunction will not disserve the public interest. *See Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 195–96 (5th Cir. 2003).

First, the degree of irreparable harm that will befall members of the Medically-Vulnerable Subclasses—serious illness, potential permanent injury, or death—could not be more serious. There is no serious question that the Medically-Vulnerable Subclass Members face irreparable harm. Indeed, Defendants do not dispute this point. Instead, they argue that remedies short of release will mitigate the threat. But that assertion is belied by overwhelming, and unrebutted medical evidence. Cohen Dec. Dkt. 3-2 ¶¶ 30-31; Supp. Cohen Dec. ¶¶ 28–30.

Second, the balance of equities favors Plaintiffs' requested relief. Defendants argue that because of the preliminary injunction issued in *Daves v. Dallas County*, this Court should

"presume" that anyone detained pretrial is "detained for a good reason." Dkt. 34 at 26-27. There are several problems with that. First, that order was issued in a lawsuit challenging Defendants' discriminatory *pretrial* detention policies and practices and therefore has no relevance to the post-adjudication class. Second, in the *Daves* case, the same lawyers and Defendants have taken the opposite position, arguing that Judge Godbey's Order requires only *procedural* relief, and that "good reasons" are *not* required to justify pretrial detention.[7] Moreover, the Felony Judges in Dallas County argue that indefinite pretrial detention is permissible on the basis of probable cause *alone*.[8] Accordingly, this Court should "presume" the exact opposite of what Defendants suggest, *i.e.*, that no judicial officer has reached any conclusion about whether good reasons exist for detaining Plaintiffs pretrial. Third, Plaintiffs do not ask for "categorical release," as Defendants mistakenly claim. Rather, they seek release for a subclass of medically vulnerable people *unless* a judge concludes by clear and convincing evidence[9] that the individual risk the person poses of fleeing the jurisdiction or harming another person cannot be mitigated short of detention. *See* Dkt. 2-1.[10]

---

[7] *See* Appellants-Cross-Appellees (Plaintiffs) Opening Brief, *Daves v. Dallas County*, Case No. 18-11368 (Jan. 23, 2019). *See also* CCCL Judges and Magistrates Brief (which was fully incorporated by the Sheriff and County in their own appellate briefs), *Daves v. Dallas County*, Case No. 18-11368 at 23-24 (Mar. 29, 2019) (arguing that there is no "heightened substantive standard" for requiring unaffordable bail, and that the Constitution is satisfied so long as alternatives to detention are considered).

[8] Appellants-Cross-Appellees (Plaintiffs) Response and Reply Brief, *Daves v. Dallas County*, Case No. 18-11368 at 16 (May 17, 2019).

[9] Defendants point to the *Daves* litigation for the notion that findings by clear and convincing evidence would not be needed. But the issue was not decided by this Court in *Daves*, as demonstrated by the issues currently on cross-appeal. The clear and convincing evidence standard is appropriate where the interest affected is "materially important" and "more substantial than mere loss of money." *Santosky v. Kramer*, 455 U.S. 745, 756 (1982).

[10] A contemporaneous ruling from the Southern District of Texas supports the use of habeas actions to challenge conditions of confinement due to risks related to COVID-19 exposure and that relief may be granted to persons presenting lower flight risks than others, as Plaintiffs request. In that case, two plaintiffs sought a temporary restraining order to compel their release from civil immigration detention. *See Barrera v. Wolf*, No. 20-CV-1241 (KPE), Dkt. No. 41 (S.D. Tex. April 17, 2020). The court held that the actions were properly brought as habeas claims and considered the plaintiffs' substantive due process claims under the Fifth Amendment to have merit. *See id.* The motion was granted as to one plaintiff, and denied as to the other, which came down to a balancing of the equities. *See id.* One plaintiff was found to have posed no threat to society, while the other was deemed a potential flight risk. *See id.*

Finally, for all the reasons Dr. Cohen and Dr. Lofgren explain, Plaintiffs' requested relief is in the public interest.[11] This Court should reject State-Intervenors' scare tactics and fear-mongering for numerous reasons. Dkt. 33 at 10, 35–37.

First, they mischaracterize the relief Plaintiffs seek. Plaintiffs do not seek release of "everyone" in the jail. Plaintiffs seek the release of two subclasses of medically vulnerable people whose presence in the jail poses an intolerable risk to their health and lives *and to the health and lives of people in the broader Dallas community*. Dr. Lofgren's models show that Defendants' continuing to detain these people *will* cause more sickness and death than if the medically vulnerable are released.

