UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| | : | |
| CRAIG WILSON, *et al.*, | : | CASE NO. 4:20-cv-00794 |
| | : | |
| Petitioners, | : | ORDER |
| | : | [Resolving Doc. 1] |
| vs. | : | |
| | : | |
| MARK WILLIAMS, *et al.*, | : | |
| | : | |
| Respondents. | : | |
| | : | |

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On April 13, 2020, Petitioners, inmates at Elkton Federal Correctional Institution, brought this emergency habeas action seeking release from Elkton due to the spread of COVID-19 within the prison.[1]  Petitioners claim to represent both a class of all Elkton inmates as well as a subclass of medically vulnerable inmates.[2]  Respondents opposed.[3]

On April 17, 2020 the Court held a hearing on the matter.  On April 18, 2020, both parties filed additional materials in response to the Court's hearing inquiries.[4]

For the foregoing reasons, the Petitioners' motion for relief is **GRANTED IN PART** and **DENIED IN PART**.

## I.    COVID-19 at Elkton

State government and the media have well documented the spread of COVID-19 and the efforts to contain the virus and limit its impact.  The virus's highly-infectious nature and the risks it poses, especially to medically vulnerable populations, has led to the

---

[1] Doc. 1.
[2] *Id.*
[3] Doc. 10.
[4] Docs. 18, 19.

Case No. 4:20-cv-00794
Gwin, J.

implementation of unprecedented measures throughout the country and the world.

While research concerning the virus is ongoing, for some time health officials have known and reported that asymptomatic persons spread the virus.[5] A large percentage of coronavirus-infected citizens are asymptomatic.[6] These asymptomatic persons show no, or limited, symptoms. Yet, they spread the virus.

Due to this threat from infected but asymptomatic individuals, testing, tracing and treatment became the first mitigation responsibilities. As the virus has become more widespread, state government has directed citizens to reduce the spread not only through careful hygiene practices, but also through social distancing and isolation.

For inmates in our country's prisons the virus is no less a threat, but distancing measures are only minimally available.

Defendants Elkton officials have implemented measures to lessen the COVID-19 threat. Elkton segregates new inmates for fourteen days.[7] Elkton officials evaluate existing inmates with virus symptoms to determine whether isolation or testing is appropriate.[8] They check inmate and staff temperatures.[9] Elkton officials segregate inmates for fourteen days before allowing the inmates to leave Elkton.[10]

But despite their efforts, the Elkton officials fight a losing battle. A losing battle for

---

[5] CDC, *Coronavirus Disease 2019: Recommendations for Cloth Face Covers*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html (last visited Apr. 20, 2020) (citing Yan Bai, Lingsheng Yao, and Tao Wei, *et al.*, *Presumed Asymptomatic Carrier Transmission of COVID-19*, JAMA (Feb. 21, 2020), https://jamanetwork.com/journals/jama/fullarticle/2762028).

[6] Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. TIMES (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[7] Doc. 10 at 8.

[8] *Id.* at 9.

[9] *Id.* at 9-10.

[10] *Id.* at 27.

Case No. 4:20-cv-00794
Gwin, J.

staff.  A losing battle for inmates.

The parties to the present action dispute some of the factual details of the current conditions within Elkton.  Even in light of these disputes, the prison's "dorm-style" design guarantees that inmates remain in close proximity to one another.[11]  With the shockingly limited available testing and the inability to distance inmates, COVID-19 is going to continue to spread, not only among the inmate population, but also among the staff.

According to Respondents, Elkton has had 59 confirmed cases of COVID-19 among inmates.[12]  The number of infected staff members, 46, is almost as high.[13]  The number has risen even in the days since the initiation of this lawsuit and will continue to do so absent intervention.

Notably, it is unlikely that these figures represent the actual number of cases at the institution, given the paltry number of tests the federal government has made available for the testing of Elkton's inmates.

To date, Elkton has received only 50 COVID-19 swab tests and one Abbott Rapid testing machine with 25 rapid tests.[14]  Most swab tests have already been used.  Because the Department of Justice has given BOP so few tests, Elkton medical staff has needed to triage test usage.

