IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| OSCAR SANCHEZ, et al., on their own | § | |
| and on behalf of a class | § | |
| of others similarly situated, | § | |
| | § | |
| Plaintiffs/Petitioners, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:20-cv-00832-E |
| | § | |
| DALLAS COUNTY SHERIFF | § | |
| MARIAN BROWN, et al., | § | |
| | § | |
| Defendants/Respondents. | § | |

## MEMORANDUM OPINION AND ORDER

Following a four-day evidentiary hearing on Plaintiffs'/Petitioners' ("Plaintiffs") Motion for Temporary Restraining Order, Preliminary Injunction, and Writ of Habeas Corpus ("the Motion") (Doc. No. 2), the Court issued a brief order on April 27, 2020, denying the Motion. This opinion is to explain the Court's reasons for denying the requested relief.

### I. Factual and Procedural Background

The United States and the Northern District of Texas are in the midst of a pandemic. As of today's date, coronavirus disease, also known as COVID-19, has resulted in the deaths of 95,883 Americans.[1]  COVID-19 has no known cure or vaccine, and science about the virus that causes the disease is in its infancy. In this case, Plaintiffs and Defendants disagreed about the conditions inside the Dallas County Jail ("the jail") and the treatment of its inmates. They disagreed about what, if any, relief is appropriate for this Court to grant in response to the Motion. What no one disagreed about is the seriousness of the COVID-19 pandemic.

---

[1] https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

This Court is deeply concerned about the spread of COVID-19 at the jail. Evidence showed the number of detainees who tested positive for the disease is rising. Balancing the rights of the inmates with the safety of the Dallas community and the community beyond Dallas is a difficult task; however, Plaintiffs have not met their burden to show they are legally entitled to the emergency relief they seek, and for the reasons set forth below, the Court denies their request for relief.

### a.  General Information about Inmates and COVID-19 at the Dallas County Jail

On March 9, 2020, the jail had 5,987 inmates. The jail has the capacity to hold 7,414 inmates. On the last day of the Court's hearing, that population had been reduced by the recent release of over a thousand inmates, resulting in 4,829 inmates remaining in jail.

On March 25, 2020, the jail had its first inmate test positive for COVID-19. As of April 22, 2020, 127 of the 4,829 inmates in the jail tested positive for COVID-19. Approximately 474 inmates are being held in quarantine and are currently being monitored for COVID-19 symptoms. As of the writing of this opinion, there have been no inmate deaths related to COVID-19. Fourteen jail employees have tested positive for COVID-19, and as of the writing of this opinion, there have been no jail employee deaths related to COVID-19.

Of the 4,829 inmates, approximately 4,105 of them are detained on felony offenses. This Court has reviewed, *in camera*, the National Crime Information Center records for each inmate remaining in the jail. With few exceptions, all inmates being held, whether on felony charges or misdemeanor charges, have prior convictions involving crimes of violence or prior convictions that may cause public safety concerns if the inmates were to be released.

Fewer than 200 inmates are being held on misdemeanor charges. There are typically only 5 to 20 inmates charged with non-violent, non-DWI misdemeanor offenses at any time in the jail.

Testimony during the hearing showed there are *no* inmates being held in jail on Class C misdemeanors, such as traffic tickets.

### b.  Plaintiffs File Suit Due to COVID-19 Concerns in the Jail

Plaintiffs are detainees at the jail.  Due to cases of the highly contagious COVID-19 at the jail, on April 9, 2020, they filed a Petition for Writ of Habeas Corpus and Class Action Complaint for Injunctive and Declaratory Relief against Defendants Dallas County Sheriff Marian Brown and Dallas County, Texas. The State of Texas; the Honorable Greg Abbott, Governor of Texas; and the Honorable Ken Paxton, Attorney General of Texas, moved to intervene as defendants, and the Court granted their motion. For clarity, the Court will refer to Sheriff Brown and Dallas County as "Defendants" and to the State parties as "Intervenors."  Plaintiffs contend the jail has failed to comply with public health guidelines to manage the outbreak of COVID-19 and cannot provide for their safety.

Plaintiffs bring this action as a putative class action. They amended their initial pleading to add new Plaintiffs. They have filed a separate motion asking this Court to certify this action as a class action. There are twelve named Plaintiffs. Some of the named Plaintiffs have contracted COVID-19 and some named Plaintiffs are alleged to have at least one condition that makes them medically vulnerable under Plaintiffs' definition of what constitutes a "medical vulnerability" during this pandemic. Some of the named Plaintiffs are pre-adjudication detainees.  They seek to represent a class of all current and future detainees in pretrial custody.  The other named Plaintiffs are in jail post-adjudication and seek to represent a class of all current and future detainees in post-adjudication custody.  Both proposed classes include a subclass of persons Plaintiffs contend are medically vulnerable by reason of age or medical condition.

### c.  Plaintiffs' Medically Vulnerable List versus CDC's List of Conditions Creating Higher Risk

Plaintiffs' definition of what constitutes "medically vulnerable" is significantly broader than the Centers for Disease Control and Prevention's (CDC) list of conditions creating a higher risk of COVID-19 infection.

| CDC's List of Conditions Leading to Higher Risk of Severe Illness[2] | Plaintiffs' Medically Vulnerable List[3] |
|---|---|
| People 65 years of age or older | People 50 years of age or older |
| People of all ages with chronic lung disease | People of all ages with lung disease |
| People of all ages with moderate to severe asthma | People of all ages with asthma |
| People of all ages with serious heart conditions | People of all ages with heart disease |
| People of all ages who are immunocompromised | People of all ages who are immunocompromised |
| People of all ages with chronic kidney disease undergoing dialysis | People of all ages with chronic kidney disease (including hepatitis and dialysis patients) |
| People of all ages with liver disease | People of all ages with chronic liver disease |
| Not listed by CDC | People of all ages with diabetes |
| Not listed by CDC | People of all ages with epilepsy |
| Not listed by CDC | People of all ages with hypertension |
| Not listed by CDC | People of all ages with blood disorders (including sickle cell disease) |
| Not listed by CDC | People of all ages with inherited metabolic disorders |
| Not listed by CDC | People of all ages who have had strokes |

---

[2] People Who Are at Higher Risk for Severe Illness. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.
[3] Plaintiffs' First Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Injunctive and Declaratory Relief (Doc. No. 39) at 13.

| Not listed by CDC | People of all ages who have "developmental delay"[4] |
| People of all ages who are severely obese and have a body mass index of 40 or more | People having a body mass index of 40 or more |
| Not listed by CDC | People having any other condition identified either now or in future as being a particular risk for severe illness/or death caused by COVID-19.[5] |

## II.  Plaintiffs' Requests for Relief

Plaintiffs seek relief from the Court through two different vehicles. First, they seek "the rapid release from custody of people most vulnerable to COVID-19"[6] through a petition for writ of habeas corpus under 28 U.S.C. § 2241, starting with the medically vulnerable subclass members.[7]  The relief Plaintiffs request includes the release of all current and future medically vulnerable subclass members, whether pre- or post-adjudication, absent proof of "judicially-recorded findings by clear and convincing evidence that the individual poses such a serious risk of flight or danger to others that no other conditions can mitigate."  In addition, Plaintiffs seek the release via habeas, or transfer to home confinement, of additional class members, including those who are not medically vulnerable, as needed to ensure that people who remain incarcerated in the jail are under conditions consistent with CDC and public health guidance to prevent the spread of COVID-19.  The group Plaintiffs seek to release to the community includes those currently infected with COVID-19. As stated by Plaintiffs' counsel at the hearing, "Plaintiffs aren't

---

[4] This was defined by Plaintiffs during the hearing as "a developmental disability such that they have trouble understanding information or practicing preventive measures, or difficulty communication [sic] symptoms." Transcript of TRO Hearing April 22, 2020, Vol 2 p. 58 lines 19-22.

[5] Plaintiffs' requested relief evolved somewhat over the pendency of their Motion. This list is taken from Plaintiffs' second amended proposed order granting their Motion, filed with the Court after an evidentiary hearing on the Motion concluded.