Second, the relief Plaintiffs seek allows Defendants an opportunity to object to the release of any individual and to prove that detention is required because there are no conditions of release that would mitigate a flight risk or danger to the community. But if there are such conditions—*i.e.*, conditions that would assure the person's appearance and safety—it is inconceivable that the government would wish to keep such a person detained punitively in an environment where medical evidence shows they face a significant and heightened risk of serious illness and death.

Third, one of the Subclasses consists of people who are being detained prior to trial, meaning that they are presumptively innocent, and many of them are in jail only because they cannot afford to pay money bail. In other words, the State would gladly release every single one of these people if they could pay even though paying money has no relationship to safety

---

[11] The fact that Judge Rosenthal denied a TRO Motion in *Russell v. Harris County*, as Defendants point out (Dkt. 34 at 16), has no bearing on the equitable relief available in this case. Plaintiffs in Russell have challenged Harris County's felony bail system. The case raises different constitutional claims to different policies and practices, and sought different relief. The fact that Judge Rosenthal weighed the relevant factors and considered the factual record before her has no persuasive value in this Court, which will be required to weigh Plaintiffs' likelihood of success on very different constitutional claims and consider an entirely different factual record, including very different facts about what local officials have and have not done to remedy the harms alleged in *this* case.

21

because people in Texas cannot forfeit bonds for new criminal activity. Their purported public-safety concerns regarding this group ring hollow. Fourth, Defendants can impose conditions on anyone who is released, including home confinement or appropriate monitoring or supervision in certain cases, if those conditions are tailored to promote safety or appearance.

This Court should ignore the State-Intervenors' cynical attempt to play on this Court's emotions and focus on the facts. And the facts about the public interest are set forth in Dr. Cohen's and Dr. Lofgren's declarations. As Dr. Cohen will explain in more detail at the hearing on Tuesday, the detained population, the guards and staff who work at the jail, the medical professionals who care for them, and the broader Dallas community will *all* suffer more infections and more serious illness if medically vulnerable people continue to be detained in the jail. If this Court grants the relief Plaintiffs seek, fewer people will become sick, and fewer people will die. It is that simple.

## III.    THE NATURE OF THE RELIEF PLAINTIFFS SEEK

Defendants misunderstand the relief Plaintiffs seek and their entitlement to it.

### A.  Plaintiffs Seek a Temporary Restraining Order and Writs of Habeas Corpus

Plaintiffs seek two categories of emergency, temporary relief. First, because medical evidence proves that nothing short of release will protect the health and lives of class members who are at the greatest risk for contracting and dying from COVID-19, Plaintiffs seek release pursuant to § 2241 for the Medically-Vulnerable Subclasses, unless a judge finds on the record by clear-and-convincing evidence that the person poses a serious risk of flight or danger to others that no condition of release can mitigate. Dkt. 2-1 (Proposed Order Granting Plaintiffs' Motion for

Temporary Restraining Order) ¶¶ 1–2.[12] Second, pursuant to §1983, Plaintiffs seek immediate appointment of a public health expert to inspect the jail and submit to the Court a plan for bringing the jail's policies and practices into compliance with minimum, medically required standards for preventing and containing the spread of COVID-19. Dkt. 2-1 ¶ 5. The jail plan should provide guidance with respect to the public supports available to persons upon release to ensure persons discharged have a home plan to ensure requisite self-isolation and social distancing.

## B.  Preliminary Injunction Order

Plaintiffs seek further relief, pursuant to both § 2241 and § 1983, in the form of a preliminary injunction, Dkt. 2-2, including:

- An order requiring Defendants to continue releasing the subclasses of medically vulnerable people who come into the jail's custody. Dkt. 2-2 ¶1.

- An order requiring Defendants to release via habeas writs, or transfer to home confinement, additional people detained in the jail, as needed to comply with social distancing. *Id.* ¶ 2.

- An order requiring that all people detained be kept in single cells. *Id.* ¶ 3.

- An order requiring production of a weekly list of people detained who are medically vulnerable and the findings supporting their detention. *Id.* ¶ 4.

- An order to comply with the plan submitted by the appointed public health expert for complying with medically necessary precautions. *Id.* ¶ 5.