Respondents represent that "test swabs are back-ordered until July or August," but

---

[11] Doc. 10 at 7.
[12] Doc. 19 at 2.
[13] The official numbers on the Bureau of Prison's website conflict with the numbers reported by Respondents.  The BOP's website reports 52 confirmed cases among inmates, 46 cases among staff.  Contrarily, Respondents report 59 cases among inmates and 34 among staff.  *Compare* Federal Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited April 22, 2020), *with* Docs. 10 at 10, 19 at 2.
[14] Doc. 19 at 1-2.

-3-

Case No. 4:20-cv-00794
Gwin, J.

they "believe that they will receive an additional 25 rapid test[s]" each week.[15]  These

additional tests are all but useless considering Elkton's 2,400 inmates.

Recent experience at another Ohio correctional facility, Marion Correctional

Institution, run by the Ohio Department of Rehabilitation and Corrections, shows how

quickly and insidiously the virus spreads among a tightly quartered prison population.

Both Elkton and Marion are low security prisons and house approximately 2,500

inmates.[16]

The State of Ohio has tested its prisoners en masse for COVID-19.  At Marion 1,950

inmates tested positive for COVID-19.[17]  This number includes large numbers of inmates

who were asymptomatic and would otherwise not have been tested.[18]

Everything suggests that if BOP tested as ODRC commendably has, results would

show that the virus has become equally widespread within Elkton.  However, without

testing there is no way to know how many Elkton inmates have the virus.

The Ohio prisons virus response undercuts BOP's ability to argue that testing is

either unavailable or is impossible.  Why has the Justice Department allocated Elkton an

entirely insignificant number of tests while Ohio has been able to pull off mass testing

across not only Marion, but at multiple institutions?

While the COVID-19 tests inadequacy is one area of grave concern, testing is only

one part of the multi-faceted approach institutions like Elkton must take to reduce the

---

[15] *Id.*

[16] Ohio Department of Rehabilitation & Correction, *Marion Correctional Institution*, https://drc.ohio.gov/mci (last visited Apr. 22, 2020).

[17] Ohio Department of Rehabilitation & Correction, *COVID-19 Inmate Testing Updated 4/20/2020*, https://drc.ohio.gov/Portals/0/DRC%20COVID-19%20Information%2004-20-2020%20%201304.pdf (last visited Apr. 20, 2020).

[18] *Id.*

Case No. 4:20-cv-00794
Gwin, J.

virus's spread.

Respondents report that the prison, in accordance with BOP guidance, has changed its operations to try to limit the virus's spread.[19]  For instance, the prison has implemented health screening measures for various groups of inmates, staff, and civilians.[20]  These are all good efforts.

However, once the virus is inside the prison, as it already is at Elkton, screening measures can only be so effective.  And screening will only help to identify individuals with active symptoms, not those asymptomatic individuals who can nevertheless spread the virus undetected.

Respondents have also implemented "modified operations" to somewhat reduce inmate contact with each other.  Elkton allows inmate housing units of 150 to pick up pre-packaged meals, receive dispensed medications, and visit the commissary with only a single housing unit moving around the institution at one time.[21]  Better practices, but not enough.

Respondents attempt to liken each housing unit to a "family unit."  They say that each unit is akin to unincarcerated community members who live with roommates or family.[22]  They say that each housing unit is separate from other units, visitors, and sick inmates.[23]

But each single housing unit includes about 150 people.[24]  Respondents ignore that

---

[19] Doc. 10 at 7-11.
[20] *Id.* at 8-9.
[21] Doc. 10 at 21.
[22] *Id.* at 21-22.
[23] *Id.*
[24] *Id.*

Case No. 4:20-cv-00794
Gwin, J.

some unit inmates nonetheless circulate throughout the prison as "essential" workers. Because some untested inmates circulate throughout Elkton, the housing units are not truly isolated.  And with 150 "family members," there are significant opportunities to increase the risk of spread.  Within each housing unit there seems to be little chance of obstructing the spread of the virus.