[6] Doc. No. 39 at p. 27.

[7] One of the named Plaintiffs, Mr. Ideare Bailey, who contracted COVID-19, has been released from the jail since the lawsuit was filed. The parties disagreed about whether he was still an appropriate representative of the putative pre-adjudication class. Because the Court has denied the relief requested by Plaintiffs' Motion, it is not necessary to determine this issue at this time.

excluding people from our request for release on the basis of being positive for COVID-19, but we recognize that there would have to be a discharge plan in place."[8]

Plaintiffs also seek injunctive and declaratory relief under 42 U.S.C. § 1983 on behalf of the proposed classes. The pre-adjudication Plaintiffs allege Defendants violated their Fourteenth Amendment rights. They claim the inmates' conditions of confinement are unsafe and constitute punishment. The post-adjudication Plaintiffs allege violations of their rights under the Eighth Amendment to be free from cruel and unusual punishment.

On the same day they instituted this action, Plaintiffs filed their Motion for Temporary Restraining Order (TRO), Preliminary Injunction, and Writ of Habeas Corpus seeking emergency relief. Plaintiffs ask the Court to provisionally certify the pre- and post-adjudication classes and medically vulnerable subclass. They also ask the Court to order Defendants to provide, within six hours, a list of all individuals detained in the jail who are age 50 or older or who have lung disease, heart disease, chronic liver or kidney disease, diabetes or other endocrine disorders, hypertension, a compromised immune system, blood disorders, inherited metabolic disorders, history of stroke, "a developmental disability such that they have trouble understanding information or practicing preventive measures, or difficulty communication [sic] symptoms," a BMI of 40 or more, or any other condition identified either now or in the future as being a particular risk for severe illness/or death caused by COVID-19.

They also ask the Court to order Defendants to release, within 24 hours of the list's submission, all persons on the list who are in jail awaiting transfer to a treatment facility as a

---

[8] Transcript of TRO Hearing April 22, 2020, Vol 2 p. 58 lines 19-22.

condition of probation, and when space becomes available at the treatment facility, that those persons shall be ordered to report to the treatment provider.

Plaintiffs propose the following process for the release of the remaining people identified as medically vulnerable:  Defendants will have five days to object to the release of anyone on the list only on grounds they are flight risks or a danger to the community. The parties must meet and confer within 24 hours of the Plaintiffs' receipt of the objections. If they cannot reach an agreement regarding release of certain detainees, the Court will review the information and issue habeas relief as it deems appropriate. In addition, Plaintiffs ask the Court to order Defendants to provide released persons with educational resources on COVID-19.

In the Motion, Plaintiffs also seek injunctive relief under § 1983 in the form of a TRO or preliminary injunction. They ask the Court to order Defendants to immediately take steps to mitigate ongoing threats to health and safety, such as providing unrestricted access to cleaning supplies for each housing area, providing sufficient personal protective equipment (PPE) for all detainees and staff, cleaning and sanitizing common surfaces in housing areas, bathrooms, and other areas, cleaning and sanitizing bunks between occupants, providing detainees with up-to-date information about transmission and risks of COVID-19, and establishing protocols for detainees to report symptoms and receive health screenings.

 Plaintiffs also ask the Court to order a plan which will be overseen by a qualified public health expert who shall be authorized to make unannounced visits to the jail. The plan will outline (a) any additional, specific mitigation efforts needed to prevent, to the degree possible, contraction of COVID-19 by all class members not immediately released; (b) a housing and/or public support plan for any released class members who do not readily have a place to self-isolate for the period of time recommended by the CDC; and (c) an evaluation of whether the release of the medically

7

vulnerable subclass members allows those who remain in jail to adequately social distance and whether other categories of prisoners must be released in order to provide for compliance with CDC guidelines, particularly social distancing. Plaintiffs ask the Court to order Defendants to abide by this plan. Further, Plaintiffs ask the Court to order continued weekly reporting by Defendants of the people in custody at the jail with the medical conditions listed above.

For a variety of reasons, Defendants and Intervenors oppose Plaintiffs' Motion seeking emergency relief. At the evidentiary hearing, the Court heard conflicting evidence about the extent to which public health protocols are being followed in the jail.

### III.   Plaintiffs' Evidence of Jail Conditions and Inmate Treatment at Dallas County Jail[9]

#### a.   Testimony from Mr. David Jones

Former inmate Mr. David Jones testified for Plaintiffs and described the state of the jail from March 8, 2020 to April 3, 2020. To put this timeframe in perspective, on March 11, 2020, the first presumptive positive test for COVID-19 was confirmed in Dallas County.[10] On March 13, 2020, Governor Abbott declared a statewide disaster for Texas counties.[11] On March 15, 2020, the

---

[9] After the evidentiary hearing, Plaintiffs filed an "Advisory Regarding Statistical Reports by the Texas Commission on Jail Standards" (Doc. No. 89). In this filing, Plaintiffs ask the Court to overrule certain objections to Plaintiffs' Exhibit 12 and admit it into evidence unconditionally. Plaintiffs also ask the Court to take judicial notice of statistics regarding reduction of the jail population and to award them "all other appropriate relief." The Court's records show Exhibit 12 was unconditionally admitted into evidence at the hearing. Accordingly, their request concerning the exhibit is denied as moot. All other relief sought in Doc. No. 89 is denied.

[10] "First 'presumptive positive' cases of COVID-19 confirmed in Dallas, Tarrant counties", https://www.wfaa.com/article/news/health/coronavirus/dallas-county-announces-first-presumtive-positive-case-of-coronavirus/287-b49f608a-63db-4a98-8d92-88fc745edd8b. (last visited May 22, 2020).

[11] https://www.texastribune.org/2020/03/13/texas-coronavirus-cases-state-emergency-greg-abbott/ (last visited May 18, 2020).

first COVID-19 death in North Texas occurred. [12] On March 25, 2020, the first Dallas County Jail inmate tested positive for COVID-19.[13]

Mr. Jones was candid about his familiarity with the jail, having, as he described it, "a long history" of criminal problems in Dallas County.[14]   Mr. Jones walked through his experiences at the jail from the time he was booked in on March 8, 2020, until he was discharged on April 3, 2020. His temperature was taken as he was booked into the jail, but he said he received no advice about social distancing and said inmates were instructed to "stay close," about a foot away from one another, while walking. Mr. Jones described how the telephones inmates frequently use were not sanitized between uses and that the inmates were largely responsible for cleaning the jail areas. According to Mr. Jones, inmates were provided four small bars of soap for free each week, and could buy liquid body wash from the commissary, but no disinfecting wipes were provided or available. Inmates were provided free laundry services and usually received clean clothing weekly and clean bedding twice a month, but Mr. Jones testified that at one point, he had to wait fourteen days for clean clothes. Mr. Jones also said he was not given instructions on how to protect his health, and that an inmate who had been coughing and who had put in a request for medical attention had to wait several days to be seen by medical professionals. Eventually, Mr. Jones was put in a single cell where his temperature was taken, and he was given a face mask. Mr. Jones did not say whether the inmate who had been coughing was subsequently diagnosed with COVID-19.

---

[12] https://www.nbcdfw.com/news/coronavirus/arlington-resident-dies-from-coronavirus-first-in-north-texas/2333046/ (last visited May 18, 2020).

[13] TRO hearing transcript April 24, 2020, at p. 109.

[14] Dallas County public records show Mr. Jones was being held in jail on a felony Assault Family Violence- Impeding Breathing/Circulation charge. A grand jury declined to indict Mr. Jones for this offense, and he was released from jail that same day. During the hearing, Mr. Jones referred to having been arrested numerous times to explain his ability to hand draw a map of the jail from memory. He has felony convictions for Burglary of a Habitation and Attempted Burglary of a Habitation as well as other misdemeanor convictions.

Mr. Jones said inmates frequently watched the news and were aware of the COVID-19 pandemic. On April 3, 2020, Mr. Jones was released from jail by an officer fully dressed in PPE, including goggles and gloves. Mr. Jones himself wore a face mask as he left the jail.