## C.  In the Alternative, the Court can Grant Relief Under § 1983 Exclusively

Even if this Court rejects the subclasses' 28 U.S.C. § 2241 Petition for writs of habeas corpus, all of the other relief Plaintiffs describe in their proposed orders is available under 42 U.S.C. § 1983. In fact, just yesterday, Judge Keith Ellison in the Southern District of Texas ordered

---

[12] In their concurrently filed response brief opposing Defendants' and Proposed-Intervenor's Motions to Dismiss, Plaintiffs will explain why § 2241 jurisdiction is properly invoked with respect to the habeas writs. In short, habeas relief is the only remedy available to protect the most vulnerable persons in the Dallas County Jail from a serious and immediate threat of serious injury and death. The requested writ of habeas corpus is not subject to the constraints of the Prison Litigation Reform Act ("PLRA").

relief very similar to what Plaintiffs seek here, via a public health plan tailored to the Dallas County

Jail enjoining defendants to provide plaintiffs with unrestricted access to hand soap, access to hand

sanitizer, tissues, cleaning supplies, and masks, transportation for necessary medical treatment,

and other measures in line with CDC guidance. *Valentine v. Collier*, ECF 40, Case No. 4:20-cv-

01115 (S.D.Tex. Apr. 16, 2020).

The relief Plaintiffs seek under § 1983 is consistent with the limitations set forth in the

Prison Litigation Reform Act, 18 U.S.C. § 3626.[13] The relief (1) is necessary to correct the

violation of Plaintiffs' and proposed Class Members' Eighth and Fourteenth Amendment rights,

(2) extends no further than necessary to correct the violation, and (3) is the least intrusive means

to correct the constitutional violation. Even given the requirements of § 3626, injunctive relief may

permissibly include both substantive instructions to improve the treatment of incarcerated persons,

as well as administrative measures such as monitoring and data tracking if necessary to ensure the

constitutional violations are cured, as Plaintiffs seek. *See, e.g.*, *Depriest v. Walnut Grove Corr.*

*Auth.*, 2015 WL 3795020, *16 (S.D. Miss., June 10, 2015) (declining to terminate certain

provisions regarding maintaining personal safety, holding that the monitoring provision therefore

"remains relevant and is not unnecessarily intrusive"), *appeal dismissed as moot sub nom. Depriest*

*v. Fisher*, 669 Fed. App'x. 209 (5th Cir. 2016).

This Court may also order the transfer of Medically-Vulnerable Subclass Members to

home confinement or another safe custodial setting consistent with the PLRA. *See Jackson v.*

*Johnson*, 475 F.3d 261, 265-66 (5th Cir. 2007) ("[A]lthough Jackson has been released from

confinement in prison, his release was not to the general public but was rather to a different form

---

[13] As Plaintiffs will explain in their forthcoming omnibus brief in response to Defendants and Proposed-Intervenors'
Motions to Dismiss, the Named Plaintiffs have either fully exhausted the grievance procedures available in the
Dallas County Jail, or were blocked by jail staff from doing so. Accordingly, the PLRA is no bar to relief under
§ 1983.

of confinement, albeit with certain additional liberties."); *Plata v. Brown*, No. C01-1351 TEH, 2013 WL 12436093, at *8 (N.D. Cal. June 24, 2013) (granting motion requiring transfer from area at high risk of coccidioidomycosis, known as "Valley Fever").

If the Court were to fashion a remedy solely under § 1983 without ordering the release of Medically-Vulnerable persons pursuant to 28 U.S.C. § 2241, or their transfer to home confinement under 42 U.S.C. § 1983,[14] Plaintiffs anticipate that Defendants would be unable to adequately ensure Plaintiffs' health and safety because social distancing—the central public health guidance mandate in light of the dangers of COVID-19—would be impossible.[15]

### D.  If the Court Denies the Medically-Vulnerable Named Plaintiffs' Requests for Habeas Writs, They Request Release Pending Further Adjudication

Finally, if the Court does not enter injunctive relief as outlined in Parts III(A),(B), or (C), Named Petitioners/Plaintiffs request an immediate order for their release pending further consideration of their writ of class habeas and motions for injunctive relief. "[I]t is within the inherent power of a District Court of the United States to enlarge a state prisoner on bond pending hearing and decision on his application for a writ of habeas corpus." *In re Wainwright*, 518 F.2d 173, 174 (5th Cir. 1975). Release pending a district court's ruling on habeas is appropriate where a petitioner "raise[s] substantial constitutional claims upon which he has a high probability of success," and "extraordinary and exceptional circumstances exist which make the grant of bail

---

[14] While, as discussed above, transfer to home confinement is an option under 42 U.S.C. § 1983, Plaintiffs are concerned about the limited efficacy of this option to remedy the likelihood of irreparable harm and constitutional violations they allege as compared to writs of habeas under 18 U.S.C. § 2241. Dallas County indicates in its response in opposition to Plaintiffs' Motion for a Temporary Restraining Order that ankle monitors for location are in limited supply. Doc. No. 34-3 at ¶ 6. Further, the experience of Plaintiff Ideare Bailey demonstrates that even Medically-Vulnerable persons who may be cleared for release from the jail may have difficulty getting set up with an electronic monitor. Bailey Dec. ¶ 2 (noting that Mr. Bailey has not been released because "the electronic monitoring company has been unable to provide him with a monitoring device.").