Respondents say that soap and disinfectant are readily available, a fact that Petitioners dispute.[25]  However, these supplies can only be so useful in an environment where the inmates are constantly in close proximity to one another.  Likewise, the education about hygiene and social distancing Respondents tout is only effective if the inmates have the supplies and physical space to put such knowledge into practice.[26]

Furthermore, while the deteriorating health conditions at Elkton pose a danger for each of the 2,400 men who are incarcerated at Elkton, the institution's inability to stop the spread of the virus among the inmates in its care poses an even greater risk for inmates whose medical conditions put them at higher risk of death if they contract the virus.[27]

Plus, while this litigation concerns Elkton's conditions for its inmates, the same conditions endanger prison staff, who must continue to go to work despite the virus's spread throughout the facility.  And the Elkton spread endangers the staff's families who come into contact with Elkton's undoubtedly exposed staff.

In light of these realities, Petitioners, inmates at Elkton, bring the present action. They sue on behalf of themselves and on behalf a class of all current and future Elkton

---

[25] *Compare* Doc. 10 at 27, *with* Doc. 1 at 17.
[26] Doc. 10 at 11-12.
[27] *See generally* Briefs for Disability Rights Ohio *and* Public Health and Human Rights Experts as Amici Curiae Supporting Petitioners, Docs. 8-1 and 14-1.

Case No. 4:20-cv-00794
Gwin, J.

inmates.[28]

They bring additional claims on behalf of the "Medically-Vulnerable Subclass,"

defined as:

> [A]ll current and future persons incarcerated at Elkton over the age of 50, as well as all current and future persons incarcerated at Elkton of any age who experience: chronic lung disease or moderate to severe asthma; serious heart conditions; conditions that can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS or prolonged use of corticosteroids and other immune weakening medications; severe obesity (defined as a body mass index of 40 or higher); diabetes; chronic kidney disease or undergoing dialysis; or liver disease.[29]

Petitioners seek certification of the classes. In addition, they request:

> a temporary restraining order, preliminary injunction, permanent injunction, and/or writ of habeas corpus requiring Respondents to identify within six (6) hours of the Court's order, and submit to the Court a list of, all Medically-Vulnerable Subclass Members, and release all such persons within twenty-four (24) hours, with such release to include supports to ensure social distancing and other expert-recommended measures to prevent the spread of coronavirus.[30]

Petitioners define release as "discharge of incarcerated persons from the physical

confines of Elkton, not necessarily release from custody."[31] Petitioners suggest that

"[r]elease options may include, but are not limited to: release to parole or community

supervision; transfer furlough (as to another facility, hospital, or halfway house); or non-

transfer furlough, which could entail a release person's eventual return to Elkton once the

pandemic is over and the viral health threat abated."[32]

---

[28] Doc. 1 at 29.
[29] *Id.*
[30] Doc. 1 at 36.
[31] *Id.* at 2 n. 2.
[32] *Id.* at 2.

Case No. 4:20-cv-00794
Gwin, J.

In other words, Petitioners seek an "enlargement." Enlargement is not release, although some courts refer to it using the terms release or bail.[33] When a court exercises its power to "enlarge" the custody of a defendant pending the outcome of a habeas action, the BOP maintains custody over the defendant, but the place of custody is altered by the court.[34]

After the release of the subclass, Petitioners request "a plan, to be immediately submitted to the Court and overseen by a qualified public health expert" that provides for mitigation efforts in line with CDC guidelines and a housing and/or public support plan for released inmates.[35] They also seek the release of Class Members so that the remaining inmates can follow CDC guidance to maintain six feet of space between them while in the prison.[36]

Respondents respond that Petitioners cannot challenge the conditions inside the prison through a habeas corpus action and that this Court and the BOP do not have the authority to grant early release.[37]

## II.    Discussion

District courts have inherent authority to grant enlargement to a defendant pending a ruling on the merits of that defendant's habeas petition.[38] The Court finds that the exceptional circumstances at Elton and the Petitioners' substantial claims, that are likely to

---

[33] *See* Declaration of Professor Judith Resnik Regarding Provisional Remedies for Detained Individuals at 8, *Money et al. v. Jeffreys*, No. 1:20-cv-02094 (N.D. Ill. April 4, 2020), ECF No. 24-3.