### b.   Testimony of Officer Emmanuel Lewis

Plaintiffs also offered the testimony of Officer Emmanuel Lewis, who had served as a Detention Services Officer (DSO) at the jail for the past seven months. Officer Lewis worked only in the South Tower of the jail, so his experience in North and West towers of the jail was extremely limited. He had last been on the job April 18, 2020, three days before the hearing. Officer Lewis testified about the sleeping arrangements in the "pods" that held up to 64 inmates, some of which were full and some of which were not completely full. The inmates eat, sleep, and live in these pods. The inmates sleep in bunk beds, and Officer Lewis said he was unaware of any efforts to direct inmates to not sleep "head to head." Officer Lewis spoke of pods that had been closed because of a COVID-19 exposure. As for the pods that were open, Officer Lewis testified that before a shift change, sometimes after dinner, and near the end of his shift, the inmates were given access to mops, buckets, and disinfectant soaps to clean their living areas. Officer Lewis said that in the past few weeks the jail "ha[s] a lot of bleach available." Officer Lewis also gave details about the anti-bacterial soaps used to spray down the tables but said he had not seen commonly-touched surfaces such as pay phones wiped down on a regular basis.

Officer Lewis explained that since the jail is closed for in-person visits with inmates, other than for attorneys representing them, the inmates make frequent use of kiosks where inmates can sit and talk with people outside the jail for free by telephone or by video conference. He also described how "[lawyers] have been doing a lot of the video visits."

Officer Lewis shared that he was recently provided, at no cost to him, PPE such as masks and gloves, and that they are replaced as needed, but that he has not been given any written instructions on how to deal with COVID-19 issues or how to detect COVID-19 exposure or symptoms. According to Officer Lewis, jail employees' temperatures are taken before they begin working, and employees recently got "a huge thing" of disinfectant wipes to use in the pods. They also now have a big bottle of hand sanitizer for jail staff to use, and inmates can now ask DSOs to spray their hands with hand sanitizer spray. Officer Lewis said he has seen inmates washing their hands "a lot more recently" and that inmates can have extra bars of soap for free if they ask the DSOs.

Officer Lewis also supervised inmates who performed janitorial tasks, and he said the inmates receive both gloves and masks to use while they do their cleaning work. Additionally, all inmates now have face masks, which they wear when they are not eating. Recently the jail began using disposable trays to feed inmates.

Officer Lewis was not familiar with the specifics of the cleaning procedures for a pod when an inmate became symptomatic, but he stated he had seen some professional cleaning services spend a "good amount of time" cleaning. He further stated that he had seen other cleaning services that were not so thorough, which he described as being "there for like, two minutes, spraying a little bit around." He agreed the jail's actions in completely shutting down a pod after an inmate who resided there became symptomatic, and having the entire pod professionally cleaned afterwards, were "reasonable steps in response to COVID-19."

### c.   Testimony of Dr. Robert Cohen

Plaintiffs also presented testimony from a doctor who was a chief physician at one of the jails at Riker's Island in New York. Amongst other topics discussed, Dr. Cohen testified about the

CDC's recent recommendation that members of the public wear face masks to prevent the spread of COVID-19. Dr. Cohen explained that N-95 masks are most needed for people taking care of patients known to have COVID-19. Dr. Cohen confirmed that non-N-95 masks are, however, "very helpful" in blocking the transmission of the virus. He spoke of the CDC's recent change to its original recommendation that members of the public who do not work in the medical field did not need to wear face masks. The CDC now recommends that everyone wear face masks when in public.

When asked about why his definition of medically vulnerable was broader than the CDC's, Dr. Cohen conceded that some of his selections were arbitrary, such as selecting age 50 and over to be included in the medically vulnerable category instead of the CDC's age 65 and over. He stated, "[I]t is arbitrary. You could have—you know, you could have looked at 51; you could have looked at 64." He was similarly vague about why he included people with hypertension in the list of medically vulnerable people. Dr. Cohen said people with hypertension who took medicine to keep their symptoms within a normal range should still be released from jail.

Dr. Cohen advocated for the release from jail of inmates who were currently COVID-19 positive. "In New York City, when people are symptomatic COVID-19 positive are released from the jail for—because they are medically vulnerable, they are—if they do not have a place to go, a home, they are provided with a hotel room and social services support." He further explained that in New York City, the city paid for the hotel rooms for released COVID-19 inmates.

Dr. Cohen had never actually been inside the jail but opined that even if the jail were to follow all CDC guidelines, it would still not be enough to control the spread of COVID-19. Dr. Cohen theorized that only a mass release of inmates would do that. Dr. Cohen did not offer a specific number of inmates he believed should be released but said it "would probably be a

substantial reduction." Dr. Cohen's primary concern was:  "They're not releasing medically-vulnerable people, and there are too many people in the jail for them to provide physical distancing that is required to control the spread of the epidemic." Dr. Cohen's solution was for this Court to appoint an expert or experts to oversee the jail and to report back to the Court periodically.

### d.  Testimony of Mrs. Wykivia Bailey

Mrs. Bailey testified that her husband, Plaintiff Ideare Bailey, was arrested April 5, 2020, for an alleged crime she described as a theft of an ATM. Mrs. Bailey said she overheard people coughing as she talked to her husband on the telephone from jail. Mr. Bailey is diabetic, and Mrs. Bailey was concerned that he was at increased risk for getting COVID-19. Mrs. Bailey became extremely worried when her husband bunked next to a man who was coughing and running a fever. She called an officer at the jail and was able to have her husband moved to a new location, away from the sick man.

Mrs. Bailey reached out to Dallas County Pretrial Release Services and talked with a supervisor about getting a bond reduction for her husband. She was told that because of his prior criminal history, the judge denied Mr. Bailey's bond reduction request.[15] Mrs. Bailey subsequently met with the judge handling her husband's case as well as with the elected District Attorney. After Mrs. Bailey's meeting with them, they agreed to release Mr. Bailey on bond.  Eventually Mr. Bailey did test positive for COVID-19, and as of the date of the hearing, he was at home recovering.

---

[15] According to Dallas County public records, Mr. Ideare Bailey has been convicted of felony Aggravated Assault with a Deadly Weapon, felony Robbery, and felony Burglary of a Building.

13

### e.   Testimony of Dallas County Jail Chief Frederick Robinson

Plaintiffs called Chief Frederick Robinson, the Chief Deputy of the jail, as an adverse witness. Chief Robinson worked his way up through the ranks of the Dallas Sheriff's Department for the last twenty-seven years. He is currently the Chief Deputy of Detention Services and is responsible for overseeing the daily jail operations in all three jail towers. He said there are about twenty sheriff's deputies on staff and about 1,300 DSOs on staff.

Chief Robinson testified about the written plan for managing COVID-19 in the jail, which was jointly authored by the Dallas Sheriff's Department and the Parkland Health and Hospital System ("Parkland"). Chief Robinson also described how the jail has adopted the CDC's interim guidance recommending best practices for preventing the spread of the COVID-19 in the jail. The Chief said the Dallas Sheriff's Department provided all employees with a written handout of instructions about the need for social distancing. Chief Robinson also talked about walking throughout the jail and seeing fliers posted for both officers and inmates to see, offering CDC guidance related to COVID-19.

The Chief expressed his opinion that social distancing was indeed possible with the current number of inmates in the jail, but difficult to enforce because "the only way to keep inmates six feet apart at all times would be to essentially lock them in place and take away their freedom of movement." Chief Robinson said he asked his officers to try to enforce social distancing when moving inmates, and that the Dallas County Sheriff limited group activities to help maintain a social distance between inmates. Chief Robinson testified that in early March of 2020, he emailed every officer telling them how to social distance. He attached CDC guidelines to his email, to inform law enforcement personnel what they need to know about managing COVID-19.