[15] At that point, Plaintiffs would request a three-judge panel authorized to order release consistent with the PLRA. *See* 18 U.S.C. § 326(a)(3). However, as evidenced by Dr. Lofgren's supplemental declarations, the epidemic in the jail will spread exponentially while the litigation awaits arrival at that procedural stage.

necessary to make the habeas remedy effective." *Calley v. Callaway*, 496 F.2d 701, 702 (5th Cir. 1974). Here, both criteria are met. The COVID-19 pandemic constitutes an extraordinary circumstance: the United States has not seen anything like it in at least 100 years. It is changing American life as we know it, and devastating communities throughout Dallas, Texas, and the country. In particular, the disease is infecting and killing people who are in government custody at a shocking and unprecedented rate—and, because of the number of people who cycle in and out of the jail every day, the rapid growth of COVID-19 behind bars threatens the health and lives of people who are not detained. Accordingly, while this Court considers whether to grant the Petitioners-Plaintiffs request for release of Medically-Vulnerable Subclass Members, it should order them to be temporarily released with any other conditions the Court deems necessary.

## CONCLUSION

These grave and unprecedented circumstances demand the urgent relief Plaintiffs request.

Dated: April 17, 2020.

Respectfully submitted,

| | | /s/Barry Barnett |
|---|---|---|
| AMERICAN CIVIL | ACLU FOUNDATION OF TEXAS | SUSMAN GODFREY L.L.P. |
| LIBERTIES FOUNDATION | Brian Klosterboer | Barry Barnett |
| Andrea Woods* | Texas. Bar No. 24107833 | Texas Bar No. 01778700 |
| N.Y. Bar No. 5595509 | Adriana Piñon** | 8115 Preston Road, Suite 575 |
| Brandon Buskey* | Texas Bar No. 24089768 | Dallas, TX 75225 |
| 125 Broad Street, 18th | Andre Segura | (866) 754-1900 |
| Floor | Texas Bar No. 24107112 | *bbarnett@susmangodfrey.com* |
| New York, NY 10004 | 5225 Katy Fwy., Suite 350 | |
| (212) 549-2528 | Houston, TX 77007 | |
| *awoods@aclu.org* | Tel: (713) 942-8146 | Michael Gervais* |
| | Fax: (346) 998-1577 | N.Y. Bar No. 5122890 |
| | | 1900 Avenue of the Stars, |
| Henderson Hill* | | Suite 1400 |
| N.C. Bar No. 18563 | | Los Angeles, CA 90067 |
| 201 W. Main St. Suite 402 | CIVIL RIGHTS CORPS | (310) 789-3100 |
| Durham, NC 27701 | Katherine Hubbard*** | *mgervais@susmangodfrey.com* |
| (919) 682-9563 | D.C. Bar No. 1500503 | |
| *hhill@aclu.org* | Elizabeth Rossi* | |
| Amy Fettig* | D.C. Bar No. 1500502 | |
| D.C. Bar No. 484883 | 1601 Connecticut Ave NW, | NEXT GENERATION ACTION |
| 915 15th Street N.W., | Suite 800 | NETWORK |
| 7th Floor | Washington, D.C. 20009 | Alison Grinter |
| Washington, D.C. 20005 | (202) 894-6126 | Texas Bar 24043476 |
| (202) 548-6608 | *katherine@civilrightscorps.org* | Kim T. Cole |
| *afettig@aclu.org* | *elizabeth@civilrightscorps.org* | Texas Bar No. 24071024 |
| | | 1808 South Good Latimer |
| | | Expressway |
| | | Dallas, TX 75226 |
| | | (214) 704-6400 |
| | | *agrinter@thengan.com* |
| | | *kcole@thengan.com* |

ATTORNEYS FOR PETITIONERS/PLAINTIFFS
*admitted pro hac vice*
**N.D. Texas admission application forthcoming*
*** pro hac vice application forthcoming*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served via the Court's CM/ECG system on all counsel registered with that system, and via email, on April 17, 2020.

*/s/ Barry Barnett*
Barry Barnett