[34] *Id.*

[35] Doc. 1 at 36-37.

[36] *Id.* at 37.

[37] Doc. 10 at 15-19.

[38] *See, e.g., Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001); *Dotson v. Clark*, 900 F.2d 77, 79 (6th Cir. 1990).

Case No. 4:20-cv-00794
Gwin, J.

succeed at the merits stage, necessitate the exercise of that authority and that such relief is proper for members of the subclass defined *infra.*[39]

However, given the nature of the present litigation as class action habeas proceeding, the Court is unable to determine the specific type of enlargement most suitable for each subclass member.  In light of this difficulty, the Court will grant a preliminary injunction, in aid of its authority to grant enlargements, ordering Respondents to determine the appropriate means of transferring medically vulnerable subclass members out of Elkton. Pursuant to the below analysis, the Court finds that Petitioners have met the standard for a preliminary injunction.

## A. Jurisdiction

Petitioners argue that Elkton's inability, even if it tried, to adequately protect the inmates from the risks posed by coronavirus subjects the prisoners to substantial risk of harm in violation of their Eighth Amendment rights.  Petitioners say that their claim is cognizable under 28 U.S.C. § 2241 as a habeas action because they are challenging the execution of their sentences, rather than the validity of the convictions themselves.[40] Petitioners argue that they are not seeking to challenge a specific aspect of their confinement, but the confinement itself.[41]

Respondents argue that habeas relief is not the proper vehicle to challenge conditions of confinement.[42]

Courts have attempted to clarify the types of claims appropriate for habeas relief and

---

[39] *Dotson,* 900 F.2d at 79.
[40] Doc. 1 at 34-35.
[41] Doc. 18 at 8-9.
[42] Doc. 10 at 15-16.

-9-

Case No. 4:20-cv-00794
Gwin, J.

distinguish those claims from civil rights claims more appropriately resolved under § 1983. The general result has been that challenges to the fact or duration of confinement that seek release sound in habeas whereas actions challenging the conditions of confinement raise concerns properly addressed under § 1983.[43]

But, these seemingly bright line rules are difficult to apply in practice. The near impossibility in some cases of drawing such distinctions has become even more obvious with COVID-19. Whereas many medical needs claims might appropriately be addressed through § 1983 litigation, claims concerning COVID-19 are not so easily classified as § 1983 claims.

Inmates challenging BOP's COVID-19 response challenge the dangerous conditions within the prison created by the virus. However, the only truly effective remedy to stop the spread is to separate individuals—a measure that in our nation's densely populated prisons is typically impossible without the release of a portion of the population. So, such actions ultimately seek to challenge the fact or duration of confinement as well.[44]

In this case, the Petitioners frame their action as a § 2241 habeas claim.[45] The Sixth Circuit, echoing the distinctions recognized by other courts, has found that "§ 2241 is not

---

[43] *See Muhammad v. Close*, 540 U.S. 749, 750 (2004) ("Challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus . . . requests for relief turning on circumstances of confinement may be presented in a § 1983 action."); *Heck v. Humphrey*, 512 U.S. 477 (1994); *Preiser v. Rodriguez*, 411 U.S. 475 (1978).

[44] *Mays v. Dart*, No. 20 C 2134, 2020 WL 1812381, at *6 (N.D. Ill. Apr. 9, 2020). Two federal district courts have noted without deciding that claims such as those brought by Petitioners might be cognizable as habeas claims because the relief sought would affect the duration of confinement or because the conditions complained of could not be eliminated without releasing the inmates from detention. *See A.S.M. v. Donahue*, No. 7:20-CV-62, 2020 WL 1847158, at *1 (M.D. Ga. Apr. 10, 2020); *Mays*, 2020 WL 1812381 at *6.

[45] Whereas other petitioners bringing COVID-19-related challenges have pleaded both habeas and § 1983 claims in the alternative, Petitioners do not do so here.