14

During his testimony, Chief Robinson walked through the processes involved from when inmates enter the facility until they are discharged. All inmates enter the jail through the sally port, where the inmates stand behind blue lines that are spaced six feet apart. Each inmate is given a face mask upon arrival. Once they enter the intake room, inmates are asked if they have been out of the country, if they have been in touch with anyone who has COVID-19, and whether they have any symptoms of COVID-19. Each inmate's temperature is taken. If any of the questions raise concerns about exposure to COVID-19, the inmate is immediately taken to see a nurse for further assessment.

If, at any time, an inmate begins to show symptoms of COVID-19, the inmate is taken to see a nurse for an assessment, and Parkland health care workers provide any COVID-19 diagnoses and tests. Inmates are quarantined and tested if they exhibit COVID-19 symptoms. Symptomatic inmates are segregated from the general population, usually in single cells. For COVID-19 positive inmates with more severe symptoms, the hospital within the jail has negative pressure cells, referred to as Airborne Infection Isolation Rooms (AIIRs),[16] which the CDC recommends. Once inmates no longer show COVID-19 symptoms, they are placed in a convalescent tank, usually for three weeks, until they test negative for COVID-19.

Chief Robinson said inmates who were in contact with other inmates confirmed to have COVID-19 are quarantined for fourteen days. If, during that fourteen-day period, one of the inmates tests positive for COVID-19, the fourteen-day quarantine period begins again.

Officers accompanying newly arriving inmates also have their temperatures taken when arriving at the sally port. No visitors, other than inmates' attorneys, are currently allowed at the

---

[16] https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html. (last visited May 19, 2020).

jail. Chief Robinson spoke of inmates' frequent use of computers to meet with their attorneys, but said some lawyers still visit inmates in person. In such a case, the lawyer's temperature is taken before he or she is allowed into the jail. According to Chief Robinson, all persons who enter the jail have their temperatures taken, and anyone whose temperature is above 100.4 degrees is denied access.

After inmates are booked in, they are arraigned. Any inmate who has medical problems is taken to another floor of the jail for a medical assessment. As early as February 2020, symptomatic inmates were provided with face masks for protection of themselves and other inmates.

Chief Robinson discussed how outside cleaners, rather than inmates, professionally disinfect areas where COVID-19 positive inmates were present and said the cleaners disinfect according to CDC recommendations. He also addressed the PPE given to staff who are in contact with COVID-19 positive inmates. "They have a[n] N-95 mask, they have face shields, recently we have acquired goggles as well. And we also have gowns." Chief Robinson said Parkland's medical director provided a training video showing jail staff how to properly put on and wear the PPE. Staff working to clean laundry or to prepare food also wear face masks and gowns.   The Chief said that inmate laundry and clothing washings had been increased to once a week, that Dallas County has enough cleaning supplies to provide to inmates, and that the cleaning supplies used have been approved by the jail commission and vetted by Parkland to be effective against COVID-19.

Chief Robinson also addressed the jail's efforts to use technology to keep the justice system moving. Parole hearings are now being done electronically, and the jail has developed a portal to help inmates interact with judges to request release or bond reductions. The portal allows court paperwork to be filed electronically and signed without requiring inmate movement. The Chief

spoke of the collaborative efforts of Dallas County stakeholders to keep the courts functioning during the pandemic. "We have gotten support from, of course, our county commissioner, Commissioner Daniel, specifically Commissioner Price, who is always in our jail. He's making sure we get what we need. And of course, the other commissioners, Commissioner Daniel, who also chairs our jail sanitation meetings. We get tremendous support from our commissioners. And, of course, from our judges as well." Chief Robinson spoke of District Attorney John Creuzot's ongoing efforts to "come up with ways to ensure that inmates who are charged with drug offenses, their charges are on hold until the results from the analysis come back so that way inmates can get out of jail until their analyses are returned." Chief Robinson's opinion was, with the jail's current infrastructure and its current conditions, there was nothing more he could do to keep the inmates safe from COVID-19.

### f.   Dr. Ank Nikhawan

Plaintiffs called Dr. Ank Nikhawan, an associate professor employed by University of Texas Southwestern Medical Center, who works at the jail as the lead infectious disease physician. At the request of the Civil Rights Corps, Dr. Nikhawan was encouraged to write a letter to Dallas County politicians and law enforcement leaders urging them to release inmates from the jail. The Civil Rights Corps provided the doctor with a pattern letter, which she revised and sent out in her capacity as a private citizen, to local stakeholders. In her letter, Dr. Nikhawan suggested releasing non-violent inmates and suggested the jail prioritize releasing inmates aged 50 or older and those having preexisting conditions such as cancer, diabetes, lung disease, asthma or chronic obstructive pulmonary disease, heart disease, or Human Immunodeficiency Virus (HIV).

During her testimony, Dr. Nikhawan explained there was no specific data supporting the selection of people aged 50 or older, but said she generally believed older patients had a higher

risk of complications of COVID-19. In Dr. Nikhawan's opinion, social distancing was nearly impossible in a jail setting. In her letter, she warned that an outbreak in the jail had the potential to overwhelm the jail's hospital system.

## IV. Defendants' Evidence of Jail Conditions and Inmate Treatment at Dallas County Jail

Defendants called Mr. Patrick Jones, the Vice-President for Correctional Health Services for Parkland Hospital, who has been assigned to the jail since 2012. Mr. Jones works in the jail full-time. He testified about the specifics of the Parkland Hospital health system that operates in the jail and the training their staff received regarding the prevention of COVID-19. Mr. Jones described the Parkland jail hospital system as being one of the better facilities in the United States.

The jail's medical staff are trained by their licensures to deal with infectious diseases and this training is supplemented by information provided by the CDC. Mr. Jones testified the jail began implementing CDC recommendations late February and early March of 2020 and said Parkland continues to meet with jail staff to discuss COVID-19 issues.

Mr. Jones described the dual-screening system set up in the jail. People entering the jail are first screened as they enter the jail and receive secondary screening again by nursing staff as they enter the central intake room.

He said the jail hospital uses a clinical algorithm created by the infection prevention department, in coordination with the CDC and the Dallas County Health Department, to determine when it is appropriate to test an inmate for COVID-19. Mr. Jones stated the Parkland jail hospital does not have enough COVID-19 tests to provide a test for every person who enters and exits the jail, but said he felt "very comfortable with the number of tests that [the Parkland jail hospital] has

18

for inmates exhibiting COVID-19 symptoms" and said they have a supply chain in place to obtain more COVID-19 tests as needed by the jail hospital.

Mr. Jones said clinicians within the jail are free to use their own judgment about when to give an inmate a COVID-19 test, even if the inmate does not exhibit multiple symptoms. COVID-19 tests are free to inmates, and posters have been hung in the jail calls and tanks notifying inmates of this fact. Inmates are not charged for medical care related to COVID-19.

Mr. Jones described what occurs when a medical staffer is called to see an inmate who believes he or she is experiencing COVID-19 symptoms. Mr. Jones confirmed Chief Robinson's testimony about the PPE worn by such staff and explained that inmates who exhibit COVID-19 symptoms are moved to isolation, if they have not already been isolated. The staff member who screens the inmate for COVID-19 symptoms uses the clinical algorithm mentioned above to determine if the inmate should be tested for COVID-19. Until the test result is received, the inmate is removed from the general population and placed with other Persons Under Investigation (PUI), who are being monitored for signs of COVID-19. The PUIs remain together only until their COVID-19 test results come back, which Mr. Jones says typically takes a day.

If the inmate tests positive for COVID-19, his or her clinical status is assessed. Those inmates who are asymptomatic or who have mild symptoms are placed together with inmates experiencing similar symptoms. These inmates are examined twice daily by medical staff to make sure their symptoms are not progressing. If they do progress, care is intensified and if they need to be hospitalized, "we will make sure that happens immediately." Mr. Jones said, "[I]f their health condition starts to deteriorate at all, then we will immediately move them to the hospital, or to a higher level of care than what we can offer at the jail."

He also described the special twenty-eight AIIRs used for inmates suspected of having an airborne illness like COVID-19 or tuberculosis, and he discussed how frail, elderly inmates are housed in a special area "more conducive to those individuals."