Case No. 4:20-cv-00794
Gwin, J.

the proper vehicle for a prisoner to challenge conditions of confinement."[46]  However, the

Sixth Circuit has also held "§ 2241 is appropriate for claims challenging the execution or

manner in which the sentence is served."[47]

Petitioners' action evades easy classification.  Part of the difficulty rests in

Petitioners' differing relief requests for the class and subclass.  For the significantly

vulnerable subclass the Petitioners seek immediate release, arguing that for the medically

vulnerable inmates continued imprisonment at Elkton is unconstitutional given the COVID-

19 outbreak.

Notably, these Petitioners do not seek a commutation of their sentences, but rather

to serve their sentences in home confinement, parole, or in half-way houses at least until

the risk of the virus has abated.  This claim is closer to a challenge to the manner in which

the sentence is served and is therefore cognizable under 28 U.S.C. § 2241.

For the remainder of the less-obviously-vulnerable class the challenges sound more

as a confinement conditions claim.  Petitioners seek the oversight of a public health expert

to mitigate the risk COVID-19 poses to class members that remain incarcerated at Elkton.

Because the not medically vulnerable Elkton inmates seek an alteration to the confinement

conditions, the claims are more like § 1983 claims.

Because Petitioners have brought their claims as a habeas petition, the Court may

only properly address those claims suitable for habeas relief.  The remainder of this order

addresses the habeas claims of the vulnerable subclass alone.

---

[46] *Luedtke v. Berkebile*, 704 F.3d 465, 465-66 (6th Cir. 2013) (citing two additional Sixth Circuit cases that found the same).
[47] *United States v. Peterman*, 249 F.3d 458, 461 (6th Cir. 2001).

Case No. 4:20-cv-00794
Gwin, J.

### B. Class Certification

Given the emergency nature of this proceeding, a class certification determination has not yet taken place. That does not, however, preclude Petitioners from obtaining class-wide interim relief at this stage. "[T]here is nothing improper about a preliminary injunction preceding a ruling on class certification."[48] This Court may grant preliminary injunctive relief to a conditional class.

As a preliminary matter, the Court finds that the Petitioners' subclass definition is likely too broad. Although the risk of complications from COVID-19 is serious for all inmates, the Court limits the subclass to those identified by the CDC as being at higher risk.[49] This includes all Elkton inmates 65 years or older and those with documented, pre-existing medical conditions, including heart, lung, kidney, and liver conditions, diabetes, conditions causing a person to be immunocompromised (including, but not limited to cancer treatment, transplants, HIV or AIDS, or the use of immune weakening medications), and severe obesity (body mass index of 40 or higher).[50] The subclass definition excludes those whose only risk factor is a history of smoking, given the difficulty of documenting such occurrence and identifying those individuals through BOP records alone.

Under Federal Rule of Civil Procedure 23(a), a class must meet the requirements of numerosity, commonality, typicality, and adequate representation. Additionally, one of Rule 23(b)'s requirements must also be satisfied.

---

[48] *Gooch v. Life Investors Ins. Co. of America,* 672 F.3d 402, 433 (6th Cir. 2012).
[49] The Court has "broad discretion to modify class definitions." *Ball v. Kasich,* 307 F. Supp.3d 701, 718 (S.D. Ohio Mar. 30, 2018).
[50] CDC, *Coronavirus Disease 2019: People Who Are At Higher Risk,* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited April 20, 2020).

Case No. 4:20-cv-00794
Gwin, J.

Petitioners have made a sufficient showing at this stage to satisfy the Rule 23(a)

factors for the above-defined subclass.

**Numerosity:**  The subclass consists of hundreds of Elkton inmates.[51]

**Commonality:**  "Commonality requires [Petitioners] to demonstrate that the class

members have suffered the same injury."[52]  "Their claims must depend upon a common

contention ... of such a nature that it is capable of classwide resolution—which means that

determination of its truth or falsity will resolve an issue that is central to the validity of each

one of the claims in one stroke."[53]  This inquiry focuses on whether a class action will

generate common answers that are likely to drive resolution of the lawsuit.[54]

In this case, all subclass members have been subjected to dangerous conditions in

which they run a high risk of exposure to the deadly COVID-19 virus.  The inquiry driving

the litigation is whether the BOP's failure to create safe conditions for inmates with

especially vulnerable health has violated those inmates' rights.  Answering this question

will determine whether the inmates are entitled to movement from Elkton.