Mr. Jones testified that the medical staff responds to urgent situations immediately and monitors jail staff for COVID-19 symptoms. Jail staff exhibiting COVID-19 symptoms are evaluated using the same clinical algorithm as the inmates and may be furloughed for safety. The jail does not provide COVID-19 tests for jail staff, but if the COVID-19 symptoms appear to be a result of workplace exposure, the jail staff member is furloughed with pay.

Inmates who have been in close contact with an inmate who has tested positive for COVID-19 become PUIs and are quarantined for fourteen days. If, after the quarantine has expired, none of the PUIs have developed the disease, they are returned to the general population. Each group of PUIs is grouped together with other inmates based on the date of their exposure. The monitored populations are not mixed, so no new PUIs, with different exposure dates, are added to the existing PUI group, so the fourteen-day quarantine clock does not have to be reset for the inmates currently being quarantined.

Mr. Jones also testified about a chart Parkland generated on March 25, 2020 that cross-referenced information from inmates' existing medical records with a list of co-morbidities associated with poor outcomes for inmates with COVID-19 infections. This list of names was given to Dallas County judges so they could review those inmates' cases to see if they would be appropriate for release.

Mr. Jones also described the general changes made in the jail since the beginning of the pandemic:

So the jail staff has—we, Parkland, have asked for specific things to happen within the jail. The first thing that we asked was that screening occur there at the sally port as people entered the jail facility itself. And screening does occur there now. A plan was put in place to—to accommodate that screening. We, Parkland, further asked for a—an area to place people who became positive in that screening during the intake process. Security formulated a plan to accommodate that. So as people were booked in, they went through the booking process, which includes appearing before the magistrate, you know, the fingerprinting, all of that. They made adjustments for that process so there would be a low physical contact process. Recommendations also came out that all employees should be screened as they entered into the jail facility and that has occurred. PPE has also been recommended to be worn by all within the facility, and the sheriff's department has implemented measures that all persons entering the facility shall have—shall be—shall wear PPE as they move about the facility.

## V.  Applicable Law

### a.  Writ of Habeas Corpus Under 28 U.S.C. § 2241

The Court will begin by addressing Plaintiffs' request for habeas relief. Plaintiffs argue that a petition for writ of habeas corpus under 28 U.S.C. § 2241 is an appropriate vehicle to remedy their alleged constitutional violations. Under § 2241, this Court has jurisdiction to grant a writ of habeas corpus to a prisoner in custody in violation of the Constitution or laws or treaties of the United States. 28. U.S.C. § 2241(c)(3); *Jones v. Cunningham*, 371 U.S. 236, 236 (1963).

Defendants and Intervenors contend that § 2241 does not provide a remedy in this situation and contend that, even if it did, Plaintiffs did not exhaust available remedies, a prerequisite to seeking the writ. They also contend habeas relief is not available for class members.

As an initial matter, during closing arguments in the hearing on the Motion, this Court expressed concerns about whether it was appropriate for this Court, rather than the criminal judges already in charge of these cases, to look at each case individually and determine whether an inmate was suitable for release or should be held because of public safety concerns over the Defendants' objections. Plaintiffs responded, "So the next bucket is, we decide which [inmates objected to by

21

Defendants] we're going to contest that we think the decision that Your Honor should make would be that the risk of harm to those individuals outweighs the potential risk to the community. And you don't need a whole bunch of people to come in and talk about that."[17]

This Court disagrees. Many of the inmates who are the subject of this lawsuit have victims who should be heard from before release is even considered. Named Plaintiff Roger Morrison is one such example. Plaintiffs allege Mr. Morrison should be released because of his high blood pressure, hepatitis C, and cirrhosis of the liver. Mr. Morrison is currently being held in jail for felony Evading Arrest with a Prior Conviction, as well as other felony charges. He also has a parole hold. This is not Mr. Morrison's complete criminal record, but of note are the following prior criminal convictions: 1) a felony Robbery conviction; 2) a felony Theft from a Grave/Corpse conviction; 3) two felony convictions for Burglary of a Habitation; 4) two felony repeat Driving While Intoxicated convictions, and several misdemeanor Driving While Intoxicated convictions; 5) a felony Evading Arrest or Detention conviction; 6) two misdemeanor Evading Arrest or Detention convictions; 7) a misdemeanor Assault conviction; 8) a Resisting Arrest conviction; and 9) a Criminal Trespass with a Deadly Weapon conviction. Mr. Morrison also had a protective order granted against him after a judge found he committed family violence.

As stated by Judge Rosenthal in a case involving COVID-19 in the Harris County Jail, "[R]eleasing those who cannot be safely released—whether because of risks of new offenses, particularly crimes involving physical violence, or risks of nonappearance—is of equal concern." *Russell v. Harris Cty., Tex.*, No. H-19-226, 2020 WL 1866835, at *8 (S.D. Tex. April 14, 2020). Based on his criminal convictions for violence, burglary, resisting and evading arrest, repeat drunk

---

[17] April 24, 2020, Hearing Volume 4 at 323.

driving, and use of deadly weapons, this Court has concerns that Mr. Morrison would be a danger to the public if released. Also of concern is whether releasing Mr. Morrison would send him back to the home of the person he battered and who had to get a protective order against him to prevent further domestic violence from occurring. Any fair hearing would require the Court to hear testimony from Mr. Morrison's victims in the cases in which he has been convicted, would require input from the judges and prosecutors who are familiar with Mr. Morrison's pending cases, and would have to allow the opportunity to Mr. Morrison's criminal defense attorney to present testimony on Mr. Morrison's behalf.

It appears from this Court's review of the criminal records of remaining inmates that the Dallas County District Attorney, the criminal defense attorneys representing accused individuals, and the Dallas County judges have collaborated well and worked diligently to drastically reduce the jail population since the eruption of the COVID-19 crisis. Over 1,000 inmates have been released recently.

Just as it would be a grave injustice to incarcerate of a mass of individuals with a blanket order, so too the mass release of inmates without individualized assessments could create a public safety hazard. Through their habeas corpus request, Plaintiffs ask this Court for such a mass release of inmates. In Plaintiffs' closing argument they said, "And the stakeholders, however many stakeholders they want to have in the process of deciding whether to let people go or not is fine, as long as the process is quick."[18] In their request for relief, Plaintiffs ask Defendants to identify all medically vulnerable inmates, according to Plaintiffs' definition, within six hours of this Court issuing an order, and ask this Court to order the inmates released within 24 hours "absent proof of

---

[18] April 24, 2020, Hearing Volume 4 at 324.

judicially-recorded findings by clear and convincing evidence that the individual poses such a serious risk of flight or danger to others that no other conditions can mitigate."

Plaintiffs propose to give Defendants five days to object to the release of anyone on the Plaintiffs' list, only on grounds they are a flight risk or a danger to the community; then propose the parties must meet and confer within 24 hours of receiving the objections, which would likely not give Defendants time to contact victims and other stakeholders who in fairness, ought to be heard. From this Court's *in camera* review of the inmates remaining in the jail, it is clear that those inmates whose release was not objectionable to Defendants have likely already been released, as reflected by the 1000+ inmates recently released and by the release of such inmates as Mr. David Jones and Plaintiff Mr. Ideare Bailey. From this Court's review of the NCIC records of the remaining inmates, it is clear that those inmates Dallas County would not object to releasing have already been let go. They would likely object to the release of most of the remaining inmates based on the seriousness of their current criminal charges or their previous criminal records. Having hearings for nearly 5,000 remaining inmates would not be quick, despite Plaintiffs' hopes that it could be accomplished in a short amount of time, and the evidence showed the Defendants are continuing to review inmates who are potentially suitable for release.  Again, to quote Judge Rosenthal, "This court is concerned about creating harm by granting a temporary restraining order that disrupts the parties' commendable efforts under difficult circumstances to address the COVID-19 crisis in the Jail, and that will require judges and others to do what simply cannot be done as fast as desired." *Russell*, 2020 WL 1866835, at *8.