Respondents argue that the subclass lacks commonality given the class's

combination of "inmates that have different crimes, sentences, outdates, disciplinary

histories, ages, medical histories, proximities to infected inmates, availability of a home

landing spot, likelihoods of transmitting the virus to someone at home detention,

---

[51] In accordance with the Court's order, dated April 17, 2020, Respondents submitted for *in camera* review, lists of Elkton inmates with certain medical conditions.  Although the Court cannot say with certainty the exact number of inmates who comprise the subclass, it is satisfied that the number is in the hundreds.
[52] *Ball*, 307 F. Supp.3d at 719 (quoting  *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011)).
[53] *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 852-53 (6th Cir. 2013) (citing *Dukes*, 564 U.S. at 350).
[54] *Id.*

-13-

Case No. 4:20-cv-00794
Gwin, J.

likelihoods of violation or recidivism, and dangers to the community."[55]

However, the Petitioners seek varied relief that allows the BOP to make individualized determination as to where each subclass member should be placed. Petitioners do not seek to open the prison gates to allow its inmates to run free.  In fact, Petitioners concede that "release" might look different for different inmates.  The Petitioners acknowledge that while some inmates might be placed in home confinement others should be furloughed and that in all instances such "release" could be temporary.[56]

The motivating question in the litigation is whether the subclass members' rights are being violated by the deteriorating conditions at Elkton.  As such, the subclass can satisfy commonality.

**Typicality:**  "Typicality is met if the class members' claims are 'fairly encompassed by the named plaintiffs' claims.'"[57]  Three of the named Petitioners have documented medical issues that are commiserate with those suffered by the subclass.  The fourth named Petitioner, Maximino Nieves, could represent that class, but not the subclass, as he attests that he doesn't have a serious medical history.[58]  Excepting Nieves, nothing suggests that the remaining three Petitioners' claims are distinct from those of the remainder of the subclass.  Typicality is satisfied.[59]

**Adequate Representation:**  The Court is satisfied that counsel is competent to represent the class.  Additionally, the interests of the named Petitioners do not conflict with

---

[55] Doc. 10 at 36-37.
[56] Doc. 1 at 2 n. 2.
[57] *In re Whirlpool,* 722 F.3d at 852 (citation omitted).
[58] Doc. 1-8 at 2.
[59] Respondents argue that the named Petitioners defy typicality because they are all ineligible for home confinement.  This contention ignores the fact that other means of removal from Elkton might be available to the named Petitioners other than home confinement, such as transfer to another facility.

Case No. 4:20-cv-00794
Gwin, J.

those of the other subclass members.

Having satisfied the Rule 23(a) requirements, the subclass must also demonstrate that it meets one of the Rule 23(b) requirements.  Petitioners argue that "Respondents have acted on grounds generally applicable to all proposed Class members, and this action seeks declaratory and injunctive relief."[60]  Indeed, Respondents' failure to protect the inmates from the spreading virus applies to the entirety of the subclass generally and injunctive relief is appropriate as to the subclass.  Rule 23(b)(2) is therefore satisfied.

For the purposes of the preliminary injunction inquiry, the Court finds that the subclass as defined in this order likely meets the requirements for class certification.

### C. Injunctive Relief

"Four factors guide a district court's decision to issue a preliminary injunction: whether the plaintiffs will likely win down the road, whether an injunction would prevent the plaintiffs from being irreparably harmed, whether an injunction would harm others, and how the injunction would impact the public interest."[61]  The Court considers each in turn.

### 1. Likely Success

Petitioners' claims are predicated on a violation of their Eighth Amendment rights which protects them from "cruel and unusual punishments."  In order to succeed on an Eighth Amendment claim, Petitioners must satisfy both an objective and subjective component.[62]

"The objective component of the test requires the existence of a 'sufficiently serious'

---

[60] Doc. 1 at 31.
[61] *McNeil v. Community Prob. Servs., LLC,* 945 F.3d 991, 994 (6th Cir. 2019).
[62] *Miller v. Calhoun Cty.,* 408 F.3d 803, 812 (6th Cir. 2005).