Public safety concerns aside, habeas is not available to review questions unrelated to the cause of detention. *Pierre v. U.S.*, 525 F.2d 933, 935 (5th Cir. 1976). Its sole function is to grant relief from unlawful imprisonment or custody, and it cannot be used properly for any other

purpose. *Id.* at 935–36. An inmate is not entitled to relief in a habeas corpus petition based on civil rights claims related to the conditions of his confinement. *Cf. Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973); *see Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (5th Cir. 1979) (case involving pretrial detainees in which Supreme Court stated, "we leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself").

Plaintiffs do not challenge the cause of their detention or contend that they are being held for an improper duration. They seek release due to the conditions at the jail cause by COVID-19. The Court concludes it lacks jurisdiction over Plaintiffs' habeas action. *See Livas v. Myers*, No. 2:20-CV-00422, 2020 WL 1939583, at *7–8 (W.D. La. April 22, 2020) (case involving prisoners seeking to be released under § 2241because of COVID-19, where court noted lack of precedent in Fifth Circuit allowing conditions of confinement claims to be brought under § 2241 and dismissing complaint for lack of subject matter jurisdiction); *see also Sacal-Micha v. Longoria*, No. 1:20-CV-37, 2020 WL 1815691, at *6 & n.6 (S.D. Tex. Apr. 9, 2020) (petitioner cannot rely on petition for writ of habeas corpus to obtain release from detention center based on COVID-19, noting Fifth Circuit has not recognized habeas corpus as permissible avenue for relief from alleged inadequate conditions of confinement); c*f. Gallegos-Hernandez v. U.S.*, 688 F.3d 190, 194 (5th Cir. 2012) (petitioner seeking benefit of drug-rehabilitation programs and halfway house placement properly brought his claims under § 2241 because those benefits could result in reduction in sentence); *Davis v. Fechtel*, 150 F.3d 486, 488 (5th Cir. 1998) (petitioner who challenged denial of parole did so properly under § 2241). *But see Vazquez Barrera v. Wolf*, No. 4:20-CV-1241, 2020 WL 1904497, at *4 (S.D. Tex. Apr. 17, 2020) (in case involving plaintiffs who seek release from civil immigration detention due to COVID-19, court found claims properly brought under § 2241).

25

Even if this Court were to determine that Plaintiffs could seek relief under § 2241, exhaustion of administrative remedies is a prerequisite to filing a § 2241 petition. *Gallegos-Hernandez*, 688 F.3d at 194; *United States v. Cleto*, 956 F.2d 83, 84 (5th Cir. 1992). A § 2241 petitioner must exhaust available state court remedies before a federal court will entertain a challenge to state detention. *Montano v. Tex.*, 867 F.3d 540, 542 (5th Cir. 2017). Federal courts should abstain from exercising habeas jurisdiction if the issues raised in the petition may be resolved either by trial on the merits in the state court or by other state procedures available to the petitioner. *Dickerson v. La.*, 816 F.2d 220, 225 (5th Cir. 1987). The requirement that state criminal defendants exhaust available state remedies is vital to preserving the respective roles of state and federal governments and avoiding unnecessary collisions between sovereign powers. *Montano*, 867 F.3d at 546. It was judicially crafted on federalism grounds to protect the state courts' opportunity to confront and initially resolve any constitutional issues arising within their jurisdictions as well as to limit federal interference in the state adjudicatory process. *Dickerson*, 816 F.2d at 225.

The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court. *See Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988). To exhaust remedies in Texas, a petitioner must present his claims to the Texas Court of Criminal Appeals by filing an appeal followed by a petition for discretionary review or by filing an application for a writ of habeas corpus. *Jenkins v. Gonzales*, No. H-19-4927, 2019 WL 7116084, at *2 (S.D. Tex. Dec. 23, 2019). In the pre-conviction context, a Texas prisoner confined after a felony indictment may file an application for writ of habeas corpus pursuant to Article 11.08 of the Texas Code of Criminal Procedure with the judge of the court in which he is indicted. *Id.*; *see* TEX. CODE CRIM. PROC. ANN. § 11.08. If the trial court denies habeas relief, the applicant's remedy

is to take a direct appeal to an intermediate appellate court and then petition for discretionary review by the Texas Court of Criminal Appeals. *Jenkins*, 2019 WL 7116084, at *2.

Plaintiffs respond that under these circumstances, the exhaustion requirement is excused. Exceptions to the exhaustion requirement are appropriate where the available administrative remedies either are unavailable or wholly inappropriate to the relief sought, or where the attempt to exhaust such remedies would itself be a patently futile course of action. *Gallegos-Hernandez*, 688 F.3d at 194. Plaintiffs have not presented evidence to this Court that the state court system was unavailable to them. *See Money v. Pritzker*, No. 20-cv-2093, 2020 WL 1820660, at *21 (N.D. Ill. Apr. 10, 2020). Plaintiffs' own evidence presented at the hearing on the Motion showed just the opposite was true. Even during a pandemic, Mrs. Bailey was able to meet with both the elected District Attorney and her husband's judge to secure her husband's release from jail. Plaintiffs presented the declaration of a criminal defense attorney stating that even with the current COVID-19 situation, bond hearings are still given priority by the courts and are held as expeditiously as possible. Many are done informally or by email or phone. This declaration concludes: 1) interlocutory appeals of an unfavorable decision would likely take months due to delays in the appellate process; 2) pre-trial writs unrelated to bond would have a longer timeline; and 3) post-conviction writs would follow yet another timeline, one that took many months before COVID-19. The declaration asserts these conclusions but gives no facts or examples to support them. Neither do the attachments to the declaration. They prove the contrary. Attached to Texas attorney Alison Grinter's declaration is a March 24, 2020, email from the Dallas County Criminal District Court Manager stating, "The Criminal District Courts are currently open and conducting essential hearings, by any and all available means, at this time."

27

Defendants also presented evidence of parole hearings being held remotely and the use of kiosks to allow inmates to communicate with the court, process court paperwork, and request release and bond reductions. The evidence before the Court is that these procedures and remedies are still available.

Plaintiffs also claim they have exhausted state remedies. The evidence does not show they have done so. Plaintiffs are not entitled to relief under § 2241, and even if they were so entitled, Plaintiffs have not exhausted their state court remedies. As a result, this Court dismisses Plaintiffs' petition for writ of habeas corpus.

### b. Injunctive Relief Under 42 U.S.C. § 1983

In their § 1983 claim, Plaintiffs allege Defendants violated the Eighth and Fourteenth Amendments through their deliberate indifference to the risk COVID-19 poses to them. Plaintiffs ask for a TRO and a Preliminary Injunction. To be entitled to a TRO or preliminary injunction, a movant must establish: (1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of injunctive relief will not disserve the public interest. *Trottie v. Livingston*, 766 F.3d 450, 452 (5th Cir. 2014).

To establish a claim under § 1983, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *Pratt v. Harris Cty.*, 822 F.3d 174, 180 (5th Cir. 2016). The pre-adjudication Plaintiffs allege that under the Fourteenth Amendment, Defendants are required to provide for Plaintiffs' reasonable health and safety. They contend Defendants have been deliberately indifferent to the risk COVID-19 poses to them and the proposed class. The post-adjudication Plaintiffs allege, on behalf of themselves and others in the

28

proposed class, that Defendants have violated the Eighth Amendment's prohibition on cruel and unusual punishment because they are deliberately indifferent to the risks of COVID-19. Pretrial detainees' rights exist under the Due Process Clause of the Fourteenth Amendment but are subject to the same scrutiny as if they had been brought as a deliberate indifference claim under the Eighth Amendment. *See Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (citing *Hare v. City of Corinth*, 74 F.3d 633, 648–49 (5th Cir. 1996) (en banc)).

The Eighth Amendment imposes duties on prison officials, who must provide humane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates. *Id.* Prison officials who act reasonably cannot be found liable under the Eighth Amendment. *Id.* at 845.