Case No. 4:20-cv-00794
Gwin, J.

medical need."[63]  Petitioners obviously satisfy this component.  At this moment a deadly virus is spreading amongst Elkton's population and staff.  For infected inmates, the virus can lead to pneumonia.  In the worse pneumonia cases, COVID-19 victims suffer diminishing oxygen absorption, with resulting organ failure leading to death.  Victims choke to death.  While not every inmate who contracts the virus will die, the subclass members are at a much greater risk of doing so.  They have a very serious medical need to be protected from the virus.

The subjective component requires that Respondents have acted with deliberate indifference, "a degree of culpability greater than mere negligence, but less than 'acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'"[64]  Petitioners satisfy this standard.

While Respondents offer certain prison-practice changes to show they know COVID-19 risks and have sought to reduce those risks, the Court still finds that, at this preliminary stage of the litigation, the Petitioners have sufficiently met the threshold for showing that Respondents have been deliberately indifferent.

One only need look at Elkton's testing debacle for one example of this deliberate indifference.  Additionally, Elkton has altogether failed to separate its inmates at least six feet apart, despite clear CDC guidance for some time that such measures are necessary to stop the spread and save lives.

Having met both prongs of the Eighth Amendment analysis, Petitioners have demonstrated a likelihood of success on the merits.

---

[63] *Id.* (citing *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004)).
[64] *Id.* at 813 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

Case No. 4:20-cv-00794
Gwin, J.

### 2. Irreparable Harm

Respondents argue that Petitioners have not shown that release will reduce the risk of exposure to COVID-19. But the district court cases Respondents use that have found that release would not lessen the risk to a defendant's health did not deal specifically with Elkton confinement.[65] Of the reported inmate deaths in nation-wide BOP custody, 6 out of 23, more than 1 in 4, has occurred at Elkton, making it a hotspot for the virus and certainly more dangerous than other facilities.[66]

Respondents also argue that the Petitioners' harm is speculative. It is true that some subclass members may not die if they contract the virus. However, it is more than mere speculation that the virus will continue to spread and pose a danger to inmates if BOP does not increase its efforts to stop the spread.[67] Petitioners have therefore shown a risk for irreparable harm.

### 3. Harm to Others

Respondents argue that the release of inmates from Elkton "would cause substantial damage to others" because there is no assurance that the inmates can care for themselves upon release.[68] They argue the inmates might be left without access to food, shelter, or medical care.[69]

As stated previously, Petitioners do not ask this Court to throw open the gates to the

---

[65] *United States v. Taylor*, No. 5:19-CR-192-KKC-MAS, 2020 WL 1501997, at *5 (E.D. Ky. Mar. 26, 2020) (noting that the Court believed that the practices at "any facility" were sufficient to protect from COVID-19); *United States v. Steward*, 2020 WL 1468005, at *1 (S.D.N.Y. Mar. 26, 2020) (denying release from Metropolitan Correctional Center).

[66] Federal Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited April 22, 2020).

[67] *See* Doc. 14-1 at 5-10 (describing the inadequacy of the Elkton measures and the risk of spread within the prison environment).

[68] Doc. 10 at 3.

[69] *Id*. at 3, 33-34.

Case No. 4:20-cv-00794
Gwin, J.

prison and leave the inmates that are released to fend for themselves. Instead, Petitioners seek "release" that consists of moving vulnerable inmates to various other types of confinement so that they are no longer at risk of dying from the virus. And as Respondents acknowledge, it is BOP's current policy to quarantine all inmates that are transferred from Elton for 14 days before transfer.[70] The continued implementation of this policy reduces the risk that an inmate with COVID-19 will carry the virus with him outside of the prison.

Furthermore, there is a continued risk of harm to others, including prison staff, if inmates remain in the prison and the virus continues to thrive among the dense inmate population.

### 4. Public Interest

Respondents argue that the public faces a grave danger if inmates are to be released *en masse* onto the streets. They say:

> Our over-burdened police and safety services should not be forced to deal with the indiscriminate release of thousands of prisoners on the streets without any verification that those prisoners will follow the laws when they are released, that they will have a safe place to go where they will not be mingling with their former criminal associates, and that they will not return to their former ways as soon as they walk through the prison gates.[71]

First, Respondents might as well be arguing against the release of any inmate, at any time, for any reason, because even in the best of circumstances the country's criminal justice system has no way, short of life imprisonment, of ensuring former prisoners do not recidivate. The COVID-19 pandemic has not suddenly raised this issue.