An Eighth Amendment conditions of confinement claim has two components, one objective and one subjective. *Id.* at 846. To satisfy the objective requirement, the plaintiff must show "an objectively intolerable risk of harm."   *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020), *denying motion to vacate stay*, 2020 WL 2497541 (May 14, 2020).    To satisfy the subjective requirement, the plaintiff must show that the defendant (1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; (2) subjectively drew the inference that the risk existed; and (3) disregarded the risk. *Id.* The incidence of diseases or infections, standing alone, do not imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks. *Id.* (citing *Shepherd v. Dallas Cty.*, 591 F.3d 445, 454 (5th Cir. 2009)). Instead, the plaintiff must show a denial of "basic human needs." *Id.* "Deliberate indifference is an extremely high standard to meet."   *Id.* (quoting *Cadena v. El Paso Cty.*, 946 F.3d 717, 728 (5th Cir. 2020)).

29

On April 22, 2020, the Fifth Circuit issued an opinion in a case involving the COVID-19 pandemic and the Texas prison system. The plaintiffs in that case sought relief similar to that sought by Plaintiffs in this case, and the opinion forecloses this Court's ability to grant the injunctive relief Plaintiffs seek. *See Valentine*, 956 F.3d 797. The *Valentine* plaintiffs were inmates at a Texas Department of Criminal Justice (TDCJ) prison for the elderly and infirm. *Id.* at 799. They filed a class action lawsuit on behalf of disabled and high-risk inmates against TDCJ, its executive director, and the prison warden. The plaintiffs alleged violations of the Eighth Amendment. The district court granted the plaintiffs a preliminary injunction that required TDCJ to take many steps, including providing plaintiffs and the class members with unrestricted access to hand soap, access to hand sanitizer in various areas, and access to tissues. *Id.* at 799–800. The injunction required common surfaces in housing areas, bathrooms, and the dining hall to be cleaned every thirty minutes from 7 a.m. to 10 p.m. *Id.* at 800. It also required the posting of information in every housing area and above every sink about how inmates can protect themselves from contracting COVID-19. *Id.* The district court ordered TDCJ to provide the plaintiffs and the Court with a detailed plan to test all inmates for COVID-19 and a plan to quarantine any inmates who test positive. TDCJ appealed and sought a stay of the preliminary injunction pending appeal. *Id.* at 801.

The Fifth Circuit granted TCDJ's motion to stay the preliminary injunction. The appellate court determined that TDCJ was likely to prevail on appeal in part because, after accounting for the protective measures taken by TDCJ, Plaintiffs had not shown a "substantial risk of serious harm" that amounts to cruel and unusual punishment. *Id.* at 801–02. The court noted, "There is no doubt that infectious diseases generally and COVID-19 specifically can pose a risk of serious or fatal harm to prison inmates." *Id.* at 801. TDCJ submitted evidence of the protective measures it

had taken, including access to soap, tissues, gloves, masks, regular cleaning, signage and education, quarantine of new prisoners. *Id.* at 801–02. The legal question was whether the Eighth Amendment requires TDCJ to do more to mitigate the risk of harm. *Id.* at 802. The district court acknowledged that its injunction required extra measures beyond TDCJ and CDC policies. The Fifth Circuit stated that there is no precedent holding that the CDC's recommendations are insufficient to satisfy the Eighth Amendment. *Id.*

Further, even assuming there is a substantial risk of serious harm, the *Valentine* plaintiffs did not have evidence of TDCJ's subjective indifference to that risk. *Id.* Deliberate indifference requires the defendant to have a subjective state of mind "more blameworthy than negligence." *Id.* (quoting *Farmer*, 511 U.S. at 835). The district court cited no evidence that TCDJ subjectively believed its measures were inadequate. *Id.* The evidence showed TCDJ had taken and continued to take measures, informed by the CDC and medical professionals, to abate and control the virus. *Id.* Even if the district court might have done things differently, its disagreement with TDCJ's medical decisions does not establish deliberate indifference. *Id.* at 803.

The Fifth Circuit also noted that the Prison Litigation Reform Act (PLRA) presented obstacles for the plaintiffs. *Id.* at 804. The PLRA requires inmates to exhaust "such administrative remedies as are available" before filing suit in federal court to challenge prison conditions. *Id.*; *see* 42 U.S.C. § 1997e(a). The exhaustion requirement is mandatory. *Valentine*, 956 F.3d at 804. There are no futility or other exceptions. *Id.* When an administrative procedure grants authority to take some action in response to a complaint, that procedure is considered available, even if it cannot provide the remedial action an inmate demands. *Id.* A remedy is not available, and exhaustion is not required, when (1) the relevant administrative procedures lack authority to provide any relief, (2) the "administrative scheme" is so opaque as to prevent a reasonable prisoner from using it, or

31

(3) when administrators thwart inmates from using a grievance process through "machination, misrepresentation, or intimidation." *Id.*

In *Valentine*, the district court found the TDCJ grievance process too lengthy to provide timely relief and thus considered it "unavailable" under the special circumstances of this crisis. *Id.* at 804–05. The Fifth Circuit rejected the "special circumstances" exception as inconsistent with the PLRA. *Id.* at 805 (citing *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016)). The appellate court also noted that the district court found that the TDCJ grievance procedure would be unduly lengthy if TDCJ took the full time allotted, but never found that TDCJ *would* take the full time, if given the chance. *Id.* Thus, the evidence did not support the district court's determination that the TDCJ process presented no possibility of some relief. *Id.*

In addition, even if the *Valentine* plaintiffs had exhausted their claims, the Fifth Circuit held that the district court's injunction went well beyond the limits of what the PLRA allows. *Id.* Under the PLRA, injunctive relief must be narrowly drawn and be the least intrusive means necessary to correct the harm. *Id.* at 805–06; *see* 18 U.S.C. § 3626(a)(2). The court's injunction, which provided a cleaning schedule for the prison "down to the half-hour interval," did not comply with the PLRA. *Valentine*, 956 F.3d at 806. The Fifth Circuit cautioned against "that level of micromanagement" as being inconsistent with the PLRA. *Id.*

There is no "question that COVID-19 presents a risk of serious harm to those confined in prisons." *Marlowe v. LeBlanc*, No. 20-30276, 2020 WL 2043425, at *2 (5th Cir. April 27, 2020). But, for purposes of resolving Plaintiffs' constitutional claims, the question is whether the constitution requires Defendants to do more than they have already done to mitigate the risk of harm. *See id.* During its four-day hearing, this Court heard conflicting evidence about the jail's COVID-19 response. *See Money*, 2020 WL 1820660, at *18 (noting plaintiffs have no chance of

success where Defendants provided lengthy list of actions take to protect inmates). Further, Plaintiffs did not present evidence that Defendants subjectively believed their actions in response to the COVID-19 situation were inadequate. As in *Valentine*, the evidence in this record does not meet the high burden required to demonstrate deliberate indifference by Defendants.

Plaintiffs seek to distinguish *Valentine* on the exhaustion issue. They point to evidence that several of the named Plaintiffs filed grievances and try to explain that those who did not "took extraordinary efforts in their attempts to comply with the grievance procedures."

Whether the inmate grievance process is currently operational was an important issue in this case because of the exhaustion issue. Chief Robinson testified about the inmate grievance process and the variety of ways inmates can file grievances. An inmate can file a grievance using one of the kiosks in the jail, by filing a paper grievance, or by contacting a jail officer and verbally requesting to file a grievance.

The Inmate Handbook for the Dallas County Jail defines "grievance" as "an electronic and/or written complaint to protect you from" civil rights violations, criminal acts, unjust denial or restriction of inmate privileges, and prohibited acts by detention staff. Inmates may submit an electronic grievance directly to the Inmate Grievance Board through kiosks located in every jail facility. A written grievance form can be requested from detention staff. Further, it is not mandatory to use the jail's form, as long as the grievance is "received in a written format." Once a grievance is submitted, the Inmate Grievance Board reviews it to determine if it meets grievance standards. After that a status response will be generated and provided to the inmate. The Board has 15 days to submit the initial status response and 60 days to submit a final response. All emergency grievances will be handled immediately.