---

[70] Doc. 10-2 at 7.
[71] Doc. 10 at 41-42.

Case No. 4:20-cv-00794
Gwin, J.

Third, the danger of recidivism reduces with age, especially after age 40.[72]  The

subclass inmates are older and by definition, the vulnerable sub-class inmates suffer serious

medical conditions.

Second, it bears repeating that the Petitioners are not asking the Court to dump

inmates out into the streets.  No one's interest would be served in doing so.  The Court is

confident that the transfer of prisoners from Elkton to other means of confinement could

accomplish the goal of protecting Elkton's vulnerable population while also protecting

public safety.

Third, six Elkton inmates have already died.  Likely, they died after agonizing days

under intensive care, most probably with ventilators.  The BOP absorbs the high cost of this

treatment—costs that are likely multiples of what it would have cost to test each Elkton

inmate and guard.

Finally, "it is always in the public interest to prevent the violation of a party's

constitutional rights."[73]

### D.  The Prison Litigation Reform Act

Respondents argue that the Prison Litigation Reform Act ("PLRA"),

18 U.S.C. § 3626, bars this Court from granting the inmates' release.[74]  This is not so.  The

PLRA does not extend to "habeas corpus proceedings challenging the fact or duration of

confinement in prison."[75]  Because the Court has determined that the subclass's claims are

---

[72] *See generally* United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, (Dec. 2017), https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders.
[73] *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994).
[74] Doc. 10 at 16.
[75] 18 U.S.C. § 3626(g)(2).

Case No. 4:20-cv-00794
Gwin, J.

properly before the Court as a habeas action, this prohibition does not apply.[76]

Additionally, Respondents argue that a release order may only be entered by a three-judge court and that the court must find that "crowding is the primary cause of the violation of a Federal right" and "no other relief will remedy the violation."[77] As stated previously the PLRA does not bar this habeas proceeding. However, even if it did, the Court is not ordering the release of the prisoners. Instead, the inmates will remain in BOP custody, but the conditions of their confinement will be enlarged.

## III. Conclusion

The Court **GRANTS IN PART** and **DENIES IN PART** Petitioners' motion for relief.

The Court orders the Respondents to identify, within one (1) day all members of the subclass as defined in this Order. Respondents must identify in the list each subclass member's sentencing court and the case number of their underlying criminal conviction.

Following identification, the Court orders Respondents to evaluate each subclass member's eligibility for transfer out of Elkton through any means, including but not limited to compassionate release, parole or community supervision, transfer furlough, or non-transfer furlough within two (2) weeks.

In undertaking this evaluation, Respondents will prioritize the review by the medical threat level. For example, older inmates with heart, pulmonary, diabetes or immunity risks should receive review priority over subclass members who are younger.

Subclass members who are ineligible for compassionate release, home release, or

---

[76] *See Colton v. Ashcroft*, 299 F. Supp. 2d 681, (E.D. Ky. 2004) ("28 U.S.C. §§ 2241, 2254, and 2255 filings have been deemed not covered by the PLRA.").
[77] 18 U.S.C. § 3626(a)(3)(E).

Case No. 4:20-cv-00794
Gwin, J.

parole or community supervision must be transferred to another BOP facility where

appropriate measures, such as testing and single-cell placement, or social distancing, may

be accomplished.  In transferring subclass members, Respondents must continue to comply

with BOP policy of quarantining inmates for 14 days prior to transfer out of Elkton.

Any subclass members transferred out of Elkton may not be returned to the facility

until the threat of the virus is abated or until a vaccine is available and Elkton obtains

sufficient vaccine supplies to vaccinate its population, whichever occurs first.

IT IS SO ORDERED.


Dated: April 22, 2020                                *s/        James S. Gwin*
                                                     JAMES S. GWIN
                                                     UNITED STATES DISTRICT JUDGE