The handbook further provides for a two-level appeals process. If an inmate disagrees with the Board's findings, he or she may submit a first level appeal within 10 days of Board's decision. The appeal can be submitted either electronically or in writing to the Quality Assurance Commander of the Quality Assurance Unit. The Quality Assurance Commander has fifteen days to respond. If an inmate disagrees with the decision of the Quality Assurance Commander, he or she may then appeal the decision to the Assistant Chief Deputy, Special Services Bureau of the Sheriff's Department. The Assistant Chief Deputy has 30 days to submit a written decision on the second level appeal. If at any point during the grievance process, an inmate does not receive a response to either the grievance, first level appeal, or second level appeal, he or she must proceed to the next step of the grievance process to fully exhaust administrative remedies.

Attached as exhibits to their original pleading, Plaintiffs submitted several declarations from Pennsylvania attorney Amy Fly, and Texas attorneys Adwoa Asante and Allison Grinter who made declarations on behalf of each named Plaintiff.  Ms. Fly's declarations each state that she spoke to the detainee at least once, who provided her with the information in the declaration. The declarations include information about the conditions in the jail, as well as information about the grievance process. Plaintiff Oscar Sanchez told Fly he was repeatedly denied grievance forms. He filed an emergency grievance on April 5, 2020, and an appeal the next day. The declaration claims that the next day, "the application to file grievances" was removed from the kiosk.

Plaintiff Marcus White told Ms. Fly that he was denied grievance forms, but made a sign demanding a grievance. He got a form on March 23, 2020. As of April 7, the grievances had not been collected. Plaintiff Marcelo Perez told Ms. Fly that he filed an emergency grievance on April 6, 2020, but had not received a response.

There is no evidence that the named Plaintiffs exhausted the jail's grievance procedure. While some of them started the process, they filed this action before letting that process play out. Exhaustion is a prerequisite to Plaintiffs' § 1983 claims. Their failure to exhaust the appropriate grievance procedures is fatal to their request for injunctive relief.

Plaintiffs agreed in their closing argument that the PLRA applies to the § 1983 claims in this case. And they ask this Court to find that, because of COVID-19, special circumstances excuse them from having to comply with the PLRA's mandatory exhaustion requirement. In *Ross v. Blake*, the Supreme Court detailed the history of the PLRA's creation and explained that the plain text of the PLRA statute was written to prevent courts from doing just what Plaintiffs ask this Court to do today.  The Supreme Court stated, "[T]hat mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account." 136 S.Ct. at 1856. Even if the COVID-19 created a "special circumstance," this Court would be bound both by the plain language of the PLRA text and Supreme Court precedent, from granting relief on such grounds.

### c.   Separation of Powers and Federalism Concerns

Additionally, Plaintiffs ask this Court to issue an order essentially taking over the jail, appointing an expert to manage it, and having the expert report back to the Court. This Court has grave concerns about the appropriateness of using the power of the federal courts to take discretion away from such elected officials as the Governor of the State of Texas, the Texas Board of Pardon and Paroles, Dallas County's County Criminal Court Judges, Dallas County's Criminal District Court Judges, Dallas County's District Attorney, the Dallas County Commissioners, and Dallas County Judge Clay Jenkins.

The evidence before this Court shows these parties all working together to respond rapidly to an ever-changing crisis created by this pandemic. If this Court were to set up a "Mother, May

I" system requiring stakeholders to get this Court's approval before making changes, it would hamper their abilities to respond quickly during this pandemic. As stated in *Russell*:

> [I]t is best to leave sensitive policy and political decisions on crafting procedures to accomplish the shared goal of safely reducing the Jail population to elected and appointed officials. "Turf wars" allow different interests and views to be heard and addressed on the ground, by those who must actually implement the policies and procedures. The court does not want to disrupt the laudable existing efforts to address the crisis.

*Russell*, 2020 WL 1866835, at *13. Further, "[t]he judiciary is ill-equipped to manage decisions about how to best manage any inmate population." *Money*, 2020 WL 1820660, at *16. Though *Money* dealt with a prison, the same concerns apply in this case. "It is no accident that the federal judiciary only rarely intrudes into the management of state prisons, and only once in history has actually ordered the release of prisoners on a scale anywhere hear what Plaintiffs hope to accomplish through this litigation." *Id.*

The Court has serious separation of powers concerns with Plaintiffs' requested relief. Some of the Plaintiffs in this case have "blue warrants," which are parole holds from the TDCJ. Ordering the release of these inmates would essentially invalidate those warrants. As in *Money*, "Here, Plaintiffs want this Court to direct—or at a minimum, strongly influence—the Governor and an administrative agency to make discretionary decisions under state law to grant a medical furlough or a home detention." *Id.* at *17. Especially in a pandemic, the federal court must abstain from exceeding its proper boundaries. "One of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions." *Id.* at *15 (citing *Missouri v. Jenkins*, 495 U.S. 33, 51 (1990)).

The Supreme Court's opinion in *Jacobson v. Massachusetts*, prohibits courts from usurping the state's authority to craft measures responsive to a public health emergency. *In re*

*Abbott ("Abbott II")*, 956 F.3d 696, 716 (5th Cir. 2020); *see Jacobson v. Mass.*, 197 U.S. 11, 35 (1905). Courts have no authority to ask whether a particular method is, perhaps or possibly, not the best. *Abbott II*, 956 F.3d at 716. Instead, courts may only ask whether the state has acted in an arbitrary, unreasonable manner. *Id.* During a pandemic emergency, public authorities must make numerous complex judgment calls. *Id.* The Supreme Court and the Fifth Circuit have explained how to resolve such an impasse: "If the choice is between two reasonable responses to a public crisis, the judgment must be left to the governing state authorities." *Abbott II*, 2020 WL 1911216, at *12 (citing *Jacobson*, 197 U.S. at 30).

This Court also questions the appropriateness of using its power to turn what are now CDC recommendations into orders that must be complied with under threat of contempt. "Disrupting a process that strives to recognize the different interests and concerns is an added risk of intruding with a temporary restraining order that is backed by the threat of contempt." *Russell*, 2020 WL 1866835, at *13.

The job of this Court is not to make law, but to interpret it. It is the duty of the legislative branch to craft laws that are solutions to this crisis. The United States Congress is presently holding hearings on COVID-19-related bills.[19] Should legislators deem it appropriate for CDC recommendations to become law, they will surely make them so. Using this Court's power to order the jail to follow what are now just recommendations from the CDC would turn this district court into a lawmaking body. Additionally, this subject matter, a novel virus that medical professionals are still learning about—both its spread and its prevention, would make a moving target for court orders. As medical professionals learn more about COVID-19, the CDC's recommendations also

---

[19] https://www.cnn.com/2020/05/19/politics/senate-banking-committee-hearing-mnuchin-powell/index.html.

evolve; for example, on April 3, 2020, the CDC reversed its previous advice and began recommending the general public wear face masks to help prevent the spread of COVID-19. If this Court were to turn CDC recommendations into court orders, the parties would have to wait for this Court to issue superseding orders before they could act, or face contempt if they acted without the Court's authority. This Court's orders would need to be in constant flux to keep up with revised recommendations from the CDC as more information about COVID-19 becomes known.  As in *Russell*, "The court cannot find on this record that in this time of crisis, federal-court intervention in fraught and rapidly evolving County affairs is required, safe, or would at this time materially improve the processes under way."  *Russell*, 2020 WL 1866835, at *11 (citing *In re Abbott*, 954 F.3d 772, 778 (5th Cir. 2020)).

## VI.  Conclusion

The Plaintiffs requested extraordinary relief, but even—especially—in these extraordinary times, the letter of the law must still be followed. "The court takes [the COVID-19] concern seriously, and recognizes the critical constitutional, health, and public safety interests the plaintiffs invoke as reasons for swift federal action. But delicate considerations of federalism and separation of powers support abstention in this complex, rapidly evolving situation." *Id.* at *13.

Because Plaintiffs have not carried their burden, their request for preliminary injunctive relief was denied.

Signed May 22, 2020.

ADA BROWN
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS